**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **INTERSPIRO, INC.,**<br><br>**and**<br><br>**SCOTT TECHNOLOGIES, INC., d/b/a/ SCOTT HEALTH & SAFETY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**MINE SAFETY APPLIANCES, INC.,**<br><br>**Defendant-Intervenor.** | **Civil Action No. 06-425C**<br><br>**(Judge Firestone)** |

**PLAINTIFF INTERSPIRO, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

David Hazelton
Joshua Chandler
Latham & Watkins LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Attorneys for Interspiro, Inc.

Of Counsel:
Kevin A. Russell
Kyle R. Jefcoat
David P. Palmer

## TABLE OF CONTENTS

I. QUESTIONS PRESENTED....1

II. STATEMENT OF FACTS....2

A. The Air Force's Draft RFP....2

B. The Air Force's Changes Based on Industry Input....4

C. The Air Force's Final RFP....6

D. Interspiro's Proposal....10

1. The Air Force Determined that Interspiro [redacted]....10

2. Interspiro's Proposal Explained that It Already Had Developed Three-Mode SCBAs On Which It Has Patents Pending....11

E. MSA's Proposal....12

F. The Air Force's Evaluation Materials....15

G. The Air Force's Agreement to Take "Corrective Action" In Light of Prior GAO Protests....16

III. ARGUMENT....17

A. The Air Force Ignored Facts Establishing the Superiority of Interspiro's Proposal....18

1. The Air Force's Evaluation Ignored that [redacted]....19

2. The Air Force's Evaluation Ignored that [redacted]....19

3. The Air Force Ignored that [redacted]....21

B. The Air Force Ignored Critical Facts Establishing that MSA's Proposal Should Have Been Eliminated Or, At Least, Substantially Downgraded....23

1. [redacted]....24

2. [redacted]....24

3. [redacted] ....26

C. The Air Force's Scoring of Proposals Was Unreasonable and Inconsistent with the RFP's Terms ....26

1. Design Approach ....27

a. [redacted] ....27

b. [redacted] ....29

c. [redacted] ....29

d. [redacted] ....30

2. Production Program Plan ....31

3. Interspiro's Past and Present Performance ....32

D. The Air Force's "Corrected" SSDD Failed to Provide a Reasonable Basis [redacted] ....33

E. Interspiro's Request for a Permanent Injunction Should Be Granted ....36

1. Success on the Merits ....36

2. Irreparable Injury ....37

3. Public Interest ....39

4. Balance of Harms ....39

IV. CONCLUSION ....40

**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**

## TABLE OF AUTHORITIES

**CASES** **PAGES**

Advanced System Technology, Inc. v. United States,
69 Fed. Cl. 474 (2006) ....................36

Aero Corp., S.A. v. United States,
38 Fed. Cl. 739 (1997) ....................37

Aeroplate Corp. v. United States,
67 Fed. Cl. 4 (2005) ....................36, 39

Alfa Laval, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999)....................18

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005)....................37

Blue & Gold Fleet, LP v. United States,
70 Fed. Cl. 487 (2006) ....................39

Chapman Law Firm v. United States,
63 Fed. Cl. 519 (2005) ....................17

CSE Construction Co., Inc. v. United States,
58 Fed. Cl. 230 (Fed. Cl. 2003) ....................17, 23, 24

CW Government Travel, Inc. v. United States,
61 Fed. Cl. 559 (2004) ....................39

Galen Medical Associates, Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004)....................17, 27

In re: Premier Engineering & Manufacturing, Inc.,
B-283028, B-283028.2, Sept 27, 1999, 99-2 CPD ¶ 65 ....................21

In re: Trimble Navigation, Ltd.,
B-271882, B-271882.2, Aug. 26, 1996, 96-2 CPD ¶102....................21

Keco Industrial, v. United States,
428 F.2d 1233 (Ct. Cl. 1970) ....................38

Madey v. Duke University,
413 F. Supp. 2d 601 (M.D.N.C. 2006) ....................22

Mark Dunning Industrial Inc. v. Perry,
890 F. Supp. 1504 (M.D. Al. 1995) ........................................................ 38

Overstreet Electric Co. v. United States,
47 Fed. Cl. 728 (2000) ........................................................ 38

PGBA, L.L.C. v. United States,
57 Fed. Cl. 655 (2003) ........................................................ 38, 39

Systems Plus, Inc. v. United States,
69 Fed. Cl. 757 (2006) ........................................................ 18, 23

Transatlantic Lines LLC v. United States,
68 Fed. Cl. 48 (2005) ........................................................ 39

United International Investigative Services, Inc. v. United States,
41 Fed. Cl. 312 (1998) ........................................................ 38

Vantage Associates, Inc. v. United States,
59 Fed. Cl. 1 (2003) ........................................................ 17

**STATUTES**

48 C.F.R. § 2.101 ........................................................ 20, 24

48 C.F.R. § 15.305(a) ........................................................ 17

48 C.F.R. § 27.104(d) ........................................................ 23

10 U.S.C. § 2305(b)(1) ........................................................ 17

28 U.S.C. § 1498(a) ........................................................ 22

35 U.S.C. § 283 ........................................................ 23

**OTHER**

2005 Annual Report: The Business of MSA ........................................................ 9

Pursuant to Rule 52.1 of the United States Court of Federal Claims, and the Order entered by the Court on July 13, 2006, Plaintiff Interspiro, Inc. ("Interspiro"), respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Judgment.

## I.
## QUESTIONS PRESENTED

1. Whether the Air Force's evaluation of Interspiro's proposal ignores critical facts including that: [redacted];[1] (b) Interspiro was the only [redacted]; and (c) Interspiro has patents pending on multiple mode SCBA technology and products.

2. Whether the Air Force's evaluation of the proposal of Mine Safety Appliances, Inc. ("MSA"), which the Air Force selected for award, ignored critical facts including that: (a) MSA failed to propose a [redacted] as required by the RFP; (b) MSA's own proposal acknowledges that its technical solution [redacted]; and (c) MSA's proposed SCBA raises serious patent infringement issues.

