**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-425C
(Judge Firestone)

INTERSPIRO, INC., and

SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant, and

MINE SAFETY APPLIANCES CO.,

Defendant-Intervenor.

DEFENDANT'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202)307-0300
Facsimile: (202)305-7643
Attorneys for Defendant

OF COUNSEL

JAMES CAINE
JOHN G. TERRA, MAJOR
United States Air Force

# TABLE OF CONTENTS

PAGE(S)

STATEMENT OF THE ISSUE . . . . . 1

STATEMENT OF FACTS . . . . . 2

A. Overview Of The Procurement . . . . . 2

B. Background To The Procurement . . . . . 2

C. The Procurement Process . . . . . 3

D. The GAO Proceeding . . . . . 6

ARGUMENT . . . . . 6

I. Scope And Standard Of Review . . . . . 6

II. Scott Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law . . . . . 8

A. The Air Force Did Not Evaluate MSA's [redacted] . . . . . 8

B. The Air Force Did Not Waive Any Technical Requirement For MSA . . . . . 9

C. The Air Force Did Not Waive Its Warranty And Maintenance Requirements For MSA . . . . . 17

D. The Air Force Properly Evaluated MSA's Proposal Risk . . . . . 19

III. Interspiro Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law . . . . . 21

A. The Air Force Did Not Ignore Any Relevant Facts In Its Evaluation Of Interspiro's Proposal . . . . . 21

1. The Air Force Properly Declined To Evaluate Interspiro's [redacted] System . . . . . 21

2. The Air Force Properly Was Not Required To Conclude That Interspiro [redacted] Had A Commercial Three-Mode SCBA . . . . . 23

B. The Air Force Properly Evaluated MSA's Proposal . . . . . . . . . . . . . . . . . . . . . . 27

1. MSA's Product Properly Met The Definition Of "Commercial Item" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. The Air Force Properly Evaluated MSA For Its Design Approach . . . . . 28

3. MSA Was Not Required To Provide [redacted] For Field Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. The Air Force Properly Evaluated MSA And Intersprio's Design Approach . . . 30

1. [redacted] . . . . . . . . . . . . . . . . 30

2. [redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. [redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4. [redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D. The Air Force Properly Evaluated Interspiro's Production Program Plan . . . . . . 33

E. The Air Force Properly Evaluated Interspiro's Past And Present Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

F. The Air Force Decision To Award The Contract To MSA Was Not Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV. Interspiro And Scott Fail To Demonstrate Entitlement To A Permanent Injunction . . . 41

A. Standard For Obtaining A Permanent Injunction . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. Interspiro And Scott Has Not Demonstrated A Reasonable Likelihood Of Success On The Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

C. Interspiro And Scott Have Not Demonstrated Irreparable Harm . . . . . . . . . . . . . 42

D. The Balance Of Harms Favors The Government . . . . . . . . . . . . . . . . . . . . . . . . . 44

E. The Public Interest Favors The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

## CASES

Aircraft Porous Media, Inc.,
B-24665.2, 91-1 CPD ¶ 356 (1991) . . . . . . . . . . 28

ATA Defense Indus., Inc. v. United States,
38 Fed. Cl. 489 (1997) . . . . . . . . . . 40, 43

Alfa Laval Sep'n, Inc. v. United States,
175 F.3d 1365 (Fed. Cir. 1999) . . . . . . . . . . 43

Amoco Prod. Co. v. Village of Gambell, Alaska,
480 U.S. 531 (1987) . . . . . . . . . . 43

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) . . . . . . . . . . 44

Bean Stuyvesant, L.L.C. v. United States,
48 Fed. Cl. 303 (2000) . . . . . . . . . . 7

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,
419 U.S. 281 (1974) . . . . . . . . . . 7

CRC Marine Servs., Inc. v. United States,
41 Fed. Cl. 66 (1998) . . . . . . . . . . 7

Cincom Sys., Inc. v. United States,
37 Fed. Cl. 663 (1997) . . . . . . . . . . 48

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir.1996) . . . . . . . . . . 7, 43

General Dynamics-Ordinance & Tactical Services,
B-295987, 2005 CPD ¶ 115 (2005) . . . . . . . . . . 40

Illinois Tool Works, Inc. v. Grip-Pak, Inc.,
906 F.2d 679 (Fed. Cir. 1990) . . . . . . . . . . 45

Input/Output Tech., Inc. v. United States,
44 Fed. Cl. 65 (1999) . . . . . . . . . . 48

Motorola, Inc. v. United States,
729 F.2d 765 (Fed. Cir. 1984) . . . . . . . . . . 28

OAR Corp. v. United States,
49 Fed. Cl. 478 (2001) . . . . . . . . . . 46

O'Shea v. Littleton,
414 U.S. 488 (1974) . . . . . . . . . . 45

Railway Labor Executives' Ass'n v. Gibbons,
448 U.S. 1301 (1980) . . . . . . . . . . 44

Reebok Int'l Ltd. v. J. Baker, Inc.,
32 F.3d 1552 (Fed. Cir. 1994) . . . . . . . . . . 44

Statistica, Inc. v. Christopher,
102 F.3d 1577 (Fed. Cir.1996) . . . . . . . . . . 7, 43

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) . . . . . . . . . . 7

Tel-Instrument Elecs. Corp. v. United States,
56 Fed. Cl. 174 (2003) . . . . . . . . . . 18

Tenacre Foundation v. INS,
78 F.3d 693 (D.C. Cir. 1996) . . . . . . . . . . 45

United Int'l Investigative Serv., Inc. v. United States,
41 Fed. Cl. 312 (1998) . . . . . . . . . . 43

Weber Cafeteria Services, Inc.,
B-290085.2, 2002 CPD ¶ 99 (2002) . . . . . . . . . . 40

Weinberger v. Romero-Barcelo,
456 U.S. 305 (1982) . . . . . . . . . . 43

Wit Assoc., Inc. v. United States,
62 Fed. Cl. 657 (2004) . . . . . . . . . . 7

Xtra Lease v. United States,
50 Fed. Cl. 612 (2001) . . . . . . . . . . 48

## STATUTES AND REGULATIONS

5 U.S.C. § 706 . . . . . . . . . . 7

28 U.S.C § 1491 . . . . . . . . . . 7

28 U.S.C. § 1498 . . . . . . . . . . 28

48 C.F.R. § 2.101 . . . . . . . . . . passim

48 C.F.R. § 27.104 . . . . . . . . . . 28

## MISCELLANEOUS

C. Wright and A. Miller Federal Practice and Procedure § 2948 (1973) . . . . . . . . . . . . . . . . . . 45

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INTERSPIRO, INC.,<br><br>and<br><br>SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>MINE SAFETY APPLIANCES CO.,<br><br>Defendant-Intervenor. | ) | No.06-425C<br>(Judge Firestone) |

DEFENDANT'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests that the Court enter judgment upon the administrative record in favor of the United States and deny the motion for judgment upon the administrative record filed by plaintiffs, Interpiro, Inc. ("Interspiro") and Scott Technologies, Inc. ("Scott"). In support of this motion, we rely upon the amended complaints, the administrative record filed with the Court ("AR"), the attached declaration of Laurie Beebe, and this brief.

STATEMENT OF THE ISSUE

Whether the Air Force properly evaluated the proposals of the offerors in accordance with the requirements of the Request for Proposals.

## STATEMENT OF FACTS

A. Overview of the Procurement

Request for Proposal ("RFP") FA8532-05-R-76133 identified a program for the design, testing, and production of Self Contained Breathing Apparatus ("SCBA") units. The units will provide full respiratory protection for military members from chemical, biological, radiological, and nuclear ("CBRN") hazards. The SCBA units presently being used by Air Force military members have reached the end of their 15-year service life. This procurement will replace the units with updated equipment that meets or exceeds current national standards and certifications that apply to equipment in the fire-fighting, emergency response, and rescue industry. Accordingly, the Occupational Safety and Health Administration ("OSHA"), National Fire Protection Association ("NFPA"), National Institute of Occupational Safety Health ("NIOSH"), Code of Federal Regulations ("CFR"), and American National Standard Institute ("ANSI") standards and certifications were incorporated into the Purchase Description ("PD") that was written for this RFP.

