**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**

No. 06-425C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INTERSPIRO, INC.,

and

SCOTT TECHNOLOGIES, INC., d/b/a
SCOTT HEALTH & SAFETY,

Plaintiffs,

v.

THE UNITED STATES,

Defendant,

and

MINE SAFETY APPLIANCES CO.,

Defendant-Intervenor.

---

# DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0300
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

JAMES CAINE
JOHN G. TERRA, MAJOR
United States Air Force

August 25, 2006

TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD . . . . . . . . 1

I. Scott Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law . . . . . . . . 3

A. The Air Force Did Not Waive Warranty And Maintenance Requirements For MSA . . . . . . . . 3

B. The Air Force Evaluated All Proposals According To The Most Current Industry Standard . . . . . . . . 6

1. The Air Force Properly Evaluated MSA's Compliance With The Governing Standards . . . . . . . . 6

2. The Air Force Properly Evaluated Scott's Proposal [redacted] . . . . . . . . 9

C. The Air Force [redacted] . . . . . . . . 11

D. The Air Force Properly Conducted A Cost/Price Evaluation Of MSA's Proposal . . . . . . . . 13

1. The RFP Did Not Require The Air Force To Evaluate Life-Cycle Costs . . . . . . . . 13

2. MSA Was Not Required To Provide [redacted] . . . . . . . . 15

E. The Air Force Treated All Offerors Equally . . . . . . . . 15

II. Interspiro Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law . . . . . . . . 19

A. The Air Force Correctly Conducted Field Evaluations Only On NIOSH-Certified SCBA Units . . . . . . . . 21

B. The RFP Did Not Require The Air Force To Consider Interspiro's Pending Patents . . . . . . . . 26

C. The Air Force Was Not Required To Consider Documents That Were Not Include In Interspiro's Proposal . . . . . 27

D. The Air Force Followed The RFP In Assessing A Risk Rating To MSA's Design . . . . . 29

E. MSA's Proposal Complied With All The Terms Of The RFP . . . . . 32

1. MSA's Proposal Complies With The Definition Of Commercial Item . . 32

2. The RFP Required Offeror's To Identify Proposal Risk And To Suggest "Work-Arounds" or Risk Mitigators . . . . . 33

F. The Air Force Took The Corrective Action It Promised . . . . . 34

G. MSA Proposed A Design [redacted] . . . . . 35

H. The Risk Rating Assigned To Interspiro's Program Production Plan Was Not Arbitrary Or Capricious . . . . . 36

I. The Air Force Properly Evaluated Interspiro's Past And Present Performance . 37

CONCLUSION . . . . . 39

# TABLE OF AUTHORITIES

CASES PAGE(S)

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983) . . . . . . . . . . 30

STATUTES and REGULATIONS

28 U.S.C. § 1498 (1988) . . . . . . . . . . 26, 27

48 C.F.R. § 27.104 . . . . . . . . . . 26, 27

48 C.F.R. § 7.101 . . . . . . . . . . 14, 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INTERSPIRO, INC.,<br><br>and<br><br>SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>MINE SAFETY APPLIANCES CO.,<br><br>Defendant-Intervenor. | ) | No.06-425C<br>(Judge Firestone) |

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Defendant, the United States, respectfully submits this reply to plaintiffs' responses to our motion for judgment upon the administrative record.

The procurement at issue involves "the design, testing, and production of Self-Contained Breathing Apparatus ("SCBA") units." AR1701. Following award of the contract, the awardee is required to provide approximately 130 "first production units" of the SCBA with PAPR (Powered Air Purifying Respirator) for testing. It is expected that 16 of these units will be destroyed in testing. When the Government determines that preliminary test data is acceptable, the awardee must then send two SCBA units to the Government for field evaluation tests. Once the Government determines that these tests are satisfactory, the awardee must then submit the remainder of the initial first production units for six contractor-conducted tests. The Government

will not accept these initial units until all required tests have been performed and accepted by the Government. Further, the Government will not accept any production SCBAs until these first production units have met these requirements. AR7, 19, 56.

Consistent with this "design, test, and production" scheme, the procurement required that offerors submit a technical proposal that "shall provide **convincing rationale** to address how the offeror **intends to meet** these requirements." AR27 (emphasis added); see also AR32 (the proposal must identify "an acceptable **design approach** for the modification of the offeror's commercial SCBA units") (emphasis added). Thus, to comply with the Request for Proposals ("RFP"), an offeror needed to provide a "convincing rationale" that its "design approach" could and would meet all relevant standards and Air Force requirements.