---

1 The RFP requires a SCBA which operates in three different modes (SCBA only mode, SCBA and Air Purifying Respirator ("APR") selectable mode, and SCBA and Powered Air Purifying Respirator ("PAPR") selectable mode). It also requires the ability to transition between modes without exposing the wearer to the contaminated atmosphere in which the SCBA is to be used. For ease of reference, the type of SCBA specified in this procurement may be identified herein as a "Three-Mode SCBA."

3. Whether the Air Force's scoring of proposals was reasonable and consistent with the RFP's requirements.

4. Whether the "corrective action" taken by the Air Force in response to the prior protests of Interspiro and Scott Technologies, Inc. ("Scott") adequately resolved the problems identified in those protests and reasonably supports the Air Force's award to MSA [redacted].

## II.
## STATEMENT OF FACTS

### A. The Air Force's Draft RFP[2]

Several months prior to the RFP's issuance, the Air Force issued a Draft RFP that did not include either PAPRs or SCBA/PAPR combination units within the scope of this procurement. See "Draft Request for Proposal (RFP) FA8518-05-R-76133," published in Federal Business Opportunities ("FBO"), Feb. 10, 2005. The Air Force specifically sought industry input from prospective offerors on the draft RFP:

> Sources are encouraged to look over the *Draft* Request For Proposal for the Self Contained Breathing Apparatus (SCBA) which has been posted to this website. Any questions or comments may be presented at the International Forum to be held on 1 March 2005, or may be provided in writing in advance to Cheri Thetford at Cheri.Thetford@robins.af.mil or Lauren Farrell at Lauren.Farrell@robins.af.mil.

A copy of the Air Force's notice and Draft RFP are set forth at App., Exhibit ("Ex.") A.

---

2 The record of these pre-RFP events are reflected in Federal Business Opportunities ("FBO"), which is the official publication of procurement notices by federal agencies. See 48 C.F.R. § 2.101 (designating the FBO website as the "Government point of entry" where all "proposed contract actions, solicitations, and associated information" are posted). Although clearly part of the procurement record and directly relevant to the issues in this case, Defendant failed to include these or related materials in the version of the AR that it filed with the Court. Interspiro is therefore providing these and other relevant materials in Plaintiff's Appendix in Support of Its Motion for Judgment on the Administrative Record ("App.").

Indeed, the Air Force went through an extensive process to obtain industry input in connection with this procurement. As far back as August 11, 2004, the Air Force issued a "Sources Sought Notice" explaining that Warner Robins Air Force Base was "preparing a solicitation package for a long-term contract for SCBAs." FBO, Aug. 11, 2004, set forth at App., Ex. B. This FBO notice further explained that the Air Force was seeking industry input "[i]n an effort to identify the most current features and capabilities of SCBAs in the market." Id. at 40. The Air Force provided offerors with a copy of a Draft Performance Specification for the SCBAs that the Air Force anticipated procuring at that time. See App., Ex. C.

In its FBO notice on August 11, 2004, the Air Force also provided a link to a "Market Research Questionnaire" that prospective offerors were requested to complete. See Administrative Record ("AR") at 1875-76. The Air Force's Questionnaire asked a variety of questions about the features and capabilities of SCBAs currently offered by prospective offerors. In its Reply to the Air Force's Questionnaire, Interspiro explained:

[redacted]

App., Ex. D at 66 (emphasis added).

Interspiro's Reply further explained that [redacted] Id. at 67 (emphasis added). Moreover, in response to the Air

Force's question whether Interspiro's products are "part of your company's commercial product line or does your company build on an order-by-order basis," Interspiro responded:

[redacted]

Id.

Although Defendant has not included industry input from other prospective offerors in the version of the AR that it filed with the Court, nothing in the AR as filed by Defendant has been found suggesting that [redacted] The record thus supports the conclusion that Interspiro [redacted] had developed Three-Mode SCBA products that [redacted] App., Ex. D at 67. This record also establishes that the Air Force was on notice, even during the pre-RFP phase of this procurement, that Interspiro had a [redacted] on its products offering [redacted] capability. Id. at 66.

**B. The Air Force's Changes Based on Industry Input**

Based on industry input in response to its pre-RFP request, the Air Force made two major changes to this procurement. First, on February 18, 2005, the Air Force published in the FBO a new SCBA Purchase Description ("PD") that redefined the nature of the SCBAs being procured. A copy of this new PD is set forth at App., Ex. F. Because the Air Force published this new PD

with tracked changes, it is easy to see the explicit addition of the requirement that the SCBA operate in multiple modes. See, e.g., id. at 80, 84. Specifically, the new PD specifies a unit that can operate in three different modes: "1.) SCBA only mode, 2.) SCBA and APR selectable mode, and 3.) SCBA and PAPR selectable mode." Id. at 80. The new PD further added language requiring that: "During transition of SCBA to APR or PAPR mode, the wearer shall not be exposed to inhalation, absorption, or ingestion contamination." Id. at 84. Thus, in contrast to the Air Force's old Draft Performance Specification, the new PD incorporated into the RFP as issued required that all offerors propose only SCBAs capable of performing in all three modes.[3]

This change marks a major technological breakthrough in SCBA capability. The traditional single mode SCBA allowed an emergency service responder to breathe compressed air from an air cylinder when working in a hazardous environment. App., Ex. C at 42. The cylinder provides an air supply for, at most, between 45 and 60 minutes. Id. at 47. Thus, with the traditional SCBA, the wearer must exit the hazardous conditions before the air supply runs out or risk exposure to the contaminated atmosphere. However, with the Three-Mode SCBA specified in the Air Force's new PD, the wearer can switch from the air cylinder to an air

---

3 These provisions were not included in the Draft Performance Specification accompanying the Air Force's FBO notice on August 11, 2004. Under the prior Draft Specification, an offeror could have proposed a system with a mask for SCBA only operation and a separate mask for PAPR operation. The Air Force addressed this issue in a "Questions and Answers" document posted on FBO on January 14, 2005. App., Ex. E at 75-76 (Question and Answer No. 15). The Air Force explained that "it is impossible for a wearer to switch masks without ambient exposure." Id. That is, under the old Performance Specification, an offeror could have proposed a product under which the wearer would be exposed to environmental contaminants when transitioning from an SCBA only mode to a PAPR mode. In light of this significant problem, the Air Force provided notice of a change to the specifications to require an SCBA that allows for transition between modes without ambient exposure. Id.

purifying respirator (either powered or unpowered) without exposure to the contaminated atmosphere. App., Ex. F at 84. This new technology allows for continued work in the contaminated environment for a much longer period of time. The life saving and other benefits of a multiple mode SCBA are thus readily apparent.