Because the Air Force wanted offerors to propose innovative SCBA technology that was more efficient, more durable, provided more fail-proof safety features, and offered purer air quality, the Air Force chose the formal source selection methodology for competitive negotiated acquisitions. AR1701. A five-year, firm-fixed-price, requirements-type contract was contemplated from the RFP, and the requirement was solicited on a full and open competitive basis among both large and small businesses. AR1443.

B. Background To The Procurement

From 2002 through March 2005, the Air Force conducted extensive research into Air Force needs for SCBA equipment. AR1443. Numerous meetings were held with the Air Force Civil Engineer Support Agency, the Air Force customer and focal point, and Air Force firefighters and emergency responders from various bases in an attempt to identify key

performance characteristics needed in the equipment. Industry sources were an important aspect of this research, and the Air Force conducted its first industry event in December 2002, at which Air Force first responders discussed their SCBA requirements and desires and the industry representatives discussed the current state of art of their commercial units. AR1443, 1710.

A draft Purchase Description was issued on January 14, 2005, and a draft RFP was issued on February 11, 2005. These documents were issued by the Air Force as a precursor to a second industry event that the Air Force team hosted on March 1, 2005. With this knowledge of the Air Force's specific goals, approximately seven companies were represented and participated in discussions on the current capabilities of their products and future enhancements in their product line. AR1710-11. Based upon this market research, the Air Force determined that SCBAs constituted a commercial item within the definition of the Federal Acquisition Regulations, 48 C.F.R. § 2.101. AR1709; see also AR1544 ("Research indicates that the marketplace could not fulfill the Government's need . . . without some modification to their existing units; however, these modifications are considered minor, and the SCBA is determined to be commercial pursuant to FAR 2.101" ).

C. The Procurement Process

The Air Force chose the formal source selection methodology for contracting by negotiation, as described in Air Force Federal Acquisition Regulation Supplement ("AFFARS") 5315.3 and AFFARS Mandatory Procedures 5315.3. AR31. In accordance with those procedures, a Source Selection Plan was prepared and approved by the Source Selection Authority ("SSA") on July 20, 2005. AR1701. The final RFP was published on the Federal Business Opportunities web site on August 1, 2005. AR1673. The solicitation advised that it was a "best value source selection." AR31. The RFP further explained: **"While the Government team and the SSA will strive for maximum objectivity, the tradeoff process, by its nature, is subjective; therefore, professional judgment is implicit throughout the**

**selection process.**" Id. (emphasis in original).

On the RFP's due date, September 16, 2005, seven proposals were received, and evaluation of the proposals began immediately. Based upon the results of the initial evaluations, the evaluators collectively prepared an Initial Technical Evaluation Report, and one proposal was eliminated from the competitive range. AR2331, 2349. On November 22, 2005, the Air Force opened discussions with the remaining six offerors. AR1674. As part of that process, the Air Force issued Evaluation Notices ("ENs") to all the offerors with respect to any deficiencies, weaknesses, or need for clarification that the Air Force deemed necessary as a result of the initial evaluations. The offerors provided written responses to those ENs. See AR1548-1559. A Final Technical Evaluation Report, taking into account the responses to the ENs, was completed on January 4, 2006. AR1478-99.

On January 12, 2006, the Air Force closed discussions and issued Final Proposal Revision requests to the remaining six offerors. AR1703. The offerors were notified of the final evaluation results of their proposals, and each offeror was given a final opportunity to revise its proposal by January 17, 2006. All offerors timely responded. Id. Interspiro advised that it was not revising its proposal. AR158. Scott advised that it was not revising its proposal. AR1115. Defendant-intervenor Mine Safety Appliances Co. ("MSA") [redacted]. AR415-433.

The final ratings of the six proposals were as follows:

FACTORS ONE and TWO: MISSION CAPABILITY and PROPOSAL RISK

| Offeror | Sub1: Certs & Data | Sub2: Field Eval | Sub 3: Design App. | Sub4: PPP |
|---|---|---|---|---|
| MSA | Green/Low | Blue/Low | Blue/Low | Green/Low |
| Scott | [redacted] | [redacted] | [redacted] | [redacted] |
| Interspiro | [redacted] | [redacted] | [redacted] | [redacted] |
| Draeger | [redacted] | [redacted] | [redacted] | [redacted] |
| International | [redacted] | [redacted] | [redacted] | [redacted] |
| Survivair | [redacted] | [redacted] | [redacted] | [redacted] |

AR1679-85.

FACTOR THREE: PRESENT AND PAST PERFORMANCE

| Offeror | Confidence Level |
|---|---|
| MSA | High |
| Scott | [redacted] |
| Draeger | [redacted] |
| International | [redacted] |
| Interspiro | [redacted] |
| Survivair | [redacted] |

AR1689.

FACTOR FOUR: COST/PRICE

| Offeror | Final Total Evaluated Price For Basic And Four Option Periods |
|---|---|
| Interspiro | [redacted] |
| International | [redacted] |
| Survivair | [redacted] |
| Scott Health | [redacted] |
| MSA | [redacted] |
| Draeger | [redacted] |

AR1692.

On January 25, 2006, the SSA determined that award of the contract would be made to MSA, and the contract was awarded on January 31, 2006. The contract was awarded in the amount of [redacted], which reflects the best estimated quantity for the line items under the basic contract period from January 31, 2006 until January 30, 2007. AR1756. The contracting officer notified all offerors of the award via telephone and written correspondence.

The unsuccessful offerors were advised that a debriefing would be given if such was requested. On February 17, 2006, the Air Force briefed Scott. AR1100.

D. The GAO Proceeding

On February 9, 2006, Interspiro filed a protest of the award with the GAO. AR1892. Scott similarly filed a protest on February 22, 2006. Scott Mot. at 9. As the SCBA contract was a requirements-type and the first delivery order had not been issued against it, a stop-work order was not issued. On March 20, 2006, the Air Force notified the GAO that it intended to take corrective action by having the SSA reconsider all the proposals and then issue a new decision document. AR2117. On March 21, 2006, the GAO dismissed the protest as academic. Interspiro App. 133.

Thereafter, the SSA followed the evaluation methodology set forth in the solicitation. The SSA considered the ratings and the relative importance of the evaluation factors. The SSA also considered the trade-off possibilities that existed. On April 18, 2006, the SSA signed a new decision document that reaffirmed the decision to award the contract to MSA. AR1883-89. The decision document reflected consideration of the price difference among the proposals, and the value of the non-price related factors relative to the cost difference. The SSA determined that the proposal from MSA provided the best value to the Air Force because its superior technical proposal, its overall business approach, and its past and present performance [redacted]. Id.

ARGUMENT

I. Scope And Standard Of Review

The Court reviews allegations of error in the contract award process under the deferential standard set forth in section 706 of title 5 of the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 221 (2001). Thus, an award may be set aside only if the agency's actions are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706.

As the Court has explained, "[b]y its very definition, this standard recognizes the

possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" Wit Assoc., Inc. v. United States, 62 Fed. Cl. 657, 660 (2004) (citations omitted). The Court may not substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. CRC Marine Servs., Inc. v. United States, 41 Fed. Cl. 66, 83 (1998). "This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a 'best value' procurement." Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320 (2000) (citations omitted). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).

Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir.1996).

## II. Scott Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

### A. The Air Force Did Not Evaluate MSA's [redacted]

Scott alleges that "the Air Force improperly used MSA's [redacted] SCBA and [redacted] in its Mission Capability evaluation," and that the Air Force confirmed this fact at Scott's post-award debriefing by stating that its evaluation of the PAPR was based upon "the offerors' 'progress of development.'" Scott Mot. at 16. As further evidence that the [redacted] were evaluated, Scott refers to comments made by two evaluators and a comment by the SSA that allegedly refers to MSA's capabilities demonstrated [redacted].

See Scott Mot. at 16, citing AR2244, 2259, and AR1888.

First, as the declaration of the contracting officer makes clear, the Air Force did not evaluate MSA's [redacted] unit nor did it [redacted]. See Declaration of Laurie Beebe, ¶ 4.

Second, with respect to its debriefing, Scott alleges that the Air Force "admitted . . . that the technical evaluation of the PAPR was based on the 'progress of development' of the offeror's proposed unit." Amend. Compl. ¶ 67. Scott provides no other context, and it is not clear from the allegation the offeror to which the statement referred. Scott's inference – that this comment reflects an evaluation of MSA's [redacted] – is speculative and not supported by the record. The debriefing document provided to Scott indicates that the only information shared with Scott about MSA's design was its overall technical rating. AR1104.