The Air Force did not require the offerors to submit a final product that currently met all of the contract requirements. That is the purpose of the "test" phase of the procurement. Nor did the Air Force require offerors to submit a final design that currently met all of the contract requirements. Offerors needed only to show how they intend to meet the requirements. Consistent with this objective, Subfactor Three is entitled "SCBA Design Approach." AR28. It is not entitled "SCBA Design." The Air Force's acceptance of unverified representations by all the offerors, as evidenced throughout the administrative record, demonstrates this requirement. See e.g. AR1161 [redacted]; AR367 (Assigning a [redacted] rating to Interspiro's design, notwithstanding Interspiro's

[redacted]

A substantial number of the arguments raised by plaintiffs, Interpiro, Inc. ("Interspiro") and Scott Technologies, Inc. ("Scott"), rely upon the faulty premise that offerors were required to submit a product currently meeting all contract requirements and ready for production. This premise is not supported by the RFP and should be rejected.

I. Scott Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

A. The Air Force Did Not Waive Warranty And Maintenance Requirements For MSA

Scott's motion for judgment was premised upon (1) the RFP requirement that the SCBA system be "field maintainable," AR55, and (2) MSA's proposal [redacted] AR558. Scott originally alleged that MSA's proposal [redacted]. Scott Motion for Judgment at 25. Implicitly acknowledging that [redacted], Scott has abandoned its original argument and now contends that the requirement for field maintenance "is not met if the Air Force [redacted] Scott Reply at 4 (emphasis added).

Scott's motion fails to appreciate the existence of industry standards and practices with respect to maintenance and repair of SCBAs. These standards and practices recognize a difference between "maintenance" and "repair" of an SCBA.

The RFP incorporated NFPA (National Fire Protection Association) Standard 1852, Standard on Selection, Care, and Maintenance of Open-Circuit Self-Contained Breathing

Apparatus (SCBA) (2002 edition).[1] AR42, 43. This standard describes the maintenance performed by individual users while they are on duty. See § 7.1, User Maintenance. The standard also describes maintenance and repair by technicians who are authorized by the manufacturer. Id., § 7.2, Technician Maintenance. Thus, in the industry, there is a distinction between field maintenance and repairs by authorized service personnel, and the specific procedures applicable to each are described in precise detail.

The NFPA standard also provides that organizations utilizing SCBAs "shall establish policies and procedures for qualification and selection of personnel for SCBA technician training and authorization" by the SCBA manufacturer. Id., § 4.8.2. Thus, the standard requires the Air Force to establish procedures for SCBA technician training and authorization by the SCBA manufacturer, MSA.[2] Scott, however, contends that the Air Force must be [redacted]. While it is clear that the Air Force must establish training procedures, it is nonsensical to suggest that the Air Force must have already complied with this obligation prior to

---

[1] A description of the NFPA standard and its table of contents, obtained from www.nfpa.org, as well as relevant excerpts from the standard, is attached to the Government's opposition to Scott's motion to compel the Government to provide a declaration regarding communications with MSA about its warranty.

[2] See also Department of Defense Instruction 6055.6, "DoD Fire and Emergency Services Program," Enclosure 2, ¶ E2.3, "Fire and Emergency Services (F&ES) Standards," which provides, "DoD F&ES shall comply with the standards outlined in the relevant standards promulgated by . . .The National Fire Protection Agency . . . .;" and Air Force Policy Directive 32-20 (20 July1994), ¶ 1.2.3., which provides that the Air Force will "[e]nsure its fire protection operations comply with all applicable national, state, local, and Department of Defense (DoD) regulations, as well as National Fire Codes published by the National Fire Protection Association (NFPA)."

selecting the manufacturer for award of the contract. The RFP imposes no such obligation, and Scott cites none.[3]

Scott then concludes that MSA's warranty fails to conform to the requirements of the contract, Scott Reply at 5, but it offers no basis for this conclusion. The RFP required that the contractor provide "at least the same express warranty terms, including offers of extended warranties, offered to the general public in the customary commercial marketplace." On its face, MSA has complied with this requirement, and Scott has not demonstrated a failure to comply.

To the extent that Scott is suggesting that [redacted] it is simply wrong. Accordingly, it is evident that MSA's proposal complies with both the RFP and the NFPA standard. Its SCBA system is field maintainable and [redacted].

B. The Air Force Evaluated All Proposals <u>According To The Most Current Industry Standard</u>

1. The Air Force Properly Evaluated MSA's <u>Compliance With The Governing Standards</u>

In its opening brief, Scott argued that MSA's proposal failed to meet both the 2004 and 2005 NIOSH draft standard, that the Air Force failed to evaluate Scott's proposal in light of the 2005 draft standard, that [redacted] by Scott's alleged compliance with the 2004 draft standard, and that [redacted]

---

[3] Scott also discusses MSA's costs [redacted]. Scott Reply at 5. Scott misrepresents these costs. [redacted] AR561. In any event, [redacted] are completely irrelevant to the issue raised by Scott – whether MSA's product is field maintainable.

[redacted] was the "most significant" difference between Scott's and MSA's proposals. Scott Motion for Judgment at 17-24. Scott's reply brief does not address our demonstration [redacted] See Def. Cross-Motion at 14-17. Scott's remaining argument amounts to quibbling with the evaluators' judgment regarding a single design factor of MSA's and Scott's proposal.