The second major change made by the Air Force is that, in addition to redefining the SCBAs being procured, the Schedule in the RFP as issued added separate line items for PAPRs as well as SCBAs with and without PAPRs. AR at 7-14. This approach allows the Air Force to procure SCBAs to which PAPRs can be attached as needed. Stated differently, although all of the SCBAs being procured under the RFP must be capable of operating in all three modes, there may be occasions when this three-mode capability is not necessary (e.g., when a very limited time in a contaminated environment is anticipated). The RFP's Schedule therefore provided for the procurement of Three-Mode SCBAs without the PAPR attached (which are less expensive than SCBAs with PAPRs, see, e.g., AR at 211-12) and the purchase of PAPR units under a separate line item which could be attached to the SCBAs when needed (e.g., when the wearer goes into a contaminated environment for a potentially longer period of time). See AR at 7-13 (providing line items for "SCBA with PAPR," "SCBAs without PAPR," and "PAPR Only").

## C. The Air Force's Final RFP

The Air Force issued the RFP on August 1, 2005 (AR at 5), and required offerors to submit proposals no later than September 16, 2005 (id. at 1). With the exception of the significant changes noted in the preceding section, the final RFP is very similar in many respects to the Draft RFP. Compare id. at 5-37 (RFP as issued), with App., Ex. A (Draft RFP). For example, both the Final RFP and the Draft RFP provide repeatedly that the Air Force is procuring "commercial items." Indeed, the RFP as issued is on a standard form entitled "Solicitation/Contract Order for Commercial Items." AR at 5-6 (emphasis added).

The Air Force made a careful and deliberate decision to conduct this procurement as an Acquisition of Commercial Items. In a Determination dated April 1, 2005, the Air Force's Contracting Officer responsible for the RFP stated:

> Whether the customers are public fire departments, municipal emergency response units or Department of Defense customers, the ways in which the SCBAs are manufactured, distributed, and procured are so similar that there is little difference among customer requirements. The form, fit, and function of the units as well as the methods of procurement, i.e. design practices, testing requirements, quality control institutions, manufacturing processes, and installation/assembly work are largely uniform in the industry. Thus, this instant requirement is considered a commercial item pursuant to the definition of commercial item in FAR 2.101, and the procedures in FAR 12 are applicable for this acquisition effort.

AR at 1882 (emphasis added).

Consistent with the Contracting Officer's Determination, the RFP as issued included clauses from the FAR and Department of Defense FAR Supplement ("DFARS") applicable to the Acquisition of Commercial Items under FAR Part 12. It contains FAR "52.212-5 Contract Terms and Conditions Required to Implement Statutes or Executive Orders-Commercial Items." Id. at 15-17 (emphasis added). The heading to this subsection explains that it is included "IAW [in accordance with] FAR 12.301(b)(4)." Id. at 15. FAR 12.302(b)(4) provides that the clause at 52.212-5 "may not be tailored" and that it "incorporates by reference only those clauses required to implement provisions of law or executive order applicable to the acquisition of commercial items." (Emphasis added.)

The RFP also contains DFARS "252.212-7001 Contract Terms and Conditions Required to Implement Statutes or Executive Orders Applicable to Defense Acquisition of Commercial Items. Id. at 18 (emphasis added). The heading to this subsection explains that it is included "IAW [in accordance with] DFARS 212.301(f)(iii)." Id. DFARS 212.301(f)(iii) provides for the use of the clause at 252.212-7001 "in all solicitations and contracts for commercial items."

(Emphasis added). The RFP also contains sections entitled "Offeror's Representations and Certifications-Commercial Items" and "Instructions to Offerors-Commercial Items." AR at 26 (emphasis added).

Significantly, the RFP does not include FAR or DFARS provisions specifically for research or development procurements. For example, the RFP does not contain the "Authorization and Consent" clause set forth at FAR 52.227-1 which, under certain circumstances, authorizes a contractor to infringe another party's patent when performing a government contract. The Air Force's decision not to include this clause in the RFP is potentially significant in light of Interspiro's patents pending on multiple mode SCBA technology and products.

Neither MSA nor any other offeror protested or otherwise challenged the RFP's express designation of this procurement as one for the Acquisition of Commercial Items. All offerors were thus required to propose "commercial items" in response to the RFP. While they could have requested a change to the RFP's express terms on this issue, all offerors accepted the "commercial item" designation of this procurement without objection. Thus, an offeror which failed to propose a "commercial item" should have been disqualified for failure to satisfy a basic requirement of this procurement.

Further, even if an offeror were not required to be disqualified for failure to propose a "commercial item," any proposal of a non-commercial item should have been downgraded substantially based on the RFP's evaluation factors. One of the RFP's five Evaluation Factors is "Proposal Risk" (Factor II). See AR at 32. Under this factor, the Air Force was supposed to make "an assessment of the potential for disruption of schedule, increased cost, degradation of performance, the [need] for increased Government oversight, and the likelihood of unsuccessful

contract performance." Id. at 33. There are increased risks in each of these enumerated areas when an offeror has never actually manufactured the Three-Mode SCBAs required by the RFP.

Similarly, Subfactor Three under Evaluation Factor I (Mission Capability) could be met only if the offeror had "an acceptable design approach for the modification of the offeror's commercial SCBA units" that met or exceeded "all the requirements of Section 3.0 of the purchase description. . . ." Id. at 32. The "commercial SCBA units" specified in this RFP provision are ones that must be capable of operating in all three modes. See Section II.B above. Moreover, the referenced "Section 3.0 of the purchase description" includes the requirement that: "The wearer shall not be exposed to inhalation, absorption, or ingestion contamination when transitioning from SCBA to APR or PAPR mode." Id. at 43. A single mode SCBA cannot satisfy this requirement.