Third, with respect to Scott's citations to comments by the evaluators and the SSA, Scott did not review the administrative record. If it had, it would have determined that the cited comments were taken directly from MSA's proposal. Compare AR2244 with AR650 ([redacted]); compare AR2259 with AR633 ([redacted]); see also AR640 ([redacted] AR648 ([redacted]). Thus, it is clear that the comments cited by Scott were derived from MSA's proposal, not an evaluation of [redacted] or a review of [redacted].

The Air Force did not evaluate MSA's [redacted] nor did it review MSA's [redacted]. Accordingly, there is no merit to Scott's argument that the Air Force failed to follow the

evaluation procedures set forth in the RFP.

B. <u>The Air Force Did Not Waive Any Technical Requirement For MSA</u>

As Scott correctly recognizes, the RFP provided that "[t]he SCBA shall meet and/or exceed all minimum requirements specified in the referenced standards below. Should those existing standards be replaced by a newer numbered or titled standard, the most current standard shall always apply." AR43. However, Scott is incorrect in its conclusion that the Air Force applied different standards to Scott's proposal than those applied to MSA's proposal.

The standard that allegedly was not consistently applied is a standard promulgated by NIOSH entitled "Concept for Chemical, Biological, Radiological, and Nuclear (CBRN) Tight Fitting, Powered Air Purifying Respirator (PAPR) Standard" ("CBRN PAPR standard"). This standard has never been issued in a final form, and it was revised several times during the procurement process.

At the time the Purchase Description was written, the 2004 draft of the NIOSH standard was the most current. However, at the time the RFP was released on August 1, 2005, both a June 2005 draft was the most current version. Moreover, the Air Force was aware that NIOSH had announced, in August 2005, that it preparing to revise this draft again. Declaration of Laurie Beebe, ¶ 7.

Upon receipt of proposals on September 16, 2005, the Air Force relied upon the most current standard at the time it began the evaluations of proposals: the June 2005 draft. <u>Id.</u>, ¶ 8. The Air Force concluded its initial evaluation of proposals in October 2005. <u>See</u>, <u>e.g.</u>, AR2137, 2204, 2265, and AR2351 (Initial Technical Evaluation Report, dated November 1, 2005). Thus, by the time that NIOSH released the November 2005 draft on November 4, 2005 (App. B to Scott's Motion), the Air Force's initial evaluations were complete.[1] <u>See</u> Scott Mot. at 19 (the Air

[1]All iterations of this standard can be reviewed at http://www.cdc.gov/niosh/npptl/standardsdev/cbrn/papr/.

Force's technical evaluation was completed prior to the release of the November 2005 Concept).

When the Air Force opened discussions with the six offerors in November 2005, it was aware of the new version of the standard. At that time, the Air Force accepted the representations of Scott and others that their proposed PAPRs would comply with the new standard. See AR1124; Declaration of Laurie Beebe, ¶ 8.

Scott contends that it "[redacted]" in its proposal for an SCBA system. Scott Mot. at 24. Notwithstanding its reliance on [redacted], Scott argues that the Air Force was required to evaluate the proposals using the November 2005 version. Scott Mot. at 18. Somewhat inconsistently, Scott also argues that MSA's proposal should have been rejected because it did not satisfy the requirements of the 2004 version. Scott Mot. at 18 and n.9.

As noted above, the Air Force performed its initial technical evaluation using the most current version at the time of the evaluation, the June 2005 version. At the same time, the Air Force was aware that NIOSH intended to issue a new draft by the end of 2005, and it took that into account in its evaluations. Accordingly, if an offeror's proposal indicated that it was prepared to meet the new standard, the Air Force accepted that representation. Thus, contrary to Scott's allegation, the Air Force did not rely upon the 2004 version in its evaluation of the proposals, and Scott cites no evidence that it did. More importantly, Scott fails to explain how MSA's proposal failed to meet the standard at issue.

Scott mistakenly alleges that 2004 version imposed a "dual use" system whereby the SCBA must provide CBRN protection in both SCBA and APR/PAPR modes. Scott Mot. at 17-18. In fact, it was an Air Force requirement that the SCBA be configurable to operate in both SCBA/APR mode and SCBA/PAPR mode. AR43. The Air Force, not the NIOSH draft standard, also required that the PAPR be designed to operate in both low and high flow rate modes. AR48. Finally, the Air Force required that the system's filter(s) not only meet NIOSH standards, AR51,

but that the system must also be compatible with a C2A1 filter (AR48, AR53), which was the filter then in general use by the military and governed by a military standard. Scott has not demonstrated that MSA's proposal failed to meet any of these requirements.

In its proposal, MSA stated that its "[redacted]," AR1042. This was not a statement that its proposal [redacted], as Scott alleges (Scott Mot. at 19), and Scott offers no explanation as to how this [redacted] fails to comply with the governing standard. Moreover, MSA addressed [redacted] in its proposal by stating that [redacted]," and it further reassured the Air Force that it was [redacted]. AR1042, 518. The Air Force found that this was an acceptable [redacted].

In this regard, it is important to note that the Air Force did not require the offerors to submit a final product that currently met all of the contract requirements. Rather, the RFP required that offerors provide a Technical Proposal that "shall provide convincing rationale to address how the offeror **intends** to meet these requirements." AR27 (emphasis added); see also AR32 (the proposal must identify "an acceptable **design approach** for the modification of the offeror's commercial SCBA units") (emphasis added). Thus, the offeror needed to provide only a "convincing rationale" that all relevant standards and Air Force requirements could and would be met in modifying the offeror's commercial SCBA unit. In this case, the Air Force deemed that MSA's proposal for [redacted] was such a convincing rationale.[2]

Scott also contends that "despite MSA's [redacted] that [redacted], the Air Force evaluators "stated that MSA met an undefined Dual Use Concept," Scott Mot. at 19, citing AR2239, 2247, and 2257. While it is not even clear what Scott means by

[2] In addition, the RFP required each offeror to identify "those aspects of the proposal considered to involve cost and/or mission capability subfactor risk," to rate each such risk, including quantitative estimates of impact on cost, schedule, and performance, and to propose "work-arounds" or risk mitigators. AR27.

"undefined Dual Use Concept," Scott appears to suggest that the evaluators had concluded that MSA's proposal had [redacted]. Scott has misinterpreted the evaluators' notes. MSA's proposal states:

> [redacted]

AR1027-28. It is this representation – [redacted] the NIOSH draft standard – to which the evaluators referred.

At bottom, Scott is suggesting that, although the RFP required a design for an SCBA meeting the Government's specifications, MSA was required to demonstrate that it already had a [redacted] This suggestion is not consistent with this procurement.

For example, Scott's design was determined to be "[redacted]." AR1495. In response to [redacted], Scott stated:

> [redacted]

AR1124. Without further testing the accuracy of this representation, the Air Force concluded that this response was acceptable. AR1495. Scott offers no rationale for distinguishing between

Air Force acceptance of Scott's unsupported representation that [redacted] and the Air Force acceptance of MSA's representation [redacted].

Scott also alleges that the Air Force "admitted" that it evaluated Scott's proposal against the requirements of the 2004 version. Scott Mot. at 22, citing Scott's Amended Compl., ¶ 110. Scott's amended complaint does not support this allegation. Scott's amended complaint avers that the Air Force admitted that it "did not apply the current version" of the NIOSH draft standard.

Scott offers no context for this "admission." However, the record is clear. The Air Force relied upon the June 2005 version at the time it conducted its initial evaluations, and by the time it issued its Final Technical Evaluation Report, it accepted the representations of Scott, MSA, and others, that [redacted]. See AR1124, 1027-28. Accordingly, the Air Force evaluated equally the representations of both proposals regarding compliance with the November 2005 version of the standard.

Scott's new version of the Air Force "admission," as set forth in its motion (Scott Mot. at 22), is not supported by evidence, and it is false. The Air Force did not evaluate Scott's proposal using the 2004 version.