First, Scott repeats its attack on the Air Force evaluation of MSA's proposal and, in particular, MSA's statement that [redacted] AR1042. Since Scott concedes that the 2004 draft standard had no bearing on the evaluation of proposals, Scott now alleges that MSA's statement indicates [redacted] Scott Reply at 9. Notwithstanding our request for an explanation in our opening brief, Def. Cross-Motion at 11, Scott has never explained how this statement [redacted]

In our opening brief, we explained that [redacted] for "a realistic 'work-around' or risk mitigator" were (1) required by the RFP (AR27), and (2) could result in a determination by the Air Force of an acceptable and "convincing rationale address[ing] how the offeror <u>intends to meet</u>" the Government's requirements" (AR27). Def. Cross-Motion at 11-13. Scott takes issue with this explanation, contending that [redacted] and that it was "patently unreasonable" for the Air Force to conclude that MSA's design had no deficiencies. Scott Reply at 9.

First, the relevant question is not whether MSA's proposal [redacted].

Scott argues, however, that the Air Force was required to determine compliance with the June 2005 standard.[4] As the declaration of Laurie Beebe explains, at the time that initial evaluations were performed, the Air Force was aware that NIOSH had announced a planned revision to the draft standard. Beebe Declaration, ¶ 7. It would have made no sense [redacted] Second, Scott offers no explanation for its claim that the Air Force acceptance of [redacted] was unreasonable.

Scott makes the conclusory assertion that [redacted] Scott Reply at 10, n.5. Scott's opinion as to the materiality of this particular requirement is not supported by the RFP or any other evidence in the administrative record. And, as we have already noted, the Air Force accepted [redacted].

In our opening brief, we compared [redacted] Def. Cross-Motion at 13. Scott contends that the situations are not

---

[4] We do not concede that [redacted] and Scott has offered no explanation for this position.

comparable because Scott provided a "detailed response" and because it stated that it [redacted][5] However, since the Air Force [redacted], it is clear that the Air Force treated all such representations equally, whether expressed in the present or future tense, and Scott's complaint is without merit.

However, if there were any doubt about equal treatment, Scott should look at [redacted]. For example, Scott admitted that [redacted]

Finally, as noted at the outset of our brief, the Air Force was not required to confirm that [redacted] See Scott Reply at 12. That is the point of

---

[5] Scott alleges that the Government ignored its "detailed response." Scott Reply at 10, n. 6. In fact, the Government quoted Scott's response in its entirety. See Def. Cross-Motion at 13.

[6] The Air Force assigned a [redacted] proposal risk to Scott's overall design approach. AR1684.

post-award testing and field evaluation. If confirmation were required pre-award, the post-award testing would be pointless.

2. The Air Force Properly Evaluated Scott's Proposal [redacted]

Scott contends that the Air Force was required to reevaluate the proposals [redacted] Scott further suggests that, [redacted] There is no merit to Scott's argument.

Having undertaken a lengthy and complex evaluation of the proposals, the Air Force was not required to redo its efforts, and nothing in the RFP states otherwise. At all phases of the evaluation process, the Air Force applied the most current standard. [redacted]

Nor did Scott suffer any prejudice from this process. Scott not only was aware of the changing standard, Scott [redacted] AR1321. Therefore, if Scott wanted to clarify how its design would exceed the requirements of the RFP, Scott had ample opportunity to do so. However, Scott only advised the Air Force that [redacted]

For example, Scott alleges that it failed to get credit for [redacted]

[redacted]

[redacted]

AR1124.

The RFP requirement was as follows: "The PAPR less filters shall weigh no more than a maximum of 6 lbs (Threshold), maximum 3.5 lbs (objective). The overall PAPR with NIOSH filters weight shall not exceed 10 lbs."[7] AR48. Accordingly, [redacted]

Scott also contends that the [redacted] Id. Scott argument overlooks, however, the requirements of the RFP, which provide that the PAPR be operable "in low and high flow rate modes." Therefore, Scott's proposal [redacted]

As we noted previously, the Air Force uniformly applied [redacted] See Def. Cross-Motion at

---

[7] Several of the RFP requirements provided for a threshold standard, which was the minimally acceptable standard, and an objective standard, which, if met, would exceed the minimally acceptable standard. See, e.g. AR46 (The SCBA system excluding the PAPR shall weigh no more than 35 pounds (threshold), 30 pounds (objective). This weight limit includes all components including air cylinder (45 minute Threshold, 60 minute Objective).

14. The Air Force was not required to redo its technical evaluations, and Scott has demonstrated no error or prejudice resulting from the procedures applied.

C. The Air Force [redacted]

In its motion for judgment, Scott alleged [redacted] Scott Motion for Judgment at 16. The declaration of Laurie Beebe, submitted with our cross-motion, unequivocally states that the Air Force [redacted] Beebe Declaration, ¶ 4. Scott has now expanded its argument to include the allegation that "the RFP was violated" when [redacted] Scott Reply at 17.