The RFP also establishes Evaluation Factors for "Present and Past Performance" (Factor III), "Cost/Price" (Factor IV), and "Small Business Participation" (Factor V). Id. at 32. Under Factor III, an offeror's experience on other projects was to be evaluated in terms of relevance. Id. at 34. Because the PD specified that the Air Force was procuring multiple mode SCBAs, an offeror's experience with multiple mode SCBAs should have been determined to be more relevant than another offeror's experience with single mode SCBAs. Regarding Factors IV and V, it is noteworthy that Interspiro [redacted], and that Interspiro is itself a small business while MSA is a large business whose stock is traded on the New York Stock Exchange. See AR at 1872; 2005 Annual Report: The Business of MSA, http://media.msanet.com/www/annual_reports/2005/asp/business.asp.

**D. Interspiro's Proposal**

**1. The Air Force Determined that Interspiro [redacted]**

The Air Force determined that [redacted]

[redacted]

The offeror is advised that the final evaluation ratings of the Mission Capability Factor are as follows:

Subfactor One: [redacted]
Subfactor Two:
Subfactor Three:
Subfactor Four:

The Government's confidence level, [redacted] the SCBA effort. The Government determined that [redacted]

[redacted]

Id.[4]

2. **Interspiro's Proposal Explained that It Already Had Developed Three-Mode SCBAs On Which It Has Patents Pending**

Interspiro's proposal explained repeatedly that it had spent years developing multiple mode SCBAs. For example, it explained:

[redacted]

Id. at 346 (emphasis added). Interspiro has developed and manufactured Three-Mode SCBA working products which readily can be modified to satisfy all specifications. Indeed, the Air Force's own evaluation noted that, [redacted]

---

4 [redacted] Regarding Proposal Risk, the RFP provides for three possible ratings. The best possible rating is "Low," then "Moderate," and finally "High." Id. According to the Air Force's January 12 letter, [redacted]

[redacted]

Id.

[redacted]

These and other statements in Interspiro's proposal expressly put the Air Force on notice that Interspiro had "patents pending" on its multiple mode SCBA technology and products. Id. at 384 [redacted] In fact, Interspiro's proposal [redacted] Id. at 368.

**E. MSA's Proposal**

In its proposal, MSA [redacted] AR at 935. MSA states specifically that [redacted] Id. (emphasis added). MSA's "commercial item" clearly [redacted] which, as documented in Section II.B above, the Air Force had [redacted] in this procurement [redacted].

It is difficult to overstate the extent of MSA's noncompliance. As acknowledged by MSA itself, [redacted]

[redacted] As documented by Interspiro's own experience (as discussed in Sections II.A and D.2 above), it can take several years of investment by an experienced manufacturer of [redacted] to develop and produce a working Three-Mode SCBA.

Because it had never [redacted], MSA acknowledged that [redacted]

[redacted]

[redacted]

Further, when describing its [redacted], MSA explains [redacted] Id. at 935 (emphasis added). This statement further documents in MSA's own words, that it [redacted]

[redacted]

Thus, while MSA [redacted]

Indeed, the Air Force's own field test evaluation results document further that it conducted field tests on--and based the resulting evaluation findings on--[redacted] For example, when scoring MSA's proposal under the "Field Evaluation" Factor, the Air Force [redacted]. Testing of these factors was required by the PD, as noted in the Air Force's own evaluation worksheet documents and elsewhere in the PD's description of the required field evaluation tests. Id., citing PD paragraphs

[redacted] See, e.g. AR at 72-73, 2204-2221.

Stated differently, the Air Force conducted field testing on--and used findings for evaluation purposes of--[redacted] The bottom line is that the Air Force's findings during MSA's field testing have little relevance because they [redacted]

F. **The Air Force's Evaluation Materials**

Based on an extensive review of the Air Force's evaluation materials in the AR, nothing has been found suggesting that the Air Force took into consideration--or even acknowledged--that: (1) Interspiro was responsible for the development of Three-Mode SCBA technology and products; (2) Interspiro has patents pending on multiple mode SCBA technology and products; (3) [redacted]; or (4) Interspiro [redacted] Three-Mode SCBAs that qualify under FAR 2.101's definition of "commercial item."

Nor has anything been found in the AR suggesting that the Air Force's evaluation took into consideration that: [redacted]

[redacted]

Further, although the Air Force was put on specific notice of Interspiro's patents pending on Three-Mode SCBA technology and products, nothing has been found in the AR suggesting that the Air Force took this patent issue into consideration. Nor has any indication been found that the Air Force made any inquiry into the substantial infringement issues raised [redacted] Attached is the Declaration of Roger A. Heppermann ("Heppermann Decl."), who is the attorney of record responsible for the prosecution of Interspiro's patent application related to multiple mode SCBA technology and products. See App., Ex. K. His declaration explains why, if he had been asked, he would have opined that a patent was likely to issue based on Interspiro's patent application.

**G. The Air Force's Agreement to Take "Corrective Action" In Light of Prior GAO Protests**

Interspiro and Scott previously filed bid protests at the GAO challenging the Air Force's actions in connection with the RFP. Based on those protests, the Air Force made a determination that "corrective action" was necessary. See AR at 2117. In light of the Air Force's agreement to take needed "corrective action," the GAO dismissed the protests as "academic" on March 21, 2006. App., Ex. H. Nearly a month passed before the Air Force provided further notice regarding its promised corrective action. In a notice dated April 18, 2006, the Air Force reported that it was reaffirming its award to MSA. AR at 2113. The Air Force reported that it had not conducted an evaluation of proposals as part of the promised corrective action. See id. at 2115.

Moreover, based on the materials now produced by Defendant in the AR in this case, it is clear that the Air Force's "corrective action" consisted only of making minor changes to the Air Force's Source Selection Decision Document ("SSDD"). Compare AR at 1749-55 (Air Force's original SSDD), with id. at 1883-89 (Air Force's "corrected" SSDD).

## III. ARGUMENT

The Air Force violated basic legal requirements governing the conduct of this procurement. The law is well established that an agency must evaluate proposals reasonably and in accordance with the solicitation's terms. See e.g., 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (stating that courts are to ensure that an agency's proposal evaluation is "reasonable and consistent with the evaluation criteria and the applicable statutes and regulations") (internal citation omitted); Vantage Assocs., Inc. v. United States, 59 Fed. Cl. 1, 23 (2003) ("Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.").