Scott also avers that, "because the 2004 Concept had a higher flow rate requirement than the 2005 Concept, . . . offerors like Scott [redacted]." As a result, according to Scott, [redacted]. Scott Mot. at 22 and n.12 (emphasis added).

Scott offers **no** evidence that flow rates as referenced in the earlier standard necessarily required [redacted]. In fact, Interspiro proposed a system [redacted]. AR2171.

More importantly, however, [redacted]. According to the evaluation of Scott's proposal, [redacted]

In addition, Scott has admitted that several other factors contributed [redacted]. As Scott stated, "[redacted]" AR1161. In light of these prior statements, it is disingenuous of Scott to argue that its initial failure [redacted]. In any event, Scott has not demonstrated that any requirement of the 2004 NIOSH draft standard compelled it [redacted].

Finally, in order to demonstrate prejudice, Scott contends that [redacted] was the "most significant" difference between MSA's proposal and Scott's proposal. Scott Mot at 22. According to Scott, [redacted]. It was within Scott's power, however, to remedy this situation. On

---

[3] The RFP specified that "[t]he PAPR less filters shall weigh no more than a maximum of 6 lbs (Threshold), maximum 3.5 lbs (Objective). The overall PAPR with NIOSH filters weight shall not exceed 10 lbs." AR48.

January 12, 2006, well after issuance of the November 2005 version, the Air Force requested a final proposal revision. AR1117. By that time, Scott could have revised its proposal [redacted]. Scott Mot. at 24. Scott, however, determined that [redacted]. AR1114-15. Having made this decision, Scott cannot complain that its ability to compete was hampered by an outdated standard.

More importantly, [redacted]. There were two other factors which were much more significant. First, the field evaluation of MSA's existing commercial SCBA units – which did not include a PAPR – resulted in an evaluation of "blue/exceptional," compared to Scott's SCBA unit, which merited a "[redacted]" rating.

In his decision to award the contract to MSA, the SSA said:

> Specifically, the blue/exceptional rating in Subfactor 2, Field Evaluation was attributed to the performance of the MSA SCBA [redacted] This is considered of great benefit for military first responders and [redacted] requirements. The [redacted] of the SCBA unit was evaluated to be outstanding due to [redacted] All these features were determined to be highly beneficial to the Government as further assurance is provided that first responders, both military and civilian, will be [redacted]

AR1744.

The second significant difference between MSA's and Scott's proposals was [redacted]. MSA described its design proposal as follows:

[redacted]

AR565. The Air Force evaluators found that this was an "exceptional" design proposal because the system allowed [redacted] AR2236.

Scott's design proposal did not have this capability. While Scott's design did meet minimal requirements [redacted], AR2345, it did not [redacted]. See AR1887 (SSA's determination that MSA's design rendered it superior to the other offerors).[4]

In sum, there is no merit to Scott's contention that the Air Force applied a different version of the NIOSH draft standard to MSA's proposal than it applied to Scott's proposal.

C. The Air Force Did Not Waive Its Warranty And Maintenance Requirements For MSA

[4] Other features also distinguished MSA's proposal from Scott's. For example, [redacted] AR2297.

According to Scott, MSA's proposal fails to meet the contract requirement that the SCBA system be field maintainable (AR55) because MSA's warranty provides that MSA would be released from its warranty obligations if "[redacted]" (AR558). According to Scott, this provision "prohibits the Air Force from [redacted] on MSA's SCBA's." Scott Mot. at 25.

Scott's argument ignores the clear language of the warranty. If repairs can be made by MSA's "[redacted]," then repairs can clearly be made by [redacted]. The warranty otherwise provides [redacted]. This language also distinguishes MSA's warranty from that at issue in Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174, 178 (2003), upon which Scott relies. Scott Mot. at 26. [redacted]

Scott's argument also ignores other representations in MSA's proposal. For example, MSA states:

> [redacted]

AR, 635, 650 (emphasis added). These statements would have been irrelevant and misleading [redacted]. That is not the case. MSA's proposal clearly and expressly met the Air Force requirement that its SCBA system be field

maintainable.

D. The Air Force Properly Evaluated MSA's Proposal Risk

According to Scott, the Air Force failed to consider the potential for increased costs in MSA's proposal. Those costs allegedly include "[redacted]," and MSA's design costs and "life cycle costs" resulting from MSA's [redacted]. Scott Mot. at 27. Scott further contends that, because of these alleged costs, the Air Force improperly assigned a "low" Proposal Risk to MSA's proposal. Id.

First, as already noted, MSA's warranty does not require that [redacted]. Second, Scott does not cite to any requirement in the RFP that required the Air Force to consider life-cycle costs. Indeed, the Air Force never intended to evaluate life-cycle costs and, therefore, did not include it in the evaluation criteria. For example, the RFP did not require a proposed price for spare parts. Rather, the RFP stated that the price of spare parts would be negotiated. AR9. The assessment of proposal risk was not related to any consideration of life cycle cost, and to do so would have violated the rules of the RFP. Third, to the extent that MSA may incur additional "[redacted] costs" [redacted], MSA is in the same position as all the offerors, including Scott, who also [redacted]. See AR1124. However, because this was a firm, fixed-price contract, any additional [redacted] costs incurred to meet the requirements of the RFP would be absorbed by the contractor, not the Air Force. See AR518 (stating that MSA [redacted]).

As stated in the RFP, the offerors' Cost/Price was designated as Factor IV and evaluated for reasonableness, balance, and the calculation of the total evaluated price. AR32, 35. The Air Force properly evaluated the proposals based upon these considerations, and there is no factual basis for Scott's contention that a "low" rating was improperly awarded to MSA's Proposal Risk.

Finally, Scott alleges that the Air Force failed to evaluate [redacted], with which MSA

had a [redacted]. Scott Mot. at 32-33. Scott does not identify any requirement in the RFP for the Air Force to conduct a separate evaluation of [redacted].

Moreover, the record demonstrates that there was little reason for the Air Force to have concerns about [redacted]. As MSA's proposal stated, [redacted]. MSA also represented that "[redacted]" AR647. In addition, several of the offerors, in addition to MSA, [redacted]. For example, Interspiro also proposed to utilize a modified version of [redacted]. AR363. As Interspiro said, "[redacted]" Id.

The contract requirements cited by Scott do not support its argument that the Air Force was required to conduct an independent evaluation of [redacted]. First, Scott cites the requirements of Factor I – Mission Capability, Subfactor Four – Program Production Plan. Scott Mot. at 32. This specification required that the Air Force evaluate the offerors' **plan** for the organization of personnel, facilities, equipment, plant layout, and material resources. AR32. Thus, it only required an evaluation of the plan; it did not require that the Air Force inspect or evaluate an offeror's facilities, equipment, and personnel, and it certainly did not require that the Air Force evaluate [redacted] personnel, facilities, equipment, plant layout, and material resources, as Scott contends. Scott Mot. at 32.

Second, Scott alleges that the Air Force should have found a proposal risk because there was no "firm commitment" by [redacted]. Scott Mot. at 33. MSA submitted [redacted] that it had with [redacted]. AR1084-86. Scott

fails to explain why this agreement does not satisfy the requirements of the RFP.

Third, Scott alleges that the Air Force should have evaluated [redacted] present and past performance. Scott Mot. at 33. As already indicated, MSA, Interspiro, and others gave ample information about [redacted] present and past performance, none of which raised any concerns.

Scott's claim that the Air Force failed to evaluate [redacted] simply has no merit. Similarly, Scott' claim that the Air Force failed to properly evaluate MSA's Proposal Risk (Factor Two/ Subfactors 3 and 4) is without merit.

## III. Interspiro Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

### A. The Air Force Did Not Ignore Any Relevant Facts In Its Evaluation Of Interspiro's Proposal

#### 1. The Air Force Properly Declined To Evaluate Interspiro's [redacted]

Interspiro faults the Air Force for not conducting a field evaluation of its so-called "[redacted]"[5] Interspiro Mot. at 19. As the RFP made clear, the Air Force intended to conduct field evaluations of only the offerors' existing commercial SCBA units. The RFP stated:

> Subfactor Two: Field Evaluation
> The offeror shall provide two (2) of its **existing commercial SCBA units** with the submission of its RFP package. The two

---

[5] The RFP seeks to acquire an SCBA unit that operates in three modes that are differentiated by the air that the user is breathing. The first mode, SCBA only, provides the first responder with compressed air from the SCBA's compressed air cylinder. The air is not filtered. The second SCBA mode is air purifying respirator ("APR"). In this mode, the user is breathing filtered air that is pulled from the outside environment. This mode can only be used where there is adequate oxygen in the environment; the user is not breathing the air contained within the SCBA cylinder. The third mode is powered air purifying respirator ("PAPR"). In this mode, the user is also breathing filtered air that is pulled from the outside environment. However, the SCBA provides a powered assist to create a positive air flow from outside the filter into the user's lungs. This mode eliminates the respiratory resistence present in APR mode, which is caused by the need for the user to pull the outside air through the filter using lung power only. Thus, a user can use the PAPR mode in more physically demanding or stressful environments.