Scott also makes the nonsensical argument that, in evaluating MSA's design approach, the Air Force was precluded from considering [redacted] Scott Reply at 18-19. The RFP provided that field evaluations would be performed on "existing commercial SCBA units." AR28. [redacted] And nothing in the RFP precludes such comments in the written narrative.

Accordingly, as we noted in our earlier brief, the evaluators reviewed MSA's written proposal – as it reviewed all offerors' written proposals – and it selectively highlighted certain aspects of that proposal in their written evaluations. Thus, the references Scott relies upon – AR2244 and AR2259 – are nothing more than quotes taken from MSA's proposal. [redacted]

[redacted] There was nothing improper about reviewing and considering such comments in MSA's written proposal.

The Government does acknowledge the written comment in Laurie Beebe's Proposal Evaluation notes stating, [redacted] AR2246. This comment is not inconsistent with Ms. Beebe's statement that the evaluators, including Ms. Beebe, [redacted] Beebe Declaration, ¶ 4. And we are required to concede that [redacted] That much is reflected in the inventory of materials delivered by MSA to the Air Force. AR2421-2422 [redacted] However, the record is clear that the Air Force [redacted] and nothing in the administrative record suggests otherwise.

Scott's reliance upon a dictionary definition of "evaluate" does not assist its case. Nothing in the record reflects that the "value, quality, importance, extent, or condition" of [redacted] was "consider[ed] or examine[d]." [redacted] Scott has not identified any violation of the RFP.

D. The Air Force Properly Conducted A Cost/Price Evaluation Of MSA's Proposal

1. The RFP Did Not Require The Air Force To Evaluate Life-Cycle Costs

In our opening brief, we responded to Scott's complaint about life-cycle costs by averring that life-cycle costs were not a part of the evaluation criteria. Def. Cross-Motion at 19. In response, Scott alleges that life-cycle costs are included within the scope of "Proposal Risk," which focuses on, among other things, the potential for "increased cost" (AR33). Scott Reply at 21. Scott also relies upon the definition of life-cycle costs in the Federal Acquisition Regulations, which provides: "Life-cycle cost means the total cost to the Government of acquiring, operating, supporting, and (if applicable) disposing of the items being acquired." 48 C.F.R. § 7.101.

This definition demonstrates that the RFP did not contemplate an evaluation of life-cycle costs. Had such an evaluation been contemplated, the RFP would have sought price quotes for spare parts, but it did not. The RFP provided that such prices would be negotiated in the future. AR9.

More importantly, Scott's proposal recognized and brought to the Government's attention [redacted] AR1363. Yet Scott provided no basis for the Air Force to evaluate [redacted] which the Air Force could have evaluated and compared to other

offerors.[8] If the RFP truly provided that life-cycle costs would be evaluated, [redacted]

As Scott correctly recognized in its proposal, the RFP required offerors to submit, and the Air Force to evaluate, unit prices for individual line items. The RFP did not require **any** information about life-cycle costs. Accordingly, Scott's complaint that the Air Force was required to evaluate life-cycle costs is not supported by the RFP and is inconsistent with the position taken in its proposal.

2. MSA Was Not Required To Provide [redacted]

In its opening brief, Scott argued that the Air Force did not evaluate [redacted] Scott Motion for Judgment at 32-33. In light of our demonstration that MSA and other offerors [redacted] Scott now argues only that [redacted] Scott Reply at 23. Although Scott alleges that such a firm commitment is required by the RFP, Scott Reply at 23, it does not cite any provision of the RFP.

As already noted, the offeror was required to submit a "design approach" addressing how it "intends to meet" all relevant standards and requirements. The Air Force determined that MSA's proposal [redacted] was deemed an acceptable design

---

[8] In this regard, Scott's proposal suffers from the same alleged defect that it ascribes to MSA's proposal, [redacted] See Scott Reply at 22, n.11. Scott complains that it received no credit for this part of its proposal, id. at 23, but [redacted] In any event, life-cycle costs were not included in the evaluation factors of the RFP.

approach, and Scott has offered no explanation as to how this design approach deviates from the requirements of the RFP.

E. The Air Force Treated All Offerors Equally

Scott wrongly complains that we did not address the "strengths" of its proposal for which it allegedly did not receive appropriate credit. Scott Reply at 25. We noted in our opening brief that Scott's design met the minimal requirements [redacted] Def. Cross-Motion at 17.

Notwithstanding this demonstration, Scott contends that its proposal "shares" the feature [redacted] Scott Reply at 25-26. Neither the administrative record it cites nor Scott's proposal supports this allegation. Scott relies upon an evaluator's note, which mentioned that [redacted] Scott Reply at 26, citing AR2317-18. [redacted]

Thus, while Scott's proposal allows the user [redacted] MSA's proposal [redacted] AR629, 631, 649. [redacted]

[redacted] AR1492, 2236, 2264. Scott's proposal does not state that [redacted] Scott's proposal in this regard was not equal to MSA's proposal.