If an offeror's proposal fails to comply with a solicitation's terms, it is ineligible for award. See CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 245 (Fed. Cl. 2003) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award.") (quoting In re Gen. Offshore Corp., B-251969.5, B-251969.6, Apr. 8, 1994, 94-1 CPD ¶ 248 at 3); see also Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005) ("[A] proposal that

fails to conform to a material term and condition of the solicitation. . . . is unacceptable and may not form the basis for an award.") (citation omitted).

If an offeror itself acknowledges problems with its proposals, the agency cannot act as if the problems do not exist. See Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999) (agencies are required to ensure that offerors comply with an RFP's terms). An agency cannot simply ignore relevant considerations. See, e.g., Sys. Plus, Inc. v. United States, 69 Fed. Cl. 757, 766 (2006) ("An agency's decision can be found to be arbitrary and capricious where the agency entirely failed to consider an important aspect of the problem") (internal citations omitted).

In this case, as documented below, the Air Force failed to comply with applicable requirements by (A) ignoring critical facts directly relevant to Interspiro's proposal, (B) ignoring critical facts directly relevant to MSA's proposal, (C) scoring both proposals in a manner that was unreasonable and inconsistent with the RFP's terms, and (D) providing an Source Selection Decision Document ("SSDD") that did not [redacted]

**A. The Air Force Ignored Facts Establishing the Superiority of Interspiro's Proposal**

The Air Force acted in an unreasonable, arbitrary and capricious manner by ignoring critical facts directly relevant to the evaluation of Interspiro's proposal including that [redacted]; and (3) Interspiro has patents pending on its multiple mode technology and products. "An agency's decision can be found to be arbitrary and capricious where the agency entirely failed to consider an important aspect of the problem." Sys. Plus, Inc., 69 Fed. Cl. at 766.

1. **The Air Force's Evaluation Ignored that Interspiro Was [redacted]**

Nowhere in the AR does the Air Force acknowledge that [redacted] Interspiro had developed and manufactured Three-Mode SCBA products. In addition, the Air Force [redacted] is all the more troublesome because, during the price evaluation, the Air Force [redacted] AR at 1557 (emphasis added).

Even more unreasonably, the Air Force gave no increased risk ratings to other offerors [redacted]. See AR at 1484, 1487, 1490, 1492-93, 1495 [redacted]. At a minimum, the Air Force was required to evaluate the risks as to whether a successful, working product [redacted] by the other offerors. However, the Air Force failed to take into consideration the risks in the development of a product that can successfully use this technological breakthrough. Id.

2. **The Air Force's Evaluation Ignored that [redacted]**

The Air Force failed to consider whether offerors were proposing "commercial items" even though the RFP repeatedly and emphatically designated this procurement as one for the

Acquisition of Commercial Items. See Section II.C above.[5] When defining "commercial items," FAR 2.101 provides that the definition includes:

> (1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and—
>
> (i) Has been sold, leased, or licensed to the general public; or
> (ii) Has been offered for sale, lease, or license to the general public;
>
> (2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;
>
> (3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for –
>
> (i) Modifications of a type customarily available in the commercial marketplace; or
>
> (ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

48 CFR § 2.101.

---

[5] During the initial status conference with the Court, MSA's counsel argued that the RFP's requirement for the first production units and testing suggested that this procurement was not really a "commercial item" acquisition. However, the reality is that an agency may want to test production units of a "commercial item" to assess whether and how well it meets the agency's requirements. Contrary to MSA's suggestion, there is no inconsistency with a "commercial item" acquisition requiring the testing of first production units. See, e.g., AR at 7 (RFP references first production units).

[redacted] Offerors proposing products that did not meet this definition should have been disqualified from the competition. See, e.g. In re: Trimble Navigation, Ltd. B-271882, B-271882.2, Aug. 26, 1996, 96-2 CPD ¶ 102 (sustaining a protest against a nondevelopmental item procurement where the winning bidder did not offer a nondevelopmental item); see also In re: Premier Eng'g & Mfg., Inc., B-283028, B-283028.2, Sept. 27, 1999, 99-2 CPD ¶ 65 (holding that a determination that an item is a commercial item may be overturned if it is unreasonable).

### 3. The Air Force Ignored that Interspiro Had Patents Pending on Multiple Mode SCBA Technology and Products

The Air Force also failed completely to consider Interspiro's pending patent applications on multiple mode SCBA technology and products. For example, [redacted]—all of which the Air Force ignored.[6] The Air Force instead turned a blind eye to Interspiro's repeated statements that it had patents pending on the type of SCBA specified in this procurement.[7] Interspiro also alerted the Air Force to the significance of

---

6 See, e.g., Heppermann Decl. ¶ 7, and attachments thereto (explaining that a patent will likely issue on Interspiro's patent application and providing copies of the application); Declaration of Wade Grimm, set forth at App., Ex. I at ¶ 4 [redacted]

7 See, e.g., App., Ex. D at 66 [redacted]

(continued...)

this patent issue. Interspiro directly addressed the risk inherent in going forward with a technology which might violate another patent [redacted] AR at 368. Moreover, Interspiro's patent application was a publicly available document which the Air Force could have located and reviewed. See Hepperman Decl. ¶ 4.

A contractor may in some instances be able to infringe another party's patent while performing a government contract pursuant to 28 U.S.C. § 1498. However, for the contractor to avail itself of Government protection under 28 U.S.C. § 1498, the contractor must be acting "with the authorization or consent of the Government." In other words, for the Air Force to permit a contractor like MSA to infringe Interspiro's patents, the Government would have to provide "authorization or consent." 28 U.S.C. § 1498(a); see also Madey v. Duke Univ., 413 F. Supp. 2d 601, 607 (M.D.N.C. 2006) ("In order to claim the protection of the affirmative defense provided by § 1498, the private party must establish that its use is (1) 'for the Government'; and (2) 'with the authorization or consent of the Government.'") (citation omitted).