> SCBA units shall be the same model and shall represent **the base unit** that the offeror intends to provide on the contract effort should it receive the contract award. The offeror shall ensure that the SCBA units comply with **paragraphs 3.4.5 and 2.4.6** of the purchase description and are complete units in that all the accessories that are used with the unit are included, along with the units' standard commercial operations and maintenance manuals.
>
> * * * * *
>
> Subfactor Two: Field Evaluation. This subfactor is met when the offeror provides all the material required for Subfactor Two in the "Proposal Requirements" provision [see AR28, above] and **the two SCBA units** meet, or exceed in a way beneficial to the Government, all the performance evaluation areas listed in the Field Assessment Questionnaire.

AR28, 32 (emphasis added). Indeed, Interspiro's proposal expressly recognized that the Air Force only intended to conduct field evaluations of existing commercial SCBAs. See AR345 ("[redacted]"); see also AR185(Interspiro stated, "[redacted]'").

Interspiro did not have an [redacted]. See AR363 (Interspiro's proposal: "[redacted]"). Its allegation to the contrary, Interspiro Mot. at 21, is not supported by any factual evidence. Interspiro allegedly sought clarification from the Air Force, and it and was advised that "existing commercial SCBA units" meant those that were "NIOSH certified." Interspiro App. 143, ¶ 17. Of course, the RFP already stated that any prototype that did not satisfy NFPA and NIOSH criteria would **not** be field tested. AR69 (¶ 4.17). Interspiro concedes that [redacted]. Interspiro App. 143, ¶ 17. Further, Interspiro does **not** allege that the Air Force represented that it would conduct field

evaluations of "accessories" that were not NIOSH certified, **id.**, and to do so would have been contrary to the RFP. Accordingly, the Air Force did not violate the requirements of its solicitation by failing to consider [redacted].

2. The Air Force Was Not Required To Conclude That Interspiro Was The [redacted] Offeror That Had A Commercial [redacted]

Interspiro offers no evidence to support its allegation that other offerors' were [redacted] Interspiro in its technology and products. Interspiro Mot. at 19. Interspiro's "statement of facts" makes the suggestion that the Air Force had not even contemplated the purchase of an SCBA/PAPR until Interspiro told the Air Force that it "developed" a new combination SCBA/PAPR. Interspiro Mot. at 2-3. Even if this were true, which it is not, Interspiro has offered no basis for its knowledge of the [redacted].

Interspiro begins its argument by falsely asserting that the initial draft RFP prepared by the Air Force did not include either a PAPR or an SCBA/PAPR unit within the scope of its procurement. Interspiro Mot. at 2. The documents upon which Interspiro relies demonstrate otherwise. An initial draft of the performance specifications, dated July 16, 2004, provided that the SCBA shall have "the capability to perform and provide full filtered respiratory protection in a nuclear biological or chemical (NBC) full spectrum threat (FSTR)/warfare environment. The filtered air capability shall be provided by both an air purifying respirator (APR) and powered air purifying respirator PAPR." Interspiro App. 45; see also Interspiro App. 46, ¶ 3.3.1 (describing transition from compressed breathing air to filtered air, using either APR or PAPR capabilities); id., ¶ 3.3.4 (describing SCBA system with PAPR). Accordingly, the Air Force did **not** make the major changes to the procurement alleged by Interspiro (Interspiro Mot. at 4-5) upon its receipt of industry input. Indeed, upon its receipt of this input, the Air Force wrote:

> SCBA and Chemical Warfare masks are standard commercial items utilized by first responders world wide. This Market Survey

> indicates that there are currently five potential manufacturers that may be able to meet the Air Force's requirements. The information presented also indicates that [redacted] are all highly capable of meeting the Air Force's requirements and time constraints due to minimal design and development.
>
> * * * * *
>
> The information obtained indicates that the marketplace will not fulfill the need of the Government without some modifications made to their existing items. Commercially, SCBA and CW units exist as two separate masks. . . . The USAF objective is a one face mask configuration with dual purpose capabilities, SCBA positive pressure mode and filtered negative pressure mode both with CBRN protection.

AR1873.

Interspiro avers that, on August 26, 2004, it advised the Air Force that it had manufactured a three-mode SCBA, which allowed transitioning "without exposure to ambient conditions." Interspiro Mot. at 3. In fact, Interspiro advised the Air Force that it had [redacted], but that, "[redacted]" Only Interspiro's "[redacted]. Interspiro App. at 66-67. Thus, the criticism that Interspiro makes of MSA's informal presentation to the Air Force in the fall of 2004 – that MSA "[redacted]," Interspiro Mot. at 4 – was also applicable to Interspiro's 2004 presentation. But see AR1871 (in the fall of 2004, "[redacted]").[6]

---

[6] Indeed, the major change made to the draft product specifications was to require a one mask configuration. See Interspiro App. 75, ¶ 15 ("it is impossible for a wearer to switch masks without ambient exposure. The draft Purchase Description, dated 18 Nov. 2004, has been revised to reflect one dual purpose mask configuration"). Compare Interspiro App. 48, ¶¶ 3.5.6 and 3.5.10 (7/16/04 draft permitted a two-mask configuration but preferred a single mask) with Interspiro App. 89, ¶ 3.6.9 ("The facepiece configuration shall be provided with the capability to breathe ambient air filtered, filtered & non-filtered without removal of the facepiece").

Nor did Interspiro's proposal demonstrate that it was [redacted] in meeting Air Force requirements. As Interspiro's proposal stated, "[redacted]" AR349. Moreover, Interspiro was so concerned about its ability to provide a completely integrated SCBA system that it proposed the following:

[redacted]

AR367.

Interspiro's allegation that it had a [redacted] three-mode SCBA is further undermined by its own proposal. According to Interspiro, "[redacted]" AR363. Thus, Interspiro admitted that it was abandoning its own [redacted], in favor of a [redacted]. Finally, a review of Interspiro's compliance matrix demonstrates the gap that needed to be bridged between [redacted] and the Air Force requirement. AR370-71.[7]

---

[7] Contrary to Interspiro's allegation, Interspiro Mot. at 11-12, the Air Force did not conclude that Interspiro was [redacted] and "expecting minimal to no design changes." In its evaluation of Interspiro's price, the Air Force attempted to determine [redacted]. The Air Force said, "[redacted]" AR1557 (emphasis added).

Nor is there any merit to Interspiro's argument that the Air Force should have considered Interspiro's "pending" patent applications. Interspiro at 21-23. First, while it is true that Interspiro's proposal referred to an area of risk as the existence of "multiple patents issued and pending in PAPR technology that have complicated the design and sourcing of PAPRs," AR386, the proposal does not state that the only patents "issued and pending" were those of Interspiro. Given the industry's response to the Air Force's market research survey of the latest technological advancements for CBRN protection, AR1869-82, the Air Force had a reasonable basis to believe that other manufacturers had patents in PAPR technology either issued or pending. Additionally, since Interspiro had proposed to provide a [redacted], this section in its proposal, which referred to PAPR patents, logically could not have been referring to a pending Interspiro patent.

Second, there is no evidence, and Interspiro has cited none, that MSA's proposed SCBA units would infringe upon anyone else's patent. The proposed SCBA system from MSA was based upon [redacted] already marketed and sold to the general public. There is not a scintilla of evidence that MSA's proposal was [redacted] SCBA unit or any other equipment that it may produce.