Scott also complains that the initial technical evaluation identified strengths that were later disregarded in the final technical evaluation. Scott Reply at 26-27. There is no merit to Scott's complaint. In the initial technical evaluation, the Air Force noted the following strengths of Scott's proposal:

[redacted]

AR2344-2346. In the final technical evaluation, the Air Force noted the following strengths of Scott's proposal:

[redacted]

AR1494-95. Thus, contrary to Scott's complaint, Scott Reply at 27, Scott's strengths were not "dropped" from the final technical evaluation.

---

9 [redacted] When the user is in PAPR mode, he or she is breathing filtered air pulled in from the outside environment with a powered assist, to make ease the user's breathing through the filter.

At bottom, Scott contends that, [redacted] it should have received [redacted] Under the evaluation process, however, the Air Force was not required to give Scott [redacted] AR33.

In contrast to Scott's proposal, the final technical evaluation noted the following strengths of MSA's proposal:

[redacted]

AR1491-92.[10] In light of these strengths and the significant differences between Scott's and MSA's proposals, [redacted] as Scott contends.

II. Interspiro Has Failed To Demonstrate That The Government's Actions In Awarding The Contract To MSA Were Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

Interspiro argues that it is entitled to the contract award because it allegedly is able to provide a three-mode SCBA [redacted]. Interspiro Reply at 28. In the first place, Interspiro's proposal demonstrates that, [redacted]

---

[10] To complete the picture, the final technical evaluation noted the following strengths of Interspiro's proposal:

[redacted]

[redacted] Moreover, in light of these comments, Interspiro cannot contend, as it does, that "Interspiro had a [redacted] to satisfy the Air Force's needs." Interspiro Reply at 4. This claim is not consistent with the representations made by Interspiro in its proposal, and it was not presented to the Air Force for its consideration.

More importantly, however, this procurement was not a contest to see which manufacturer [redacted]. In this procurement, the Government sought innovative designs for a new SCBA unit that would best meet its objectives, and it used a best value approach, in which the contract would be awarded to the offeror "who gives the Air Force the greatest confidence that it will best meet or exceed our requirements affordably." AR31. The Government did not seek to procure a "fully operational product" for immediate delivery. The Government solicited a "design approach" demonstrating how the offeror intended to meet or exceed the Government's requirements. AR27, 32. Accordingly, the Government was not

required to award the contract to an offeror who simply met the contract requirements, [redacted][11]

The Air Force properly evaluated the proposals in accordance with the requirements of the RFP, and it awarded the contract to MSA. The decision was based primarily upon [redacted] None of Interspiro's arguments detracts from the weight of those conclusions, and Interspiro has not demonstrated that the Air Force award was arbitrary, capricious, or contrary to law.

We address each of those arguments as follows:

A. The Air Force Correctly Conducted Field <u>Evaluations Only On NIOSH-Certified SCBA Units</u>

Interspiro alleges that the Air Force violated the terms of the RFP by [redacted] In the same vein, Interspiro argues that units submitted for field evaluation were required to meet all of the standards and requirements of the RFP, and therefore, [redacted] Interspiro relies upon (1) Appendix A – Field Evaluation Exercise (AR72-76), and (2) two partial quotes from the RFP (AR28, 32). Interspiro Reply at 4-6, 21-22.

Interspiro's argument fails to address the plain language of the RFP, which states that the field evaluation will evaluate "existing commercial SCBA units," which "shall be the same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award." AR28. The RFP further provided that SCBA units and APRs that were not NIOSH-certified would not be field tested and would be rated unacceptable.

[11] In any event, the awardee is required to submit the first production SCBA units within 120 days of the initial delivery order. AR19.

AR69, 2409. In further clarification, the Air Force stated that the two SCBA units submitted for field evaluation must be "NIOSH CBRN certified; APR and PAPR modes are not required."[12] AR2409. Indeed, at the time of contract award, NIOSH CBRN certified PAPRs did not exist.

In our opening brief, we pointed out that the Field Evaluation Tests set forth as Appendix A to the RFP were intended for two different uses: to evaluate the offerors' existing commercial items in the pre-award phase, AR28, and to evaluate the awardee's first production SCBA units in the post-award phase, AR19, 56. [redacted] It was, therefore, entirely appropriate for the Air Force to limit field evaluations to NIOSH-certified SCBAs. And it was entirely appropriate to utilize the Field Evaluation Assessment form at the pre-award phase to evaluate **only** those components for which NIOSH certification is available.

Without acknowledging these different purposes as stated in the RFP, Interspiro alleges that it relied upon [redacted] Interspiro Reply at 4-8. Interspiro's interpretation is patently inconsistent with the provision that field evaluations will be conducted on "existing commercial SCBA units."

More specifically, Interspiro's proposal stated that it was submitting [redacted] the 'existing commercial SCBA units . . . ." In addition, Interspiro was submitting "all the accessories . . . including [redacted] of the new CW component . . . ." AR327. Interspiro contends that it "used the term '[redacted]' because the RFP used that term to describe what offerors were to provide for Field Evaluation." Interspiro Reply at 6-7, citing AR72 (Appendix

---

[12] This clarifying statement issued by the Air Force in response to frequently asked questions directly refutes Interspiro's allegation that the Air Force violated the RFP by conducting field evaluations on only the SCBAs. See Interspiro Reply at 6.