Neither authorization nor consent exists in this RFP. When the Government wishes to consent to a contractor's patent infringement during a procurement, "[t]he federal procurement regulations recognize the varying types of consent that may be included in certain Government contracts." Madey, 413 F. Supp. 2d at 608 (citing FAR § 27.201-2(a), FAR § 27.201(b), and FAR § 52.227-1 as examples of authorization and consent provisions). Indeed, an exhaustive

---

(...continued)
[redacted] (emphasis added).

search of the RFP demonstrates not only a lack of any explicit authorization or consent to infringe language, but it also yields no indemnification clause by the Air Force for patent infringement. The lack of an indemnification provision is noteworthy because the FAR calls for such provisions when the Government intends to authorize an infringement. "Generally, the Government should be indemnified against infringement of U.S. patents resulting from performing contracts when the supplies or services acquired under the contracts normally are or have been sold or offered for sale by any supplier to the public in the commercial open market or are the same as such supplies or services with relatively minor modifications." 48 C.F.R. § 27.104(d). In short, the Air Force knew of Interspiro's patent applications, yet chose not to include any authorization or consent for other infringement by offerors.

The Air Force failed to take into consideration that, without such authorization and consent, there is a range of normal remedies for infringement, including monetary damages and the possibility of an injunction. See 35 U.S.C. § 283 (allowing courts to "grant injunctions . . . to prevent the violation of any right secured by patent"). Nowhere in the AR does the Air Force even attempt to (1) verify Interspiro's claimed patents, (2) assess Interspiro's chances of having the patents awarded, (3) evaluate whether other offerors infringe those patents, or (4) consider the impact both to costs or to production risks from potential infringement. The Air Force's failure to even consider these factors was arbitrary, capricious and unreasonable. Sys. Plus v. United States, 69 Fed. Cl. at 766.

**B. The Air Force Ignored Critical Facts Establishing that MSA's Proposal Should Have Been Eliminated Or, At Least, Substantially Downgraded**

Because MSA failed to propose [redacted] as specified in the RFP, the Air Force should have eliminated its proposal from this procurement. See, e.g., CSE Constr. Co., 58 Fed. Cl. at 245 (citation omitted) ("any proposal that fails to conform to material terms and

conditions of the solicitation should be considered unacceptable and may not form the basis for an award"). Indeed, as explained below, MSA failed to [redacted].

**1. MSA [redacted]**

The FAR's definition of "commercial items" generally requires that the item has been sold or has been offered to the general public. See 48 CFR § 2.101. An exception to that general requirement applies when the item in question "evolved" from an item sold or offered to the public. See id. [redacted]

**2. MSA's Own Proposal Acknowledges [redacted]**

The Air Force's rating of MSA's proposal risk [redacted] was arbitrary, capricious, and in violation of the RFP's express terms. The RFP required each offeror to assess the risks posed by various aspects of its design approach "in accordance with MP5315.305, paragraph 5.5.2," which is the same risk assessment system that the Air Force is supposed to use in assessing proposals. AR at 27; see also AR at 33 (requiring the Air Force to use MP5315.305 ¶ 5.5.2). [redacted] AR at 660. Notably, [redacted]

[redacted]

Id.[8]

These risk ratings demonstrate [redacted] a "High" risk rating is reserved for features that are "[l]ikely to cause significant disruption of schedule, [i]ncreased cost or degradation of performance." AR at 33 (emphasis added). Moreover, such "[r]isk[s] may be unacceptable even with special contractor emphasis [a]nd close Government monitoring." Id. (emphasis added). Moderate risk ratings are reserved for situations in which "Contractor emphasis and close Government monitoring" will be required to overcome difficulties. Id.

[redacted] See AR at 1492. In doing so, the Air Force ignored the plain terms of the RFP and the [redacted], and instead simply [redacted] AR at 1493. The Air Force's decision to unilaterally ignore

---

8 [redacted]

[redacted] of the risks was arbitrary, capricious, and contrary to law, and requires that the award to MSA be set aside.

**3. MSA [redacted]**

The RFP incorporates detailed requirements for testing of proposed SCBAs. AR at 75-92. The "Field Evaluation Exercise" is specifically identified as "a mandatory part of this specification." Id. at 72. As part of the "Test Reporting," a table providing the field test findings was required for "each operational mode test exercise." Id. at 75. However, because MSA provided [redacted] (see Section II.E above), the Air Force could not conduct tests on the operation of MSA's products [redacted] See AR at 2204-2221 (evaluator worksheets [redacted]. Nor could the Air Force conduct tests on other features required by the RFP but [redacted]. Id.

Not only should MSA have been significantly downgraded [redacted] also should have resulted in its elimination from the competition as a noncompliant offeror.

## C. The Air Force's Scoring of Proposals Was Unreasonable and Inconsistent with the RFP's Terms

The Air Force's evaluation of the proposals of Interspiro and MSA was objectively unreasonable and inconsistent with the RFP's terms because it (1) unreasonably rated MSA's "Design Approach" as "Blue/Exceptional" [redacted]; and (3) did not adhere to the terms of the RFP

and ignored critical facts in assessing Interspiro's past and present performance. The law is well established that an award must be set aside where an agency has evaluated an offeror's proposal unreasonably or in a manner inconsistent with the terms of the applicable solicitation, regulations, or statutes. See, e.g. Galen Med., 369 F.3d at 1330 (stating that courts are to ensure that an agency's proposal evaluation is "reasonable and consistent with the evaluation criteria and the applicable statutes and regulations"). Applying these standards to the Air Force's evaluation of proposals in this case makes clear that the award to MSA cannot stand.

1. **Design Approach**

The Air Force rated MSA's proposal as "Blue/Exceptional" with a "Low" proposal risk rating [redacted]

As set forth below, the Air Force's assessment of each of these factors was arbitrary, capricious and contrary to the RFP's terms.

[redacted]

The Air Force based its rating of MSA's design approach [redacted]. AR at 1492. Of all the factors leading to [redacted] this appears, based on the record, to have been most important. For example, the Air Force states that [redacted]

[redacted] AR at 1492.

However, [redacted] Rather, MSA explicitly states [redacted] The Air Force's evaluation reflects that the evaluation team did not consider basic information [redacted]

Significantly, [redacted] Indeed, the very purpose of having an SCBA mode is for use in environments in which it is not safe to breathe filtered air, and would be frustrated if filtered air from the APR or PAPR

were allowed to infiltrate the apparatus in SCBA mode. See Brookman Decl. ¶ 11; see also AR at 1315. Accordingly, [redacted] In this mode, a user can safely remove the APR filter and replace it while breathing only supplied air. And because [redacted] allows a user to transition from SCBA only to APR or PAPR modes and back with no exposure to the ambient air--as required by the Air Force's Purchase Description--any compliant product would permit the wearer to replace the filters in contaminated areas. [redacted] See AR at 345.