Finally, Interspiro's claim of patent infringement is speculative and irrelevant to the award decision. In Aircraft Porous Media, Inc., B-242665.2, 91-1 CPD ¶ 356 (1991), the General Accounting Office rejected a similar claim, stating: " A potential for patent infringement does not provide a basis for objection to award. As we have recognized, 28 U.S.C. § 1498 (1988) gives patent holders an adequate and effective remedy for patent infringement, while saving the government from having its procurements delayed pending litigation of patent disputes." See also Motorola, Inc. v. United States, 729 F.2d 765, 771 (Fed. Cir. 1984) ("it is the policy of the United States that it must award the bid to the lowest qualified bidder irrespective of the possibility or inevitability of infringing the patents of other bidders or non-bidders"); 48

C.F.R. § 27.104(b) ("Generally, the Government will not refuse to award a contract on the grounds that the prospective contractor may infringe a patent").

B. The Air Force Properly Evaluated MSA's Proposal

Interspiro alleges that the Air Force evaluation of MSA's proposal was patently erroneous because "MSA failed to (1) propose a commercial item, (2) propose a product that could likely perform to the RFP's specifications, and (3) [redacted]." Interspiro Mot. at 24. Interspiro's arguments are without merit.

1. MSA's Product Properly Met The Definition Of "Commercial Item"

Again citing the FAR definition of "commercial item," 48 C.F.R. § 2.101, Interspiro contends that MSA's product could not have "evolved" from a commercial item because "[redacted]" Interspiro Mot. at 24. The FAR does not define a commercial item as one that has been [redacted]. A commercial item can be one that "will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation," or a commercial item that has been modified to meet the Government's requirements. Id. The RFP did not require that the offerors submit designs for products that had already been offered for sale in the commercial martketplace, and Interspiro does not allege that MSA will be unable to satisfy the delivery requirements of the contract.

2. The Air Force Properly Evaluated MSA For Its Design Approach

Interspiro criticizes the "Low" risk rating given to MSA's Design Approach subfactor. Interspiro Mot. at 24. The RFP required each offeror to submit a "risk matrix," in which proposal risk was identified and rated (including quantitative estimates of impact on cost, schedule, and performance) and to propose "work-arounds" or risk mitigators. AR27. MSA provided such a risk matrix. AR660. Notably, Interspiro identified [redacted], but it failed [redacted] in accordance with regulations. AR366-369. Notwithstanding its own failure to comply with the RFP by [redacted],

Interspiro alleges that the Air Force was bound by [redacted]. Interspiro Mot. at 25-26. Interspiro offers no support for this proposition, and the RFP does not require that the Air Force forego its independent evaluation of MSA's proposal.

More specifically, Interspiro concludes that MSA had [redacted] as to [redacted] Interspiro Mot. at 25. Without quibbling as to whether this is an accurate characterization of MSA's [redacted], see AR660, we would note, again, Interspiro's reservations [redacted]:

> [redacted]

AR367. If the Air Force were to follow Interspiro's argument, Interspiro's proposal risk would have been rated "[redacted]" due to its "[redacted]." AR33. The Air Force gave Interspiro's design approach a [redacted] risk rating. AR1487.

3. MSA Was Not Required To Provide [redacted] For Field Evaluation

Interspiro alleges that MSA's proposal should have been rejected because it did not provide [redacted]. Interspiro Mot. at 26. Interspiro's only basis for this argument is the Field Evaluation Exercises, set forth in Appendix A to the RFP. Id.

The RFP did not require that offerors provide for field evaluation a product that met the Air Force's ultimate needs.[8] Based upon its market research, the Air Force knew that all major

---

[8] See, e.g., AR1520 ([redacted]").

manufacturers already had existing commercial units to which varying modifications would be necessary to meet the requirements of the Purchase Description. AR1873. Accordingly, the RFP required the Air Force to evaluate how each offeror proposed "to modify" its existing commercial SCBA unit. AR28.

This was also the reason for doing a field evaluation of only the SCBAs, and not SCBAs with APR or PAPR. As the RFP made clear, field evaluations were to be conducted on the offerors' "existing commercial SCBA units," and the offeror was to ensure that its commercial SCBA units complied "with paragraphs 3.4.5 and 3.4.6 of the purchase description." AR28. A set of "Frequently Asked Questions" posted by the Air Force further stated that the two SCBAs supplied for field evaluation were to be NIOSH CBRN certified SCBAs; "ARP and PAPR modes are not required." AR2409.

The Field Evaluation Tests set forth as Appendix A to the RFP were intended for two different uses: to evaluate the offerors' existing commercial items, AR27, and the awardee's first production SCBA units, AR19, 56. There was no requirement in the RFP, and Interspiro cites none, that the SCBA units submitted for pre-award field evaluations had to be compliant with all the provisions of the PD.

Interspiro further seeks to disparage MSA's proposal by noting that, in its field evaluation of MSA's existing commercial item, "[redacted],' because those factors did not apply to [redacted]

Interspiro Mot. at 14-15, 26, citing AR2204-2221. It must be noted that the field evaluations of Interspiro's commercial unit [redacted]" as those so marked on MSA's evaluation, including [redacted]. AR2137-55. Consistent with the RFP, the Air Force treated all offerors equally, and it conducted field evaluations of only the offeror's SCBA units; it did not conduct field evaluations of any APRs or PAPRs.

C. The Air Force Properly Evaluated MSA And Interspiro's Design Approach

Interspiro purportedly challenges the Air Force's evaluation of MSA's proposal, but, in doing so, it completely ignores one of the essential factors – Field Evaluation – in which MSA was given a "Blue/Exceptional" rating and a "Low" risk. Having chosen to ignore this essential factor, Interspiro cannot establish that it was prejudiced by any alleged error. Therefore, Interspiro's critique of the evaluation process is meaningless. Furthermore, Interspiro's contentions are again based upon the erroneous premise that the offeror was required to have already built the SCBA system that was described in its design proposal.

1. [redacted]

Interspiro contends that MSA's design for protecting users from harmful exposure [redacted] while its design "has already been successfully tested by the Government." Interspiro at 27-29.

Interspiro's argument is not supported by its proposal. Interspiro's proposal states that [redacted]. AR345. However, with respect to [redacted], Interspiro's proposal states: "[redacted] AR365-66; see also AR2201 (proposal statement noted by Air Force evaluators). Notwithstanding this fundamental misunderstanding of the RFP, the Air Force concluded that this design approach met "[redacted]," resulting in a "[redacted]" rating and an assessment of "[redacted]" proposal risk. AR1487.

MSA's design approach differed from [redacted]. AR565, 640, AR2248. At the time the proposals were submitted for evaluation,

MSA [redacted] AR629, 631, 641, 660. Based upon the professional knowledge and judgment of the Air Force evaluation team, this was determined to be an acceptable solution. AR2236. Although the amount of contamination, if any, will not be known until the completion of post-award testing, the Air Force determined that this design best met the Air Force's desire for the ability [redacted]

2. [redacted]

Interspiro complains that [redacted] but that it did not get appropriate credit. Interspiro Mot. at 29. The RFP required that the manufacturer provide any unique tools that were necessary to maintain the SCBA system. AR55. It further provided that the evaluation of the design would take into account the number of necessary tools and whether such tools were common in form, fit, and function. AR32. Interspiro's proposal states: "[redacted]." AR359. Interspiro's proposal with respect to [redacted] was rated [redacted] with a [redacted] risk rating. AR2172. This was the [redacted] given to MSA's proposal for [redacted]. AR2237.

3. [redacted]

The RFP provided that the SCBA system shall [redacted]. However, the objective was [redacted]. AR46. This [redacted] limit contemplated a system with a [redacted]. Id. The [redacted] of MSA's SCBA [redacted]. AR649, 2236. In contrast, Interspiro's SCBA system [redacted]

[redacted]. AR358, 2171.

These [redacted] were not conjectural, as Interspiro alleges. Interspiro Mot. at 29. During the field evaluation, the Air Force [redacted] all offerors' existing commercial SCBA units submitted for field testing under Subfactor Two of the RFP, with full cylinders. [redacted]. Declaration of Laurie Beebe, ¶ 2; AR2422 .

4. [redacted]

The RFP provided that the "PAPR less filters shall weigh no more than a maximum of 6 lbs (Threshold), maximum 3.5 lbs (Objective). The overall PAPR with NIOSH filters [redacted] AR48. According to Interspiro, it proposed [redacted]. Interspiro Mot. at 30. According to Interspiro's proposal, [redacted]. AR2 365. In contrast, [redacted], AR649. Thus, it is evident that Interspiro's proposal [redacted] was not the critical factor causing [redacted].