A to the RFP). See also id. ("[redacted] citing Appendix A, AR72).

In contrast to Appendix A, the RFP stated:

> Subfactor Two: Field Evaluation
> The offeror shall provide two (2) of its **existing commercial SCBA units** with the submission of its RFP package. The two SCBA units **shall be the same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award**. The offeror shall ensure that the SCBA units comply with paragraphs 3.4.5 and 3.4.6 of the purchase description and are complete units in that all the accessories that are used with the unit are included, along with the units' standard commercial operations and maintenance manuals.

AR28. Interspiro provides no explanation for choosing one word in Appendix A over the more comprehensive language in the Purchase Description, which is the most relevant provision describing what offerors were required to submit.

Moreover, Interspiro's reliance upon this single word in the appendix is inconsistent with information allegedly provided by the Air Force to Interspiro that "base test units provided by the offerors would have to be NIOSH certified to qualify as 'existing commercial SCBA units' eligible for field testing during the evaluation process."[13] Interspiro App. 143 (Declaration of Mr. Brookman), ¶ 17.

Nor does the partial quote from the RFP assist Interspiro. Interspiro relies upon the following language set forth in bold: The two SCBA units "**shall be the same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award.**" [redacted]

[13] In light of this communication, there is no merit to Interspiro's argument that it was merely following Air Force "instructions" [redacted]. Interspiro Reply at 9-10. Moreover, it is a stretch to argue that one word used in an appendix constitutes "instructions."

[redacted]

Interspiro's [redacted], Interspiro App. 143, ¶ 17, and Interspiro does not contend otherwise. Interspiro, however, rejects Ms. Beebe's statement that "[redacted] See Interspiro Reply at 9, n.5. Without directly refuting Ms. Beebe's contention, Interspiro responds that its multi-mode unit has been "marketed." Id. Interspiro does not dispute that [redacted] In order to overcome this fatal fact, Interspiro contends that components of its SCBA [redacted] Interspiro Reply at 9, n.5. The RFP provided that only NIOSH-certified units would be field evaluated. [redacted]

Interspiro's claim that [redacted] Interspiro Reply at 9, is a misrepresentation of the record. It is not disputed that the [redacted]

Interspiro also relies upon a phrase in the RFP taken out of context. Interspiro quotes the following language set forth in bold:

[redacted]

Interspiro Reply at 21-22, citing AR32. As previously noted, the material required for Subfactor Two included two "existing commercial SCBA units," which "shall be the same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award." AR28. The RFP further stated that these SCBA units must "comply with paragraphs 3.4.5 and 3.4.6 of the purchase description." Id. One cannot read this provision, limiting the performance evaluation areas with which an SCBA unit must comply to two paragraphs of the RFP, and conclude, as Interspiro has, that the existing commercial unit required for field evaluation must meet "all the performance evaluation areas listed in the Field Assessment Questionnaire." Interspiro's interpretation is also inconsistent with the RFP requirement that offerors need only provide "a convincing rationale to address how the offeror intends to meet these requirements." AR27.

Finally, Interspiro's interpretation would have represented a patent ambiguity requiring Interspiro to seek clarification. In this case, Interspiro apparently already obtained that clarification. See Interspiro App. 143 (Declaration of Mr. Brookman), ¶ 17 (Interspiro was advised by the Air Force that "base test units provided by the offerors would have to be NIOSH certified to qualify as 'existing commercial SCBA units' eligible for field testing during the evaluation process").

Interspiro's proposal clearly stated that [redacted] AR327. Interspiro's claim that [redacted] is without

merit. Interspiro's further claim that [redacted] is similarly without merit.

B. The RFP Did Not Require The Air Force To Consider Interspiro's Pending Patents

While we have not found any controlling precedent in this Court, the Government Accountability Office ("GAO") has uniformly rejected bid protests based on anticipated patent infringement. See Lab Products, Inc., B- 252452, 93-1 CPD ¶ 250 (1993) ("A potential claim for patent infringement does not provide a basis for sustaining a protest. The exclusive remedy for a patent holder who claims patent infringement by the government or by a government contractor who acts with the authorization or consent of the government is a suit against the government in the United States Court of Federal Claims"); Odetics, Inc., B-246008, 92-1 CPD ¶ 185 (1992) ("this is a matter between those private parties, not appropriate for consideration under our bid protest function. A potential for patent infringement does not provide a basis for objecting to a contract award"); Aircraft Porous Media, Inc., B-241665, 91-1 CPD ¶ 356 (1991) ("A potential for patent infringement does not provide a basis for objection to award. As we have recognized, 28 U.S.C. § 1498 (1988) gives patent holders an adequate and effective remedy for patent infringement, while saving the government from having its procurements delayed pending litigation of patent disputes").