In sum, because the Air Force ignored [redacted] with respect to this feature and ignored the fact that any compliant proposal would offer this feature, [redacted] was arbitrary and capricious.

[redacted]

The Air Force also based its [redacted].

c. [redacted]

The Air Force's uncritical acceptance of [redacted] was unwarranted. [redacted] AR at 660. Moreover, 60 minutes of 4500 psi compressed air weighs no less than 6.5 pounds. See AR at 357 (showing difference in weight

of filled and empty 60 minute cylinders is 6.5 pounds). Yet, [redacted] Id. Because the Air Force accepted [redacted] was arbitrary and capricious.

[redacted]

The Air Force [redacted].

First, the PD requires that an offeror propose a PAPR that "is designed to operate in low and high flow rate modes with visual indication of operation mode." AR at 48. However, [redacted]

[redacted][9]

Because the Air Force [redacted] was arbitrary, capricious, and contrary to the RFP's terms.

**2. [redacted]**

The Air Force's assessment [redacted] was arbitrary and capricious because it failed to properly perform the arithmetic necessary to assess Interspiro's ability to meet the government's surge requirements.[10] Surge capability was measured under the contract as the total number of units an offeror could produce and deliver over a 60 day time period, and 10 units per day, or 300 units per month, was considered a minimum ability.[11] AR at 1488. [redacted] AR at 186. The Air Force rated [redacted]

9 [redacted]

10 [redacted]

11 An additional reason why the Air Force's assessment of risk based on this factor was unreasonable is that this threshold did not appear anywhere in the RFP or other relevant materials.

[redacted]

However, a simple look at the solicitation [redacted] would have revealed that the BEQ for the first contract year is 1330 units, and the BEQ for the second year is 2000 units. See AR at 7-14; AR at 372 [redacted] Using the proper BEQ, [redacted] Because its assessment relied on a clear error in interpreting Interspiro's proposal and the RFP's terms, the Air Force's assignment [redacted] was arbitrary and capricious.[12]

3. [redacted] **Past and Present Performance**

Based on the facts and the RFP's terms, it was unreasonable and contrary to law for the Air Force to [redacted] The RFP specifically set out that the past performance would be evaluated on "the development and production" of various technologies associated with this procurement. See AR at 34. The Air Force in fact did not consider "development" of the products in this procurement whatsoever. MSA [redacted]

---

12 The Air Force also ignored [redacted] Even using the Air Force's incorrect annual BEQ of 1000 units yields a normal monthly production volume (in addition to the surge volume of 250 units) of 83 units, for a total production ability of 333 units, which exceeds the government's requirement and would have resulted [redacted]

[redacted]

Moreover, the Air Force's Past Performance evaluation failed to consider [redacted] In addition to the references listed in the proposal, the Air Force was required by the RFP to consider information from "other sources known to the government" as well as information from "key subcontractors." AR at 34. [redacted] See AR at 243.

**D. The Air Force's "Corrected" SSDD Failed to Provide a Reasonable Basis for** [redacted]

The Air Force itself recognized the need to take "corrective action" in light of the problems in the evaluation process identified in Interspiro's and Scott's prior GAO protests. AR at 2117. The Air Force further agreed that, as part of this "corrective action," it would "reconsider the proposals" and "issue a new Source Selection Decision Document." Id. Interspiro's GAO protest filings had identified numerous problems with the Air Force's evaluation of proposals under the RFP. See, e.g., id. at 1890-1930, 2010-66. One of the several issues raised [redacted]

13 The present RFP similarly calls for the integration of the SCBA/PAPR with a protective suit. "SCBA system must interface with JSLIST [Joint Service Lightweight Integrated Suit Technology] & JFIRE [Joint Firefighter's Integrated Response Ensemble] garments." AR at 47.

[redacted] See, e.g., AR at 1896, 2018. For example, it explained:

> [redacted]

Id. at 1896.[14]

However, after acknowledging the need for "corrective action," the Air Force acknowledges that it did not conduct a new evaluation of proposals. Id. at 2038. The Air Force simply issued a revised SSDD. AR at 1883-89. In the original SSDD, the Air Force offered no explanation of [redacted] Id. at 1888-89.

---

14 Other cost-related factors identified by Interspiro, but ignored by the Air Force, were:

[redacted]

Id. at 1896.

The Air Force's focus [redacted] is significant because, as explained below, the "corrected" SSDD ignored critical issues that, when taken into consideration, strongly favor Interspiro over MSA on this issue. For example:

[redacted] MSA itself [redacted]

[redacted]

The bottom line is that [redacted] and that the lives of Air Force personnel truly would be put at risk if they are not provided with SCBA/PAPR protection in a timely and proper manner. The Air Force ignored these and other facts that refute the conclusion set forth in the SSDD. The reality is that, [redacted] Therefore, if the Air Force had conducted a reasonable and proper evaluation consistent with the RFP's terms, Interspiro would

have been in line for award (including because [redacted]

E. **Interspiro's Request for a Permanent Injunction Should Be Granted**

Given the Air Force's failure to comply with the legal requirements governing the conduct of this procurement, the Court should grant the permanent injunction sought by Interspiro. The four factors justifying injunctive relief are satisfied based on the uncontroverted facts and established law: (1) success on the merits; (2) irreparable injury to Interspiro if the Air Force is not enjoined; (3) the public interest; and (4) the harm to Interspiro outweighs the harm to the Defendant. See Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 13 (2005). "No one factor is dispositive, and 'the weakness of the showing regarding one factor may be overborne by the strength of the others.'" Advanced Sys. Tech., Inc. v. United States, 69 Fed. Cl. 474, 483 (2006) (internal citation omitted).

1. **Success on the Merits**

Interspiro has demonstrated success on the merits in this case because the Air Force has violated the applicable law by failing to comply with the legal requirements governing the conduct of this procurement. As explained by this Court in Advanced Systems Technology, "[i]n a bid protest action, the Court reviews the defendant's decision under the standards in the APA. The APA directs a reviewing court to overturn agency actions that are 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A)." 69 Fed. Cl. at 483 (internal citations omitted). The Air Force's actions were clearly "arbitrary, capricious . . . [and] not in accordance with law" because they demonstrate a failure to comply with the legal requirements governing this procurement's evaluation. This prong of the test for injunctive relief is met by the uncontroverted facts and arguments presented above.