The RFP also provided that the "PAPR shall have a minimum battery life of 6 hours (Threshold) with a 12 hour objective . . . ." AR48. Interspiro's proposal states that [redacted]. AR365. MSA's proposal states that [redacted]. AR 647.

Interspiro's design with respect to battery life was noted as [redacted]. AR2171. Although this was a strength in Interspiro's proposal, when considering all the elements considered for subfactor three, Interspiro's proposal did not provide features that warranted a rating other than "[redacted]." Compare AR2171-72 (spread sheet evaluating the individual features of Interspiro's proposed design) with AR2236-37 (evaluation of MSA's design).

D. The Air Force Properly Evaluated Interspiro's Production Program Plan

Interspiro criticizes the Air Force's math in determining Interspiro's [redacted]. Interspiro Mot. at 31-32.

The RFP required that each offerors' production plan provide "a viable plan for accelerating production and delivery of SCBA units to meet surge and contingency situations . . . ." AR32. Interspiro identified [redacted]" AR366. Although Interspiro identified this risk, which other offerors did not, it did not [redacted]. Accordingly, the Air Force rated this subfactor as [redacted] with [redacted] proposal risk, and [redacted]. AR2339, 186.

Interspiro responded [redacted]" Id.

The Air Force concluded that Interspiro's response [redacted]

[redacted]

AR1487-88. Interspiro's rating was [redacted], but the [redacted] proposal risk [redacted]

[redacted]. AR1487.

In light of the information provided by Interspiro, the Air Force applied its best effort to deduce what "[redacted]. See, e.g., AR9-10 (BEQ for line item 1001 is 200; BEQ for line item 1002 is 1,800. The BEQs are the same for each of the four option years, in which the contractor is in full production mode). [redacted]. In comparison, MSA proposed [redacted]. AR1039.

Interspiro challenges the Air Force's math and alleges a "clear error" in interpreting Interspiro's proposal. The Air Force did not make a "clear error;" the Air Force applied its best effort to determine what Interspiro's proposal meant in terms of [redacted]. The Air Force utilized calculations that were reasonable in light of Interspiro's [redacted]. More importantly, however, Interspiro [redacted]. AR160. Interspiro [redacted].

[redacted], Interspiro's allegation that the Air Force erred is without merit.

E. The Air Force Properly Evaluated [redacted]

The RFP provided that the offerors would be evaluated based upon its past and present contract performance. AR33. The RFP also provided that the Government would perform an independent determination of the relevancy of the data provided and would not be bound by the offeror's opinion of relevancy. AR34. Interspiro's faults the Air Force's determination of [redacted]. Interspiro Mot. at 32-33.

Interspiro was evaluated on the basis of [redacted] contracts it identified. AR1516-19. [redacted]. AR168.

Interspiro responded, [redacted]. AR169-170. In particular, [redacted] the Air Force concluded [redacted] AR1520.

Interspiro also contested [redacted]" AR170 (emphasis in original). The Air Force disagreed, stating, "[redacted]" AR1521.

Finally, Interspiro challenged [redacted]

[redacted]. In light of Interspiro's response, [redacted]" AR1521.

In short, while Interspiro makes conclusory arguments [redacted], it completely fails to address [redacted]. Interspiro has, thus, failed to demonstrate that the Air Force determinations were "unreasonable and contrary to law," as it alleges. Interspiro Mot. at 32.

In addition, Interspiro's rating [redacted]. AR171. Although Interspiro [redacted] AR1521. Notwithstanding these concerns, the Air Force concluded [redacted] Id.

Interspiro also challenges the Air Force's conclusion of a "high confidence" that MSA could successfully perform the contract. Interspiro Mot. at 32. Interspiro fails to identify any specific failure in the administrative record. See AR1522-29. Indeed, the record reflects not

only that [redacted] Id.

Finally, Interspiro contends that its "incumbent" status should have been considered. Interspiro at 33. First, it is arguable whether Interspiro is even an "incumbent" as the instant requirement for an SCBA is dramatically different from the SCBA it provided under the previous Air Force procurement due to changes in industry standards. However, even if Interspiro were an incumbent, the General Accounting Office has stated that it would be improper to afford an incumbent an evaluation preference or additional credit absent a provision in the RFP allowing special recognition or consideration for the past performance of the incumbent contractor. See General Dynamics-Ordinance & Tactical Services, B-295987, 2005 CPD ¶ 114 (2005); Weber Cafeteria Services, Inc., B-290085.2, 2002 CPD ¶ 99 (2002). The Air Force did not err in failing to consider Interspiro's "incumbent" status.

F. The Air Force Decision To Award The Contract To MSA Was Not Unreasonable

Finally, Interspiro takes issue with the Air Force evaluation of "best value." Interspiro Mot. at 33-35. Interspiro's arguments, however, are nothing more than conclusory statements without any factual basis. The most egregious is Interspiro's claim that it "[redacted] has invested in multiple mode SCBA technology and products over a period of years, [and] it is in the best position to field the required products on the fastest schedule and at the lowest price." Not only is there no evidentiary basis for this argument, but the extensive market research conducted by the Air Force demonstrates otherwise. See AR1873 (as of September 2004, [redacted]). Interspiro also makes frivolous claims that MSA will need a license from Interspiro and that its proposal raises infringement issues. Again, there is no evidentiary basis for these arguments, and even if there were, a speculative claim that MSA's product will infringe upon Interspiro's "pending" patent application is not a matter that is

relevant to the award decision.

More importantly, however, Interspiro overlooks the fact that MSA submitted a proposal that was superior [redacted]. In contrast to Interspiro's proposal which merited an [redacted] for the four subfactors under mission capability, the MSA proposal was rated exceptional in two of the four mission capability subfactors and acceptable in the other two subfactors. The Air Force emphasized the value of the features that led to MSA receiving two exceptional ratings:

> [T]he blue/exceptional rating in Subfactor 2, Field Evaluation [which neither Interspiro nor Scott challenges] was attributed to the performance of the MSA SCBA to [redacted] This is considered of great benefit for military first responders and exceeds [redacted] The [redacted] of the SCBA unit was evaluated to be outstanding due to [redacted] All these features were determined to be highly beneficial to the Government as further assurance is provided that first responders, both military and civilian, will be [redacted]
>
> The blue/exceptional rating in Subfactor 3, Design Approach, was attributed to [redacted] aspects of MSA's proposal. The areas in which the design approach exceeded the minimum performance and capability requirements include [redacted]

> [redacted] All these areas were considered beneficial to the Government in that the proposed system [redacted]

AR1751-52.

In past performance, MSA received the highest possible rating, a high confidence level, while Interspiro received a [redacted] rating, which is [redacted] than MSA's rating. Thus, the record establishes that MSA submitted a superior proposal in the most important evaluation factors, and Interspiro has not provided any credible allegations that the Air Force evaluation was flawed.

Given MSA's clearly superior technical proposal, Interspiro is forced to allege that the Air Force failed to consider price related factors in its price evaluation. Specifically, Interspiro alleges that (1) it has a huge inventory of spare parts and accessories, (2) the Air Force will incur migration and transition costs, and (3) MSA will incur patent infringement costs. Interspiro Mot. at 34 and n.14. These arguments are without merit.

First, the MSA unit will completely replace the Interspiro unit so Interspiro's inventory of spare parts is not relevant to any reasonable price evaluation. Second, as to "migration and transition" costs, Interspiro does not identify what specific costs the Air Force should have considered in replacing an older, less capable SCBA provided by Interspiro with a newer, more capable model. Third, as noted above, Interspiro's speculative patent infringement claim is not a proper consideration in a Government procurement. Finally, the RFP specified how the price evaluation would be conducted. The RFP did not purport to evaluate these factors identified by

Interspiro.