As one decision noted:

> It would be improper to reject a low bid merely because the bidder was not licensed to manufacture a patented article. Such conclusion was predicated upon the principle that competitive bidding on government contracts should be encouraged, regardless of a possible infringement claim, particularly in view of the obvious purpose and intent of 28 U.S.C. 1498, which was designed to compensate the patent holder in such situations. To conclude otherwise would be inconsistent with public interest since it would discourage competition . . .

Charles Pfizer & Co., B-141459, 1960 CPD ¶ 37 (1960). This guidance is consistent with the Federal Acquisition Regulations, which provide that "[g]enerally, the Government will not refuse to award a contract on the grounds that the prospective contractor may infringe a patent." 48 C.F.R. § 27.104. Interspiro has not offered any basis to depart from this general practice.

While Interspiro speculates that 28 U.S.C. § 1498 may not apply to this procurement because there is no indemnification clause in the contract, Interspiro Reply at 11, Interspiro provides no basis for this alleged concern. The language in section 1498 is clear:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

The remedy provided by section 1498 is not contingent upon an agreement by the Government contractor to indemnify the United States. See Lab Products, Inc., infra (patent holder may claim infringement "by the government or by a government contractor who acts with the authorization or consent of the government").

Nothing in the RFP required the Air Force to consider potential patent infringement issues.

C. The Air Force Was Not Required To Consider Documents That Were Not Include In Interspiro's Proposal

According to Interspiro, the Government claimed that it was unaware that Interspiro "had already developed, manufactured and marketed Three-Mode SCBAs." Interspiro Reply at 14. The Government made no such claim.[14] Whether Interspiro had already developed,

---

[14] Nor did the Government "acknowledge[] that Interspiro had [redacted] as Interspiro alleges. Interspiro Reply at 16, citing AR1518. Interspiro misrepresents the record. AR1518 sets forth an Air Force comment upon one of Interspiro's

manufactured, and marketed Three-Mode SCBAs is completely irrelevant. The only relevant issue is whether Interspiro [redacted] As we noted above and in our opening brief, [redacted] See AR363 [redacted]

The Air Force properly considered Interspiro's proposal and the information contained therein. Interspiro offers no authority for its proposition that the Air Force was required to consider Interspiro's 2004 response to the Air Force's market research questionnaire, Interspiro's patent filing, or the declarations provided in this lawsuit. See Interspiro Reply at 16. To the

---

current contracts. The comment states:

> [redacted]

Nothing in this comment indicates that Interspiro had produced [redacted]

extent that Interspiro deemed any information in those sources to be relevant to this procurement, Interspiro should have included it in its proposal.

Finally, Interspiro contends that the Air Force should have issued an evaluation notice to Interspiro, or otherwise raised Interspiro's claim that it had developed and manufactured a three-mode SCBA during the discussions phase of this procurement. Interspiro at 17. [redacted] Accordingly, there was nothing for the Air Force to question.

D. The Air Force Followed The RFP In Assessing A Risk Rating To MSA's Design

Interspiro alleges that the risk rating assigned to MSA's design proposal was "fatally flawed." Interspiro Reply at 18-21. Interspiro's complaint attacks the Air Force's judgment in evaluating the proposals, but it has not established that the evaluation lacked a rational basis or violated the terms of the RFP. Instead, Interspiro seeks to have the Court substitute its judgment for that of the agency, which it may not do. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983).

In this procurement, offerors were required to identify "those aspects of the proposal considered to involve cost and/or mission capability subfactor risk" and to rate each such risk. AR27. [redacted].[15] AR660. [redacted] See AR366-69. [redacted] Interspiro suggests that the Air Force was [redacted] The RFP does not require this result. In fact, Mandatory Procedure 5315.3, paragraph 5.5.2, which governs this analysis,

---

[15] With regard to the risk assessments MSA provided in its risk matrix, AR660, the Government chose not to quibble with Interspiro's characterization of MSA's proposal. Def. Cross-Motion at 28. The Government does not take issue with the definitions of the risk ratings, as Interspiro suggests. Interspiro Reply at 19.

AR33, provides that "[f]or any weakness identified, the evaluation shall address the offeror's proposed mitigation and why that approach is or is not manageable."

Interspiro singles out for comment [redacted] Interspiro Reply at 20, n. 14. As we stated in our opening brief,

> [redacted]

Def. Cross-Motion at 31. Indeed, [redacted]

Moreover, [redacted]

[redacted]

Using Interspiro's logic, [redacted]

[redacted]

Interspiro apparently takes issue with the judgment of the Air Force that, [redacted] See Interspiro Reply at 20-21. Interspiro's disagreement with this judgment does not make it arbitrary, capricious, or otherwise not in accordance with the requirements of the RFP.

E. MSA's Proposal Complied With All The Terms Of The RFP

1. MSA's Proposal Complies With The Definition Of Commercial Item

Interspiro's reply brief does not make any new arguments in support of its claim that MSA's design approach [redacted] Interspiro continues to assert that FAR section 2.01 requires that an item "evolved" from a commercial item must have undergone a completed evolution by the time the proposal was submitted. Interspiro Reply at 23-25.