Interspiro was also prejudiced by the Air Force's actions. As this Court has explained, a plaintiff may demonstrate prejudice it if shows that "there was a substantial chance [plaintiff's proposal] would have [been found to be within the competitive range] but for that error." Aero Corp., S.A. v. United States, 38 Fed. Cl. 739, 767 (1997) (quoting Statistica Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). This "substantial chance" standard is a lenient one. It does not require proof that but for the errors, Interspiro would have won the contract. See Bannum, Inc. v. United States, 404 F.3d at 1346, 1358 (Fed. Cir. 2005). The Air Force's failure to comply with the legal requirements governing the conduct of this procurement has effectively denied Interspiro a fair and meaningful opportunity to compete for this procurement – a procurement which Interspiro had more than a "substantial chance" of winning but for the Air Force's deficient evaluation process. The following section further documents the prejudice to Interspiro.

2. **Irreparable Injury**

The Air Force's failure to comply with the legal requirements governing the conduct of this procurement caused irreparable harm to Interspiro because it effectively denied Interspiro the opportunity to fairly compete for an award that Interspiro would otherwise have won. It is beyond dispute that Interspiro has the resources and experience to perform the work at issue in this RFP. [redacted]. AR at 243. It was only because the Air Force ignored critical facts and evaluated Interspiro's and MSA's proposals in a manner both objectively unreasonable and in contradiction of the express terms of the RFP (as set forth above) that MSA was even deemed eligible for award, let alone received it over Interspiro. See Section III, B-C above.

Particularly significant in this regard are the Air Force's (a) decision to ignore [redacted] and Interspiro's pending patent, (b) failure to field test the

actual Three Mode SCBAs it was procuring, as required by the RFP, (c) complete disregard of the [redacted] (d) flawed evaluations of MSA's and Interspiro's production plan, design, and past performance, [redacted] and (e) failure to reasonably assess the differences between Interspiro's and MSA's proposals to determine [redacted] Id. If the Air Force had evaluated the proposals for this procurement in accordance with relevant legal requirements, Interspiro would have been in line for award.

Although Interspiro maintains that an evaluation based on the terms of the RFP would have resulted in an award to it, the actual standard for a finding of irreparable harm is much lower, and Interspiro easily meets it. For example, this Court has repeatedly acknowledged that a lost opportunity to fairly compete constitutes sufficient irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 744 n.25 (2000) (finding irreparable harm and granting injunction because of protester's "lost opportunity to compete in a fair competitive bidding process.").[15] The Air Force's numerous failures to comply with the terms of the RFP and other relevant legal requirements satisfy this requirement.

Interspiro has no other adequate remedy. Interspiro may not recover profits for a procurement contract that "never actually came into existence." See Keco Indus., v. United States, 428 F.2d 1233, 1240 (Ct. Cl. 1970). Interspiro's only alternative at law--recovery of bid proposal costs for this RFP--is inadequate as a matter of law. See Mark Dunning Indus. Inc. v.

---

15 See also PGBA, L.L.C. v. United States, 57 Fed. Cl. 655 at 664 (2003) ("This Court has acknowledged that a lost opportunity to compete may constitute an irreparable harm."); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he [lost] opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm.").

Perry, 890 F. Supp. 1504, 1517 (M.D. Al. 1995) ("The federal courts have recognized the inadequacy of the Court of Claims remedy" to only recover bid preparation costs.). The very inadequacy of this remedy by itself demonstrates that a bid protestor has been irreparably harmed. See, e.g., Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 514 (2006).

**3. Public Interest**

Granting the injunctive relief requested by Interspiro is in the public interest. As this Court has repeatedly noted, "[i]t is well-established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004).[16] Furthermore, "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." PGBA, 57 Fed. Cl. at 663. This is especially true where, as here, the government intends to [redacted] for a product that it improperly evaluated, poses substantial risks, and is not [redacted]

**4. Balance of Harms**

Finally, the harm to Interspiro if the Air Force is not enjoined outweighs any possible harm to the Air Force. "Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor." PGBA, 57 Fed. Cl. at 663. In particular, "[t]he balance of hardships element requires 'a consideration of the harm to the government.'" CW Gov't Travel, 61 Fed. Cl. at 575. The Government's interest in violating the legal requirements

---

16 See also Aeroplate, 67 Fed. Cl. at 13 ("It is in the public interest for the Government to conduct fair procurement procedures, and to give honest and fair consideration to all bids."); Transatlantic Lines LLC v. United States, 68 Fed Cl. 48, 57 (2005) ("The public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations.").

AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC

governing the conduct and evaluation of this procurement is nonexistent. As set forth above, Interspiro has documented the irreparable harm it will suffer absent injunctive relief, as well as how such relief will serve the public interest. Accordingly, the balance of hardships tilts in Interspiro's favor.

Because Interspiro has demonstrated both that the Air Force has failed to comply with the legal requirements governing the conduct of this procurement, and that the factors justifying injunctive relief weigh in Interspiro's favor, this Court should enjoin the Air Force by requiring that it: (a) terminate and cancel the contract awarded to MSA under this RFP; (b) award the contract to Interspiro consistent with the RFP's terms and applicable law; and (c) take any other corrective action as appropriate.

## IV. CONCLUSION

Based on the established facts and legal precedent, the Court should grant Interspiro's Motion for Judgment on the Administrative Record. Interspiro respectfully requests that the Court enter a permanent injunction requiring that the Air Force either make an award to Interspiro, or alternatively, conduct a new evaluation of proposals that complies with the RFP's terms and takes all relevant factors into consideration.

Dated: July 19, 2006

Respectfully Submitted,

David R. Hazelton (Counsel of Record)
Joshua K. Chandler
LATHAM & WATKINS LLP
555 11th St., N.W., Suite 1000
Washington, D.C. 20004-1304
Direct Dial: (202) 637-2254
Facsimile: (202) 637-2201

Attorneys for Plaintiff Interspiro, Inc.