IV. Interspiro And Scott Fail To Demonstrate Entitlement To A Permanent Injunction

A. Standard For Obtaining A Permanent Injunction

An injunction is an equitable remedy that is not granted as a matter of course. ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 (1997) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982)). In order for Interspiro or Scott to obtain a permanent injunction, they bear the burden of proof to establish each of the following: (1) that they will suffer irreparable harm if injunctive relief is not warranted; (2) that granting the relief serves the public interest; (3) that the harm they will suffer outweighs the harm to the Government and third parties; and (4) actual success on the merits. United Int'l Investigative Serv., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998); see also Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987). Indeed, the court will not permanently enjoin an agency's award decision on a solicitation decision unless the agency's action constitutes a clear violation of the law or abuse of discretion and the decision materially prejudiced the protester. Alfa Laval Sep'n, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).[9] Further, plaintiffs must point to clear and convincing evidence that each factor has been satisfied. Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991). Thus, Interspiro and Scott bear the heavy burden of proving entitlement to any injunctive relief. Id.

---

[9] "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." Data General Corp. v. United States, 78 F.3d at 1556, 1562 (Fed Cir. 1990); accord Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581-82 (Fed Cir. 1996); Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) (protestor must show there was a substantial chance it would have received the contract but for the alleged procurement error).

B. Interspiro And Scott Has Not Demonstrated A Reasonable Likelihood Of Success On The Merits

As discussed above, Interspiro and Scott do not demonstrate that the Air Force violated law or regulation or was arbitrary or unreasonable in selecting MSA for contract award under the solicitation. Interspiro fails to establish that its SCBA is the only possible commercial SCBA that would satisfy the solicitation's requirements. Furthermore, Interspiro fails to demonstrate any flaws in the Air Force's evaluation of MSA and its SCBA. Finally, despite Interspiro's attempt to persuade the Court otherwise, the solicitation clearly allowed the Air Force [redacted], as the Air Force chose to do.

Scott also fails to establish that the Air Force improperly evaluated MSA or its proposal. Additionally, Scott failed to establish that the Air Force did not use the proper industry standards in evaluating the SCBAs. Finally, Scott fails to prove any of its numerous allegations that the Air Force treated the offerors differently in evaluating proposals. Therefore, as Interspiro and Scott cannot prevail on the merits, injunctive relief is inappropriate.

C. Interspiro And Scott Have Not Demonstrated Irreparable Harm

Of the prerequisites for injunctive relief, the requirement that a movant show that it will suffer irreparable harm is the most important. Railway Labor Executives' Ass'n v. Gibbons, 448 U.S. 1301 (1980); Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[I]rrespective of relative or public harms, a movant must establish . . . irreparable harm."); Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed. Cir. 1990); see 11 C. WRIGHT AND A. MILLER FEDERAL PRACTICE AND PROCEDURE § 2948 at 431 (1973). Plaintiff must demonstrate a "likelihood of substantial and immediate irreparable injury," an element requisite to any grant of equitable relief. O'Shea v. Littleton, 414 U.S. 488, 501-03 (1974). To constitute irreparable harm, the alleged injury must be "certain and great," not theoretical. Tenacre Foundation v. INS, 78 F.3d 693, 695 (D.C. Cir. 1996).

Interspiro's and Scott's proposed remedy in this matter would require the Air Force to re-solicit for this requirement and further delay the delivery of this critical safety equipment. Should the Court decide such a remedy is warranted, Interspiro and Scott claim one of them may receive a subsequent award. This argument does not take into account that Interspiro's proposal provided the Air Force with [redacted] and Scott's proposal was [redacted] but did not have [redacted]. The SSA, in recognition of the life and death nature of the mission that this equipment supports, has demonstrated a willingness [redacted] price premium to get the better technical solution. Other than its unsupported allegation that it had a commercial, [redacted], Interspiro does not even attempt to argue that its product was technically superior. In effect, Interspiro asks this Court to assist it in forcing its [redacted] product on Air Force first responders performing an extremely dangerous mission in the most hazardous of environments. Interspiro asks the Court for this relief when its only harm is a loss of ability to compete in any re-solicitation. Even this loss does not truly prejudice Interspiro. The Air Force, in defining its requirement and developing the solicitation, established that mission capability is far more important than price considerations for this equipment. Thus, while the Air Force has already made it clear that it places a high value on acquiring the most capable piece of equipment for this critical mission, Interspiro [redacted].

Scott, which also seeks a decision that would force a new competition, is also not prejudiced. Scott [redacted] that the Air Force determined justified [redacted]. However, not only did it not offer [redacted] that convinced the Air Force [redacted], in the case of Scott, there would be [redacted].

D. The Balance of Harms Favors the Government

If the permanent injunction is issued, the Air Force would be forced to re-solicit the contracts, and it will continue to use a contractor, Interspiro, that is providing an older, less capable product that does not offer the enhanced safety features now available in the market. Unlike Interspiro and Scott, the Government would suffer real and demonstrable harm should the Court issue an injunction suspending contract award. See OAR Corp. v. United States, 49 Fed. Cl. 478, 483-84 (2001) (holding that continued performance of an out-dated contract harms the Government).

This harm to the Government is especially severe in this case which involves key safety equipment used by first responders in the harshest and most dangerous of environmental conditions. Specifically, the Air Force would be forced to continue to equip its key first responders with less capable equipment, [redacted]. The United States is currently engaging in armed conflict in two different locations and continues to face risks of additional terrorist attacks in our homeland. This equipment and new capabilities offered by MSA have the potential of saving Air Force lives.

Currently our rescue personnel, if placed in a situation where they respond to an incident, such as a burning factory, and find the air contaminated requiring swap from compressed air to filtered air and vice versa, they are faced with deadly choices: one, they can take time to retreat from the contaminated environment, if possible, to a chemical free area and swap masks; two, they can swap masks to filtered air, hoping the contamination does not kill them; or three, they can proceed into the burning structure hoping they do not run out of compressed air before completing the mission and retreating to a decontamination zone. This is a choice we should never force our firefighters or other rescue personnel make.

The SSA specifically states in his selection decision that:

> In reaching my decision, I considered the impact that a better device would have on those who use it—Air Force personnel. The features of the MSA proposal provided [redacted] advantages over the other offerors' proposals. These features would be highly beneficial in providing Air Force personnel, both military and civilian, [redacted] during rescue and mission operations during extreme catastrophic and emergency situations. The importance of the SCBA and APR, through their impact on saving lives, makes ensuring Air Force personnel have the best device of utmost importance.

AR1889. The harm that Interspiro and Scott assert, the speculative possibility that they might win a future solicitation, pales beside the life threatening dangers to Air Force personnel engaged in extremely hazardous missions and being denied the most modern and best possible safety equipment.

E. <u>The Public Interest Favors the Government</u>

The re-solicitation of these items would place Air Force first responders in increased peril by forcing them prolonged use of outdated and less capable equipment. Continued delay in awarding this contract will force the Air Force to continue procuring older and less capable Interspiro SCBA equipment. The SSA has demonstrated how highly the Air Force values this enhanced mission capability and the safety features provided by the MSA SCBA as he explains in his narrative and by his willingness to [redacted].

Against the real and imminent harm the Air Force would suffer if forced to cancel the MSA contract, Interspiro and Scott have failed to present any evidence that even if allowed to propose on a new solicitation, they would have a meaningful chance of award. Interspiro's SCBA does not have the enhanced features the Air Force is desperately seeking for its first responders. Scott's SCBA does not offer the enhanced safety features that led the SSA [redacted] and Scott proposes [redacted]. The court should defer to the agency's discretion in determining its requirements. "The determination of an agency's

minimum needs is a matter within the broad discretion of the agency officials . . . It is not the duty of the court to second guess such determinations." Xtra Lease v. United States, 50 Fed. Cl. 612, 625 (2001) (citing Input/Output Tech., Inc. v. United States, 44 Fed. Cl. 65, 72 n.9 (1999); Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 672 (1997)). Therefore, as the Air Force would suffer severe harm in the form of increased dangers to its personnel caused by operating with less capable equipment in hazardous environments, and Interspiro's and Scott's potential harm is speculative at best, the balance of harms favor the Government.

## CONCLUSION

For these reasons, we respectfully request the Court to grant the Government's cross-motion for judgment upon the administrative record, deny the motions for summary judgment upon the administrative record filed by Interspiro and Scott, and dismiss their complaints.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

OF COUNSEL

JAMES CAINE
JOHN G. TERRA, MAJOR
United States Air Force

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0300
Fax: (202) 305-7643

Attorneys for Defendant

August 7, 2006