Section 2.101 provides that a "commercial item" is one that has "evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation." Interspiro's interpretation of section 2.101 should be rejected as it renders the second clause in this definition surplusage. Indeed, Interspiro contends that the second clause is immaterial. Interspiro brief at 25.

Interspiro's argument also overlooks the scheme of this procurement. As we previously noted, this was a design, test, and produce contract for which the procurement process evaluated an offeror's existing commercial SCBA unit, and then evaluated the offeror's design approach for modifying that unit in order to conform to the contract requirements. [redacted] There is no merit to this argument.

2. The RFP Required Offeror's To Identify Proposal Risk And To Suggest "Work-Arounds" or Risk Mitigators

Interspiro's reply brief makes a completely new argument – that MSA's proposal should have been disqualified [redacted]

[redacted] AR48 (emphasis added).[16] See Interspiro Reply at 26-27. Once again, Interspiro ignores the "design" element of this procurement.

MSA's proposal [redacted] As previously noted, Mandatory Procedure 5315.3, paragraph 5.5.2, provides that "[f]or any weakness identified, the evaluation shall address the offeror's proposed mitigation and why that approach is or is not manageable." Indeed, since Interspiro also [redacted]

Interspiro also contends that MSA's design approach was not entitled to a [redacted] rating because [redacted] Interspiro Reply at 34-35. See Interspiro Motion for Judgment at 30-31. We would only note, once again, that the Air Force was required to evaluate not only the design risks identified by the offeror, but also its proposed work-around or risk mitigator. In the judgment of the Air Force, [redacted] This decision was neither arbitrary, capricious, nor a violation of the RFP.

F. <u>The Air Force Took The Corrective Action It Promised</u>

Interspiro makes yet another new argument – that the Air Force failed to take the corrective action it proposed to the GAO. Interspiro Reply at 27-28. Interspiro is incorrect.

---

[16] Interspiro originally argued that the Air Force rating of [redacted] for MSA's design approach was arbitrary and capricious because [redacted] Interspiro Motion for Judgment at 30-31.

On March 20, 2006, the Air Force provided written confirmation to the GAO that "[t]he Source Selection Authority (SSA) will reconsider the proposals, and will then issue a new Source Selection Decision Document." Interspiro App. 131. The Air Force took the action it promised.

The SSA followed the evaluation methodology set forth in the solicitation. The SSA considered the ratings given to the offerors' proposals by the technical evaluation team, and he considered the relative importance of the evaluation factors. The SSA also considered the trade-off possibilities that existed. On April 18, 2006, the SSA signed a new decision document that reaffirmed the decision to award the contract to MSA. AR1883-89. The decision document reflected consideration of the price difference among the proposals, and the value of the non-price related factors relative to the cost difference. The SSA determined that the proposal from MSA provided the best value to the Air Force because its superior technical proposal, its overall business approach, and its past and present performance [redacted]. Id.

The Air Force did not promise to conduct a new evaluation of the proposals, to reopen discussions, or to obtain new information. Accordingly, there is no basis for Interspiro to argue that the Air Force was required to engage in these activities. See Interspiro Reply at 28.

G. MSA Proposed A Design [redacted]

In yet another new argument, Interspiro alleges that the Air Force gave credit to MSA's proposal design that is undeserved.[17] Interspiro Reply at 32-34. Interpiro is mistaken.

---

[17] This argument appears designed to overcome our observation that Interspiro's proposal states: [redacted] See Def. Cross-Motion at 31. Interspiro is at least consistent; it does not argue that [redacted] See Interspiro Reply at 33-34.

MSA's proposed design [redacted]

H. The Risk Rating Assigned To Interspiro's Program <u>Production Plan Was Not Arbitrary Or Capricious</u>

The RFP expressly required the offeror to provide "a viable plan for accelerating production and delivery of SCBA units to meet surge and contingency situations." AR32. Interspiro's proposal identified such a plan. AR1487. [redacted] AR366.

Interspiro [redacted] Accordingly, the Air Force [redacted] AR2339, 186.

Interspiro responded, stating that [redacted]

Id. (emphasis in original).

The Air Force took Interspiro at its word, and assumed that [redacted]

As we previously stated, the Air Force applied its best effort to determine [redacted]

[redacted]

I. The Air Force Properly Evaluated Interspiro's Past And Present Performance

Finally, Interspiro makes a new argument regarding [redacted] Interspiro Reply at 38-40.

[redacted]

[redacted]

[redacted]

[redacted]

CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant the Government's motion for judgment upon the administrative record and dismiss plaintiffs' complaints.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

OF COUNSEL

JAMES CAINE

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Trial Attorney

---

[18] Interspiro misrepresents [redacted] See AR384.

JOHN G. TERRA, MAJOR
United States Air Force

Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0300
Fax: (202) 305-7643

Attorneys for Defendant

August 25, 2006