**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **INTERSPIRO, INC.,**<br><br>**and**<br><br>**SCOTT TECHNOLOGIES, INC., d/b/a/ SCOTT HEALTH & SAFETY,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**MINE SAFETY APPLIANCES CO.,**<br><br>**Defendant-Intervenor.** | **Civil Action No. 06-425C**<br>**(Judge Firestone)** |

# PLAINTIFF INTERSPIRO, INC.'S RESPONSE TO DEFENDANT'S AND DEFENDANT-INTERVENOR'S CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

David Hazelton
Joshua Chandler
Latham & Watkins LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Attorneys for Interspiro, Inc.

Of Counsel:
Kevin A. Russell
Kyle R. Jefcoat
David P. Palmer

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

I. THE UNDISPUTED FACTS ESTABLISH SEVERAL ALTERNATE GROUNDS FOR GRANTING INTERSPIRO'S MOTION ........................................2

A. The Undisputed Facts Establish Fatal Flaws in the Air Force's Evaluation of Interspiro's Proposal ........................................................................4

1. The Air Force Violated the RFP's Requirements [redacted] ........................................................4

2. The Air Force Also Ignored the RFP's Terms When [redacted] ........................................................................7

3. The Air Force [redacted] ........................................10

4. The Air Force Ignored Documentation Establishing That Interspiro Had Already Developed, Manufactured and Marketed Three-Mode SCBAs ........................................................................14

B. The Undisputed Facts Establish At Least Four Fatal Flaws in the Air Force's Evaluation of MSA's Proposal ........................................................18

1. [redacted] ........................................................................18

2. [redacted] ........................................................................21

3. [redacted] ...........23

4. [redacted] ........................................................................26

C. The Undisputed Facts Establish That The AirForce Failed to Take Reasonable "Corrective Action" ........................................................................27

**AGREED-UPON REDACTED COPY – MAY BE MADE PUBLIC**


II. THE AIR FORCE'S AND MSA'S MOTIONS ARE MISGUIDED AS A MATTER OF FACT AND LAW ....29

A. The Air Force' Assessment of MSA's Design Approach Was Arbitrary and Capricious ....30

1. The Air Force Displayed a Lack of Understanding of the Three-Mode Technology By Rating MSA Blue For its Proposed Design ....31

2. [redacted] ....34

3. The Air Force Should Have Questioned MSA's [redacted] ....36

B. [redacted] ....36

C. The Air Force's Evaluation of Past and Present Performance Violated the Express Terms of the RFP ....38

III. INTERSPIRO SHOULD BE GRANTED PERMANENT INJUNCTIVE RELIEF ....41

A. Interspiro Has Demonstrated Success on the Merits ....41

B. Interspiro Will Suffer Irreparable Injury Absent Injunctive Relief ....43

C. The Balance of Harms Weighs in Favor of Granting Interspiro Injunctive Relief ....44

D. The Public Interest is Best Served By Granting Interspiro Injunctive Relief ....46

IV. CONCLUSION ....47


**APPENDIX**


Exhibit A MSA's Risk Matrix ....Interspiro Ex. Page 1

Exhibit B Air Force Field Assessment Questionnaire for MSA ....Interspiro Ex. Page 3

Exhibit C RFP PAPR Requirement and MSA Proposal Language ....Interspiro Ex. Page 8

## TABLE OF AUTHORITIES

**CASES** **PAGES**

Aircraft Porous Media Inc.,
B-242665.2, 91-1 CPD ¶ 356 (1991) .......... 13

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) .......... 31, 41, 44

Blue & Gold Fleet, LP v. United States,
70 Fed. Cl. 487 (2006) .......... 41, 43

CACI Inc.-Federal v. United States,
719 F.2d 1567 (Fed. Cir. 1983) .......... 42

CSE Construction Co. v. United States,
58 Fed. Cl. 230 (Fed. Cl. 2003) .......... 27

CW Government Travel, Inc. v. United States,
61 Fed. Cl. 559 (2004) .......... 46

Cardinal Maintenance Service, Inc. v. United States,
63 Fed. Cl. 98 (2004) .......... 43, 46

Chapman Law Firm v. United States,
63 Fed. Cl. 519 (2005) .......... 3, 27

Ellsworth Associates Inc. v. United States,
45 Fed. Cl. 388 (1999) .......... 43

Galen Medical Associates, Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) .......... 21

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) .......... 17, 45

Impresa Contruzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 42

Information Technology & Applications Corp. v. United States,
316 F.3d 1312 (Fed. Cir. 2003) .......... 42

Keco Industrial v. United States,
428 F.2d 1233 (Ct. Cl. 1970) .......... 44

M.A. DeAtley Construction, Inc. v. United States,
71 Fed. Cl. 370 (2006) ....29

Motorola, Inc. v. United States,
729 F.2d 765 (Fed. Cir. 1984) ....11

Omega World Travel, Inc. v. United States,
54 Fed. Cl. 570 (2002) ....17

Orca Northwest Real Estate Service v. United States,
65 Fed. Cl. 1 (2005) ....17, 19

Overstreet Electric Co. v. United States,
47 Fed. Cl. 728 (2000) ....43

PGBA, L.L.C. v. United States,
57 Fed. Cl. 655 (2003) ....42

Premier Engineering & Manufacturing., Inc.,
B-283028, B-283028.2, Sept. 27, 1999, 99-2 CPD ¶ 65 ....24

Rotech Healthcare Inc. v. United States,
No. 06-303C, 2006 WL. 2055882 (Fed. Cl. July 24, 2006) ....46

System Plus, Inc. v. United States,
69 Fed. Cl. 757 (2006) ....20

Trimble Navigation, Ltd.,
B-271882, B-271882.2, Aug. 26, 1996, 96-2 CPD ¶ 102 ....24

TVI Energy Corp. v. Blane,
806 F.2d 1057 (Fed. Cir. 1986) ....12

United International Investigative Services, Inc. v. United States,
41 Fed. Cl. 312 (1998) ....43

**STATUTES & REGULATIONS** **PAGES**

48 C.F.R. § 2.101 ....24

48 C.F.R. § 27.104(d) ....12

5 U.S.C. § 706(2) ....41

28 U.S.C. § 1498 ....11

35 U.S.C. § 283 .......... 11

F.A.R. § 2.101(2) .......... 24, 25

## INTRODUCTION

In accordance with the Court's Orders dated June 2 and August 17, 2006, Plaintiff Interspiro, Inc. ("Interspiro") respectfully submits this Response to Defendant's Cross-Motion for Judgment upon the Administrative Record and Opposition to Plaintiff's Motions for Judgment upon the Administrative Record ("AF Mot.") and Defendant-Intervenor Mine Safety Appliances Company's Opposition to Interspiro's Motion for Judgment on the Administrative Record and Cross Motion for Judgment on the Administrative Record ("MSA Mot.").

In their Motions, the Air Force and MSA fail to come to grips with the reality that: (1) unlike MSA and other offerors, Interspiro has a proven Self Contained Breathing Apparatus ("SCBA") capable of operating in all three modes required by Request for Proposals No. FA8532-05-R-761323 ("RFP"); and (2) because it will not have to spend the time and money developing a Three-Mode SCBA, Interspiro was able to [redacted][1] How could the Air Force have

---

[1] In their Motions, the Air Force and MSA adopt the term "Three-Mode SCBA" as used in Interspiro's Motion to describe the product being procured under this RFP. The Air Force provides the following helpful description of the Three-Mode SCBA at issue in this procurement:

> The RFP seeks to acquire an SCBA unit that operates in three modes that are differentiated by the air that the user is breathing. The first mode, SCBA only, provides the first responder with compressed air from the SCBA's compressed air cylinder. The air is not filtered. The second SCBA mode is air purifying respirator ("APR"). In this mode, the user is breathing filtered air that is pulled from the outside environment. This mode can only be used where there is adequate oxygen in the environment; the user is not breathing the air contained within the SCBA cylinder. The third mode is powered air purifying respirator ("PAPR"). In this mode, the user is also breathing filtered air that is pulled from the outside environment. However, the SCBA provides a powered assist to create a positive air flow from outside the filter into the user's lungs. This mode

made such an arbitrary and capricious decision? The Administrative Record ("AR") documents that the Air Force's patently flawed decision was rooted in its failure to consider the existence of Interspiro's Three-Mode SCBA, coupled with its failure to confront the acknowledged shortcomings of MSA's proposal, all in direct contravention of the RFP's terms.

Based on the undisputed facts and established law, Interspiro respectfully requests that the Court deny the Air Force's and MSA's Motions and grant Interspiro's Motion for Judgment on the Administrative Record ("Interspiro's Motion"). Part I below documents that neither the Air Force nor MSA have disputed the facts establishing several alternate grounds for granting Interspiro's Motion. Part II explains that the Air Force's and MSA's other arguments are misguided as a matter of fact and law. Finally, Part III documents that Interspiro has satisfied all four factors for permanent injunctive relief. Based on the established facts and law (as discussed below and in Interspiro's prior submissions), the Court should grant Interspiro's Motion and deny the Air Force's and MSA's Motions.

## I.
## THE UNDISPUTED FACTS ESTABLISH SEVERAL ALTERNATE GROUNDS FOR GRANTING INTERSPIRO'S MOTION

Neither the Air Force nor MSA disputes the facts establishing several alternate grounds for granting Interspiro's Motion. As documented in Subpart (A) below, the undisputed facts establish that the Air Force's evaluation of Interspiro's proposal was fatally flawed because: (1) the Air Force violated the RFP's explicit provisions by [redacted]; (2) it also ignored the RFP's terms and its own

> eliminates the respiratory resistance present in APR mode, which is caused by the need for the user to pull the outside air through the filter using lung power only. Thus, a user can use the PAPR mode in more physically demanding or stressful environments.

AF Mot. at 21 n. 5.

instructions to offerors when [redacted]; (3) it failed to consider the potential impact of Interspiro's patents pending on Three-Mode SCBA technology; and (4) it ignored extensive documentation establishing that Interspiro had developed, manufactured and marketed Three-Mode SCBAs.

Perhaps more importantly, the Air Force's evaluation of MSA's proposal was also fatally flawed. As documented in Subpart B below, the undisputed facts establish that: [redacted] the obvious risks inherent in any offeror trying to create a new type of device for the first time; [redacted] See, e.g., Chapman Law Firm v. United States, 63 Fed. Cl. 519, 527 (2005) ("[A] proposal that fails to conform to a material term and condition of the solicitation . . . is not acceptable and may not form the basis for an award.") (internal citations omitted).

The Air Force implicitly acknowledged errors in the evaluation process when agreeing to take "corrective action" in response to Interspiro's earlier protests to the Government Accountability Office ("GAO"). AR 2117. As explained in Subpart C below, the undisputed facts establish that the Air Force has failed to take any meaningful steps that could possibly "correct" the errors explicitly identified in the earlier GAO protests. The Air Force's failure to

take meaningful "corrective action" further documents the continued presence of these errors in its evaluation of proposals.

### A. The Undisputed Facts Establish Fatal Flaws in the Air Force's Evaluation of Interspiro's Proposal

#### 1. The Air Force Violated the RFP's Requirements [redacted]

[redacted]

The Air Force's refusal [redacted] violated several RFP requirements. First, the "Field Evaluation Exercise" procedures set forth in Appendix A to the RFP's Purchase Description provides specifically for "the field test of manufacturer's **prototypes**," and further explain that this testing "is a **mandatory** part of this specification." AR 72 (emphasis added). The introductory paragraph to the Field Evaluation procedures states in its entirety:

> This appendix details the procedures that the Government will utilize in the conduction of the field test of manufacturer's **prototypes**. This appendix is a mandatory part of this specification.

Id. (emphasis added). Thus, far from suggesting that "prototypes" were not to be field tested as imagined by the Air Force, the RFP provided specifically for the testing of "prototypes." The Air Force violated the RFP's express terms [redacted].

Second, a straightforward review of the RFP's Field Assessment Questionnaire further documents that the Air Force erred by failing [redacted] Regarding the "Field Evaluation" subfactor, the RFP required that offerors meet or exceed "all the performance evaluation areas listed in the Field Assessment Questionnaire." AR 32. The Field Assessment Questionnaire is set forth as an attachment to the RFP. AR 130-33. It is impossible, however, to meet all of the specified performance evaluation areas without a Three-Mode SCBA. For example, the performance evaluation areas identified in the Field Assessment Questionnaire include "[e]ase of replacing filter" and "[e]ase of attaching PAPR." AR 131. Because a traditional Single-Mode SCBA does not have a filter or PAPR, it cannot possibly meet or exceed the requirements in these performance areas.[2] It is only by conducting a Field Evaluation on a Three-Mode SCBA that the Air Force could make the determination required by the RFP of whether an offeror met or exceeded "all the performance evaluation areas listed in the Field Assessment Questionnaire." AR 32. [redacted]

2 [redacted]

[redacted]

Third, when describing the Field Evaluation to be conducted by the Air Force, the RFP required offerors to supply two SCBA units that "shall be the **same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award**." AR 28 (emphasis added). The RFP's Purchase description specifically required an SCBA that can operate in three different modes: "1.) SCBA only mode, 2.) SCBA and APR selectable mode, and 3.) SCBA and PAPR selectable mode." AR 38. The RFP also required that: "The wearer shall not be exposed to inhalation, absorption, or ingestion contamination when transitioning from SCBA to APR or PAPR mode." AR 43. These are yet additional RFP provisions [redacted].

[redacted]

3 [redacted]

[redacted][4] As explained in the following section, the Air Force repeatedly ignores how this and other terms were used and defined in connection with this RFP.

### 2. The Air Force Also Ignored the RFP's Terms [redacted]

In addition to violating the RFP's terms [redacted] the Air Force also ignored the RFP's terms when reading Interspiro's proposal [redacted]. The Air Force supports this reading of Interspiro's proposal [redacted] The Air Force's reading of this and other portions of Interspiro's proposal ignores the specific instructions that the Air Force had provided to offerors about [redacted]

As explained in the preceding section, the RFP's Purchase Description used the term "prototype" to identify the units to be subjected to Field Evaluation. AR 72. [redacted] The objective reality is that

4 [redacted]

Interspiro has had a commercially available Three-Mode SCBA for years. Not only is this fact reflected [redacted], but it is also documented in Interspiro's briefings to the Air Force, patent applications and declarations. See, e.g., Supp. AR, Tabs 27, 36-39.

Perhaps more troublesome, the Air Force ignores the very specific instructions that it provided to offerors regarding the use of the term "accessories." For purposes of this procurement, the Air Force instructed that the PAPR and APR (which are essential to a Three-Mode SCBA) were to be considered as "accessories" separate from the "traditional basic SCBA" (i.e., a single mode SCBA). A prospective offeror had posed the question: "[A]re the PAPR and APR systems to be considered accessories?" Supp. AR, Tab 33 at 2550 (Q & A 17). In its answer to this question, the Air Force stated:

> Response: **Accessory is any component not part of the traditional basic SCBA, so yes the PAPR has been referred to as an accessory within the PD** [RFP's Purchase Description].

Id. (emphasis added). The Air Force further stated that, except as otherwise specified in the RFP's Purchase Description, "each and every mention of accessories include the PAPR." Id. See also id. at 2552 (Q & A 21) ("Is the PAPR considered an accessory? Response: Yes."); id. at 2552 (Q & A 23) (discussing "the use of the word 'accessories' and the previous definitions and clarifications provided by the Government"); id. at 2554 (Q & A 28) (again citing the Air Force's previous definition of the word "accessories" to explain why the Purchase Description's requirements included the PAPR).

Contrary to the Air Force's suggestion, the RFP's Purchase Description called for the testing of "accessories" such as the PAPR during the Field Evaluation. See, e.g., AR 72 (requiring that the "SCBA **and accessories**" be worn during the Field Evaluation exercises) (emphasis added). The Air Force is also mistaken that, in order to be field tested, the PAPR had

to be NIOSH certified.[5] Indeed, the Air Force had instructed offerors specifically that:

> For PAPR, the Government requires that the unit meets NIOSH Standard (draft) requirements unless stated otherwise in the Purchase Description. No stipulations beyond NIOSH draft Concept Standard have been specified.

Supp. AR, Tab 32 at 2539. Because no final NIOSH standards for PAPR certification existed,[6] the Air Force specifically made allowances for providing PAPRs not subject to a NIOSH certification requirement so long as they met the draft NIOSH requirements. Id.

In its proposal, Interspiro followed precisely the Air Force's instructions when describing the units and accessories that it provided for Field Evaluation. [redacted]

[redacted]

---

5 For example, the Declaration of the Air Force's Project Lead Engineer asserts that [redacted]. AF Mot., Beebe Decl. ¶ 9. The Air Force does not dispute, however, that [redacted]. Based on the RFP's terms and the Air Force's instructions to offerors, Field Evaluation was required under these circumstances.

The Air Force's Project Lead Engineer also suggests that, [redacted]. Id. ¶ 10. However, the Air Force cites no legal or other requirement for NIOSH certification as a condition for commercial sales. And more importantly, Interspiro has documented that "it had been marketing its Three-Mode SCBAs, including at industry trade shows attended by both government and commercial users, since at least 2003." Supp. AR, Tab 39, Brookman Decl. ¶ 3.

6 [redacted]

[redacted] These are the "traditional basic SCBA" units that were to be NIOSH certified. See Supp. AR, Tab 33 at 2550. Further following the Air Force's instructions (and using its terminology), [redacted]

[redacted]

As a result of this failure, the Air Force misread and improperly evaluated Interspiro's proposal.

### 3. The Air Force Failed [redacted]

The Air Force does not dispute that, back in September 2003, Interspiro filed a patent application on Three-Mode SCBA technology. See Supp. AR, Tab 38 at 2571-92; see generally id. at 2566-69 (Hepperman Decl.). These patent materials document Interspiro's development of Three-Mode SCBA technology well before the RFP's issuance in August 2005. AR 5.

Moreover, neither the Air Force nor MSA disputes that [redacted]

Under 28 USC § 1498, the Government is responsible for monetary damages to a patentee for infringement. See 28 USC § 1498 ("the owner's remedy shall be by action against the United States ... for the recovery of his reasonable and entire compensation for such use and manufacture"). Neither the Government nor MSA can identify any provision in the RFP requiring MSA to indemnify the Government for any patent infringement. Moreover, even one of the cases cited by MSA directs that potential royalty payments may only be ignored where there is an indemnification clause:

> [I]n conjunction with a bidder's required agreement to indemnify the United States against loss, all bids would be for consideration on a common basis, whether or not the equipment which the Government desired to purchase could be produced by some of the bidders without infringing one or more existing patents.

Motorola, Inc. v. United States, 729 F.2d 765, 771 (Fed. Cir. 1984) (quoting Herbert Cooper Co., 38 Comp. Gen. 276, 277 (1958)). In this procurement, where there is no indemnification clause, the Air Force may not treat offerors "on a common basis." The Government has to consider, at a minimum, the risk of increased costs to the procurement should it award the contract to MSA.

Moreover, it is far from clear that § 1498 applies to this procurement because the RFP does not contain the "authorization and consent" required for its application. Neither the Air Force nor MSA denies that (a) where § 1498 does not apply, the patentee is free to pursue all the normal remedies for infringement including an injunction against the potential infringement, and (b) the Air Force failed to consider that risk in connection with MSA's proposal. See 35 U.S.C. § 283 (allowing courts to "grant injunctions . . . to prevent the violation of any right secured by patent").

Because the RFP contains no "authorization and consent" to infringe patents, MSA relies on TVI Energy Corp. v. Blane, 806 F.2d 1057 (Fed. Cir. 1986), for the proposition that a patent infringer can invoke § 1498 protection based on implied consent in an RFP specification. However, unlike Interspiro, the plaintiff in TVI was seeking an injunction for patent infringement in an attempt to prevent a competitor from even competing in the bidding process, because the competition required patent infringement. Id. at 1059. Moreover, the TVI decision permits flexibility to fully evaluate potential infringement issues, including increased costs and risk of injunctions by allowing a competition to proceed. Id. at 1060.[7]

Additionally, in a commercial item procurement, an indemnification provision is required if the Government intends to authorize patent infringement. "Generally, the Government should be indemnified against infringement of U.S. patents resulting from performing contracts when the supplies or services acquired under the contracts normally are or have been sold or offered for sale by any supplier to the public in the commercial open market or are the same as such supplies or services with relatively minor modifications." 48 C.F.R. § 27.104(d). Based on Interspiro's response to the market research questionnaire, the Air Force was on notice of Interspiro's patent application before issuing of the RFP. See Supp. AR, Tab 26 at 2426-27. In a commercial item procurement, where the agency was directly on notice of potential patent infringement and the agency failed to include any provision either explicitly authorizing infringement or even requiring indemnification, a court should not read implied consent and authorization into the procurement.

---

7 The TVI Court also was particularly focused on the de minimus nature of the infringement. "We add that Blane's 'demonstration-infringement' was minimal at best. The total value of the targets was only $500." TVI Energy Corp., 806 F.2d at 1061. The potential infringement which is at issue in this instance is not de minimus. See AR 146 (notifying Interspiro that MSA had been awarded a contract evaluated at over $35 million).

The Air Force admittedly failed to consider potential costs and disruption due to patent infringement issues. Instead, the Air Force suggests that it was not on notice that patent infringement issues related to Interspiro's patents. See AF Mot. at 26-27.[8] However, the record documents that Interspiro had patents pending on Three-Mode SCBA technology. [redacted]

[redacted]

The Air Force is also factually mistaken when it asserts that "there is no evidence, and Interspiro has cited none, that MSA's proposed SCBA units would infringe upon anyone else's patent." AF Mot. at 26.[9] In reality, Interspiro has submitted declarations and other

---

8 [redacted]

9 Both the Air Force and MSA argue that the patent infringement issue should not be considered, because it is "speculative." See AF Mot. at 27; MSA Mot. at 18-19 (both citing Aircraft Porous Media Inc. B-241665.2, B-241665.3, April 8, 1991, 91-1 CPD ¶ 356)). However, in Aircraft Porous Media, the Government and the awardee both claimed that they were unaware of any patent issue and furthermore, the awardee certified that it could perform the contract using technologies that were "more than 20 years" old. 91-1 CPD ¶ 356 at 11. In this case, [redacted]

documentation regarding its patent applications and MSA's apparent infringement. See, e.g., Supp. AR, Tabs 36 and 38. As one declarant attests, [redacted] Id., Tab 36 at 2558.

In short, the uncontroverted record establishes that the Air Force erred by failing to give any consideration whatsoever in the evaluation process to the potential costs and other implications of Interspiro's patents pending on Three-Mode SCBA technology.

### 4. The Air Force Ignored Documentation Establishing That Interspiro Had Already Developed, Manufactured and Marketed Three-Mode SCBAs

Incredibly, the Air Force continues to attempt to maintain the fiction that it was unaware that Interspiro had already developed, manufactured and marketed Three-Mode SCBAs. See, e.g., AF Mot. at 22 (asserting that Interspiro's claim regarding its Three Mode-SCBA "is not supported by any factual evidence"), 24 (disputing Interspiro's representation that it advised the Air Force of its Three-Mode SCBA),[10] 25 (again disputing that Interspiro had "a fully-developed

---

[redacted], and the Air Force was well aware of the patent issue. Additionally, Interspiro's patent applications were publicly available documents. See Supp. AR, Tab 38 at 2567 (Hepperman Decl. ¶ 4). The Air Force already had engineers evaluating these products who could have evaluated whether proposals violated the terms of the patent application. See, e.g. Supp. AR, Tab 36 at 2558 (Grimm Decl. ¶ 4). However, the Air Force made no determination that MSA could perform without violating Interspiro's pending patents. Nor did it even consider the issue.

10 The Air Force argues that Interspiro did not have a commercial item because: "[o]nly Interspiro's 'two mask' approach allegedly allowed switching without harmful exposure." AF Mot. at 24. The Air Force errs, however, by failing to distinguish between a "dual air" mask (meaning a mask that can function in multiple modes) and a "two mask" system (meaning the need to switch between different masks in order to switch modes). As Interspiro explained to the Air Force:

three-mode SCBA").

In reality, the uncontroverted record establishes clearly the development history of Interspiro's Three-Mode SCBA. [redacted] Even before this RFP issued, Interspiro specifically made a proposal to engineering personnel from Warner Robbins AFB responsible for this procurement and provided them with briefing slides outlining Interspiro's Three-Mode capabilities. See Supp. AR 2614-2626. Furthermore [redacted]

[redacted]

---

[redacted]

Interspiro never states that it was proposing a "two mask" system. Interestingly, it was [redacted] – not Interspiro. See AR 1871.

[redacted]

There is also a wealth of additional evidence that Interspiro had developed and manufactured Three-Mode SCBA years ago. This documentation includes Interspiro's Response to the Air Force's Market Research Questionnaire and other materials provided by Interspiro in connection with this procurement, Interspiro's delivery over a period of years of thousands of Dual-air Chemical Warfare ("CW") kits that provide a three-mode capability, Interspiro's patent filing back in 2004 regarding its Three-Mode SCBA, and multiple declarations providing further background and context regarding Interspiro's Three-Mode SCBA. See generally Supp. AR, Tabs 26, 27, 36-39.

Perhaps most importantly, if the Air Force had any questions or uncertainty about the status of Interspiro's Three-Mode SCBA notwithstanding the wealth of documentation on point, it could have asked for additional information or documentation from Interspiro. The Air Force acknowledges that it "issued Evaluation Notices ("ENs") to all offerors with respect to any deficiencies, weaknesses, or need for clarification . . . ." See AF Mot. at 4. This "discussion" phase of the procurement continued all the way until January 12, 2006. Id. ("On January 12,

2006, the Air Force closed discussions. . ."). [redacted]

If the Air Force genuinely had any questions or concerns about the status of Interspiro's Three-Mode SCBAs, it should have raised them during the lengthy "discussions" phase of this procurement. See, e.g., Orca Nw. Real Estate Servs. v. United States, 65 Fed. Cl. 1, 9 (2005) (stating that agencies are "required to point out weaknesses or deficiencies in a proposal" during meaningful discussions, and such weaknesses are to include "areas . . . which could have a competitive impact") (internal citations omitted); Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 576 (2002) (stating that "[m]eaningful discussion . . . should be as specific as practical considerations permit," including identification of proposal areas that do not meet solicitation requirements) (internal citation omitted); Cf. Gentex Corp. v. United States, 58 Fed. Cl. 634, 653 (2003) ("[W]here an agency fails to resolve an ambiguity during discussions which should have been reasonably detected and which materially prejudices an offeror, the agency has failed in its obligation to conduct meaningful discussions.").[11]

---

11 Although this is a FAR Part 12 commercial item procurement, "the Air Force chose the formal selection methodology for contracting by negotiation, as described in . . . AFFARS[ ] 5315.3 and AFFARS Mandatory Procedures 5315.3." AF Mot. at 3. AFFARS Mandatory Procedures 5315.3, at Section 5.6.4.1 states that "[a]fter receipt of proposals, [the contracting officer shall] control exchanges with offerors in accordance with FAR 15.306." It is "well-settled that agency-offeror discussions [pursuant to FAR 15.306] must be meaningful." E.g., Orca Nw. Real Estate Servs., 65 Fed. Cl. at 9.

### B. The Undisputed Facts Establish At Least Four Fatal Flaws in the Air Force's Evaluation of MSA's Proposal

#### 1. [redacted]

[redacted]

In its Motion, the Air Force does not contend that it actually considered the [redacted]

---

12 Elsewhere in their Motions, both the Air Force and MSA imply that the Air Force decided that [redacted]

13 [redacted]

[redacted]

Neither the Air Force nor MSA dispute that, as prescribed in the RFP, [redacted] risk classifications were the same ones used by the Air Force when making its risk assessment. See Int. Mem. at 24-25, citing AR 27, 33. Moreover, while the Air Force states that it does not want to "quibbl[e]" with Interspiro about the meaning of the risk classifications [redacted] assigned itself (AF Mot. at 28), the fact is that those risk classifications have specific defined meanings. For example, "high" risk is used for features that are "[l]ikely to cause significant disruption of schedule, [i]ncreased cost or degradation of performance." AR 33. High risks are also risks that "may be unacceptable even with special contractor emphasis [a]nd close Government monitoring." Id. Similarly, "Moderate" risk ratings are reserved for situations in which "Contractor emphasis and close Government monitoring" will be required to overcome difficulties. Id. [redacted] knew these definitions, since they were set forth in the RFP. Id. And it used these definitions as prescribed in the RFP. Id. Accordingly, the meaning of [redacted] risk classification matrix is clear—and was ignored by the Air Force when it found that [redacted]

---

[redacted] the Air Force should not be heard now to make an after-the-fact assertions to the contrary. Orca Nw. Real Estate, 65 Fed. Cl. at 9.

[redacted][14]

The Air Force's only response is that "the RFP does not require that the Air Force forego its independent evaluation [redacted]." AF Mot. at 28. This is an obvious straw man. This case is not about whether the Air Force was able or required to reach its own conclusion about [redacted]. Instead, the question is whether the Air Force was justified in reaching a different conclusion about [redacted] than [redacted] (who had every incentive to understate, rather than overstate risks), without even examining, let alone rejecting, [redacted] reasons for its conclusions. The Air Force has not answered this question. Nor has MSA. Indeed, MSA argues that, so long as MSA "fully and accurately identifie[d] and discusse[d]" the risks of its proposal, the Air Force was entitled to pretend as though [redacted] did not exist. MSA Mot. at 22. This is an obvious non-sequitur.

[redacted]. See, e.g., Sys. Plus, Inc. v. United States, 69 Fed. Cl. 757, 766 (2006) ("An agency's decision can be found to be arbitrary and capricious where the agency entirely failed to consider an important aspect of the problem") (internal citations omitted). [redacted]

---

14 [redacted]

[redacted]

[redacted]

However, the Air Force did not also accept and acknowledge this feature's [redacted]. It is the decision to credit the speculative rewards of [redacted] design without considering its [redacted] that makes the Air Force's decision arbitrary and capricious. Of course, it is true that the Air Force could have determined that the rewards of [redacted] approach justified [redacted], but that is not what it did. By not adjusting [redacted], the Air Force committed a classic blunder—a failure to engage in rational decision making—that requires that its award to MSA be set aside. See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (stating that courts are to ensure that an agency's proposal evaluation is "reasonable and consistent with the evaluation criteria and applicable statutes and regulations") (internal citation omitted).

**2.** [redacted]

The Air Force does not dispute that, under the Field Evaluation subfactor, the RFP required that the offeror submit units that "**meet or exceed** in a way beneficial to the

Government **all the performance evaluation areas listed in the Field Assessment Questionnaire**." AR 32 (emphasis added). The Field Assessment Questionnaire lists 20 performance areas where an offeror could be scored "Marginal," "Acceptable" or "Exceptional." AR 130-33. [redacted]

[redacted]

Id.[15] For ease of reference, a copy of a Field Assessment Questionnaire [redacted] (AR 2212-15) is attached as Ex. B in the Appendix hereto.

[redacted] Nor do they dispute that, under the RFP's explicit terms, an offeror was required to meet or exceed "all the performance evaluation areas listed in the Field Assessment Questionnaire." AR 32. Instead, the Air Force argues only that [redacted]

---

15 [redacted]

[redacted] Nothing in the AR suggests that the [redacted] did or could meet "all the performance evaluation areas listed in the Field Assessment Questionnaire." AR 32. Having these performance evaluation areas in the RFP, the Air Force cannot ignore them or designate them [redacted] in direct contravention of the RFP's terms.

3. [redacted]

Neither the Air Force nor MSA dispute that this procurement is for a "next generation" SCBA operating in three different modes. The Air Force emphasizes that "the instant requirement for an SCBA is **dramatically different** from the [single mode] SCBA provided under the previous Air Force procurement." AF Mot. at 37-38 (emphasis added). MSA's Motion also repeatedly acknowledges this same point:

- "The Air Force sought a 'next generation' unit that could operate as an SCBA alone, or as an APR or PAPR." MSA Mot. at 4 (citing AR 38).
- "[T]he present solicitation calls for a 'next generation' SCBA." Id. at 41.
- "[T]his is a procurement for a 'next generation' SCBA." Id. at 42 n.14.
- "The SCBAs that the Air Force seeks do not currently exist – they are the 'next generation' SCBAs." Id. at 45-6 (citing AR 1544-45).
- "[T]he Air Force wanted offerors to propose innovative SCBA technology." AF Mot. at 2.

Since this procurement is for a "next generation" SCBA, the "commercial item" that must be proposed under the RFP is a "next generation" Three-Mode SCBA – not a prior generation Single-Mode SCBA.

Neither the Air Force nor MSA dispute that, to be eligible for award, an offeror had to propose a "commercial item." This requirement is basic to a FAR Part 12 "commercial item" acquisition. See, e.g. Trimble Navigation, Ltd. B-271882, B-271882.2, Aug. 26, 1996, 96-2 CPD ¶ 102 (sustaining a protest against a nondevelopmental item procurement where the winning bidder did not offer a nondevelopmental item); see also Premier Eng'g & Mfg., Inc., B-283028, B-283028.2, Sept. 27, 1999, 99-2 CPD ¶ 65 (holding that a determination that an item is a commercial item may be overturned if it is unreasonable).

[redacted].[16] FAR 2.101 provides three ways to meet the "commercial item" test, and [redacted]. See 48 CFR § 2.101. First, [redacted]

---

16 [redacted] These are the types of modifications contemplated by subsection (3) of FAR 2.101's definition of "commercial item." [redacted], Interspiro has many years experience in manufacturing and marketing Three-Mode SCBAs that need only to be modified to meet the RFP's requirements consistent with FAR 2.101's "commercial item" definition.

[redacted] MSA Mot. at 15, 16-17. [redacted] Additionally, the prerequisites for field testing are not the "commercial item" test. See FAR § 2.101.

Second, [redacted] It is immaterial whether the product "will be available… to satisfy the delivery requirements under a Government solicitation" (AF Mot. at 27) if it has not already "evolved" as required by FAR § 2.101(2).[17]

Third, [redacted] AR 518 (emphasis added). Moreover, since the Three-Mode SCBA is a "dramatically different" product the modifications cannot be minor. [redacted]

---

17 FAR § 2.101(2) provides:

> Any item that evolved from an item described in paragraph (1) of this definition [an item sold or offered for sale to the general public] through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation.

18 The next generation SCBA requires the addition of a PAPR, an APR, electronic equipment, and associated hoses and connections, increasing the weight, bulk, and profile of the SCBA. See e.g. AR 649 ([redacted]

[redacted]

4. [redacted]

[redacted] The RFP's Purchase Description states specifically the PAPR **must** operate in two speeds: "The PAPR shall be designed to operate in low and high flow rate modes." AR 48. In its Motion, the Air Force also emphasizes this minimum requirement that "the PAPR be designed to operate in both low and high flow rate modes." AF Mot. at 11. [redacted] For ease of reference, the accompanying Appendix includes at Ex. C a copy of the RFP's requirement for a two-speed PAPR (AR 48) and [redacted]

[redacted]

---

[redacted]

19 The purpose has changed from merely providing supplied air in heavily contaminated or oxygen deprived environments to providing supplied and filtered air, both in powered and unpowered mode, in environments where there may or may not be sufficient oxygen and environments where there is contamination, but at lower levels. See MSA Mot. at 4; AF Mot. at 2.

20 [redacted] The Air Force and MSA both emphasize the vast difference in value between a Single-Mode SCBA and a Three-Mode SCBA in their arguments against a resolicitation. See AF Mot. at 45 (expressing concerns about being forced to use "less capable" Single-Mode SCBA equipment if a resolicitation occurs); MSA Mot. at 46 (emphasizing "the extra margin of safety [Three-Mode SCBAs] provide over the current SCBAs").

[redacted] The Air Force's Motion specifically acknowledged this fact. AF Mot. at 20 [redacted]

If an offeror's proposal fails to comply with a solicitation's terms, it is ineligible for award. See CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 245 (Fed. Cl. 2003) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award.") (quoting Gen. Offshore Corp., B-251969.5, B-251969.6, Apr. 8, 1994, 94-1 CPD ¶ 248 at 3); see also Chapman Law Firm, 63 Fed. Cl. at 527 ("[A] proposal that fails to conform to a material term and condition of the solicitation. . . . is unacceptable and may not form the basis for an award.") (citation omitted). The Air Force acted in an arbitrary and capricious manner by not disqualifying MSA or even addressing in its evaluation that [redacted]

### C. The Undisputed Facts Establish That The Air Force Failed to Take Reasonable "Corrective Action"

The Air Force does not dispute that its original decision to award the contract to MSA was flawed and required "corrective action." In protests previously filed at the Government Accountability Office ("GAO"), Interspiro identified numerous problems with the Air Force's evaluation of proposals. See, e.g., AR 1890-1921, 1922-1930, 2010-2066 (copies of Interspiro's GAO protests). The Air Force responded to the GAO protests by agreeing to take "corrective action" and, as part of that corrective action, to "reconsider the proposals" and "issue a new

Source Selection Decision." AR 2117. The GAO dismissed Interspiro's protests as "academic" in light of the Air Force's promise to take "corrective action." Supp. AR, Tab 35 at 2556. Neither the Air Force nor MSA dispute any of these facts.

Nor do they dispute that the Air Force conducted **no** new evaluation of proposals. They also do not suggest that the Air Force reopened discussions or obtained any new information to support the selection of MSA for contract award. Indeed, the only "corrective action" taken by the Air Force was to make relatively minor edits to the Air Force's Source Selection Decision Document ("SSDD"). AR 1883-89. [redacted] Neither the Air Force nor MSA come to grips with this crucial issue in their attempts to justify the Air Force's source selection decision. See AF Mot. at 38-40; MSA Mot. at 41-44.

## II.
## THE AIR FORCE'S AND MSA'S MOTIONS ARE MISGUIDED AS A MATTER OF FACT AND LAW

In their Motions, both the Air Force and MSA seek at length to justify the scoring of proposals. See AF Mot. at 30-38; MSA Mot. at 23-41.[21] As explained below, their arguments

---

21 MSA also complains: "Interspiro's arguments in Sections A.2, B.2, B.3, C.1, and C.2 were not included in its Amended Complaint." MSA Mot. at 11 n.2. However, "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" M.A. DeAtley Constr., Inc. v. United States, 71 Fed. Cl. 370 (2006) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Moreover, MSA's arguments were all fairly included within its Amended Complaint.

The argument in A.2 concerns the Air Force's failure to credit Interspiro for proposing the only "commercial item." Interspiro's Amended Complaint specifically states "the Air Force's source selection decision ignored critical facts related to Interspiro's unique position as ... the only manufacturer which could offer SCBA/PAPR products as 'commercial items.'" Interspiro Amended Complaint ("Int. Am. Compl.") ¶ 25.

The argument in B.2 points out the [redacted] Int. Am. Compl. ¶ 54.

The argument in B.3 concerns [redacted] With regard to field evaluation, Interspiro's Amended Complaint specifically alleged: "Interspiro. . . has an existing product which it can use with only minor modification to meet the government's needs, while MSA and other competitor's products are still in development." Int. Am. Compl.¶ 49.

The argument in C.1 points out the Air Force's failure to score proposals reasonably and consistently for design approach. Interspiro alleged that the Air Force failed to consider the risks in MSA's design approach. See Int. Am. Compl. ¶ 50.

Finally, the argument in C.2 focuses on the Air Force's unreasonable and inconsistent scoring of offerors' Production Program Plan. Interspiro singled out MSA's complete lack of experience with multiple-mode SCBAs and the Air Force's failure to consider Interspiro's performance as the incumbent on this contract. See Int. Am. Compl. ¶ 51.

All of these arguments were fairly included within Count I (Failure to Evaluate Proposals Reasonably and in Accordance with the RFP's Requirements), Count II (Failure to Properly Consider Price and Weigh Price and Non-Price Factors), Count IV (Failure to

are misguided as a matter of fact and law. [redacted]

**A. The Air Force' Assessment of MSA's Design <u>Approach Was Arbitrary and Capricious</u>**

The Air Force based its "Blue/Exceptional" rating of MSA's design approach [redacted] These contentions have no merit as discussed below.[23]

---

Evaluate All of the Information Presented in Accordance with RFP's Requirements), and Count V (Failure to Evaluate Proposals Consistently).

22 [redacted]

23 Curiously, both Defendant and MSA argue that MSA's "Blue/Exceptional" rating in the field testing has not been challenged, and that Interspiro's discussion of MSA's Design Approach rating is therefore irrelevant. <u>See</u> AF Mot. at 30; MSA Mot. at 33. n.11. They are wrong on both the facts and the law. As a factual matter, Interspiro's Motion challenges the Air Force for contradicting the terms of the RFP and its own guidance by [redacted] Int. Mem. at 14-15, 26. As a matter of law, this Court need not speculate as to what the outcome of the Air Force's

### 1. The Air Force Displayed a Lack of Understanding of the Three-Mode Technology By Rating MSA Blue For its Proposed Design

[redacted] Moreover, the ability to transition to breathing ambient air through a PAPR or APR and then to transition back to SCBA mode without ambient exposure is also required. See AR 43. [redacted]

---

evaluations or trade-off decisions would have been had the Air Force properly evaluated proposals, but need only find that, but for the errors, there was a "substantial chance" that Interspiro would have received the award. See Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); see also Part III infra.

24 [redacted] Moreover, the Air Force was aware of this capability, as shown by the fact that it is among the capabilities required to be tested. AR 65, 80, 131. MSA's contention to the contrary would require offerors to assume no prior knowledge on the part of the Air Force—for example, MSA's logic would require this Court to assume that

[redacted] AR 640. Indeed, MSA is exactly right when it says in its Motion that this is a "require[d]" feature of the product to be proposed under the terms of the RFP. MSA Mot. at 26. The RFP's Purchase Description explicitly requires testing of how much exposure is suffered by a wearer when changing filters. AR 80 (requiring testing of "mask leakage" when performing exercises, including "filter replacement."); AR 65 (requiring testing of "ability to replace filter").

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

---

25 [redacted]

26 This is significant because changing the APR filter (as opposed to adding or removing a PAPR) does not involve a change to the "configuration" of the SCBA, undermining the arguments used by Defendant and MSA [redacted]. See MSA Mot. at 27-28; AF Mot. at 31.

[redacted]

2. [redacted]

[redacted]

27 [redacted]

[redacted] Not only is this assertion false,[29] but it is also irrelevant. It is not this Court's role to determine, after the fact, based on the litigating positions of the agency and the successful offeror, what the weight of MSA's PAPR would hypothetically have been [redacted] The fact that the Air Force rated MSA's Design Approach as "Blue/Exceptional" [redacted] renders its rating arbitrary and

---

28 [redacted]

29 [redacted]

capricious.

### 3. The Air Force Should Have Questioned [redacted]

Interspiro previously documented that MSA's weight claims were doubtful because MSA had not yet actually built the system it was proposing, and because compressed air has a known weight that would make MSA's claims suspect. Int. Mem. at 29-30. In response, [redacted] See Defendant's Notice of Filing Supplement to the Administrative Record; see also AF Mot., Beebe Decl. ¶ 2. However, as documented in Part I above and in Interspiro's prior submissions (see, e.g., Int. Mem. at 29-30), the "existing commercial SCBA units" the Air Force weighed [redacted]

## B. [redacted]

The Air Force committed clear error by assessing Interspiro's program production plan using an unstated threshold and failing to properly perform the necessary arithmetic in assessing Interspiro's ability to meet this unstated requirement. See Int. Mem. at 31-32. Indeed, the Air Force and MSA concede by their silence that the surge threshold used by the Air Force was never stated in the RFP.[30] Moreover, the calculation which they claim the Air Force used is

---

30 MSA also makes the nonsensical suggestion that "a contractor must comply with **any** order exceeding the maximum Best Estimated Quantity." MSA Mot at 34. No contractor, including MSA, could fill such a requirement, because to do so would require unlimited capacity. MSA's attempt to turn the RFP's requirement that a contractor provide 10 days notice before rejecting an order into a requirement that it fulfill any order, no matter what the size, is unreasonable and unsupported by the RFP's terms. Id. Equally nonsensical is MSA's suggestion that the Air Force's assessment of its own needs is irrelevant because its assessment was "only for evaluation purposes." Id. MSA

even more clearly wrong than the calculation previously identified by Interspiro. See Int. Mem. at 31-32; AF Mot. at 33-35; MSA Mot. at 34-37. Both MSA and the Air Force allege that the Air Force reached its assessment of Interspiro's "surge" ability [redacted]

Both the Air Force and MSA argue that the Air Force's misinterpretation of Interspiro's proposal was Interspiro's fault, because Interspiro could have clarified its proposal in its final proposal revisions. See AF Mot. at 35; MSA Mot. at 35-36. However, neither can explain why

---

gives no reason why this Court should assume that the Air Force evaluation team, in setting its evaluation threshold, did not account for "any reasonable wartime surge requirements" the Air Force may have had. Id. [redacted]

31 MSA argues that MSA had superior surge capability to Interspiro (MSA Mot. at 37) but this is irrelevant and not proven. Interspiro's proposed surge capability (however calculated) [redacted]

the Air Force should have required clarification at all. [redacted] AR 186. Nor can they explain how Interspiro could have known that the Air Force had committed an arithmetic or interpretive error in [redacted] without also knowing what threshold the Air Force was using for assessing proposal risk. The Air Force's disregard of Interspiro's [redacted] Id.[32]

### C. The Air Force's Evaluation of Past and Present Performance Violated the Express Terms of the RFP

The Air Force failed to evaluate Interspiro's past and present performance in accordance with the RFP because it [redacted] See Int. Mem. at 32-33. The RFP provides:

> [A]n offeror's work experience on three contracts may, by definition, represent only a semi-relevant effort when each contract is considered as a stand-alone effort. However, when these contracts are performed concurrently (in part or in whole) and are assessed in the aggregate, the work may more accurately reflect a very relevant effort.

---

32 [redacted] There is no "BEQ" in the RFP for cylinders—the whole concept is meaningless except as applied to SCBAs. AR 7-14. If there were such a BEQ, it would be twice the BEQ for SCBAs, since the RFP specifies two cylinders per SCBA. AR 49.

AR 34.[33] [redacted], in the aggregate, Interspiro's contracts involved everything required by this procurement.[34] Particularly egregious was the Air Force's decision to entirely ignore, rather than aggregate, [redacted]. See AR 1521.

---

33 Indeed, while MSA states that "the evaluators rated the overall relevancy of the offerors' past contracts/efforts to the present procurement, then assessed their overall confidence in the offerors' ability to perform," it cites in support of this proposition only the RFP section that requires the Air Force to proceed in this manner, without citing any evidence that it actually did. MSA Mot. at 38. This is because there is no such evidence.

34 [redacted]

35 MSA incorrectly portrays this contract as not involving development of a Three-Mode SCBA (MSA Mot. at 40 n.13) and ignores that [redacted]

36 In addition to ignoring Interspiro's development of a Three-Mode SCBA, [redacted] Compare AR 170, 1518 with AR 131.

Nor did the Air Force consider information about Interspiro's past performance "from other sources known to it" as required by the RFP. See AR 34. [redacted] in contravention of the RFP's requirements. See AR 34; 1516-1522.

Only through these failures to adhere to the terms of the RFP was the Air Force able to come to the arbitrary and capricious conclusion that Interspiro—the only offeror to have ever developed a working Dual-Mode or Three-Mode SCBA, [redacted][38]

---

[37] MSA and the Air Force's attempt to dispute Interspiro's status as the incumbent, based on the advanced technology at issue in this procurement, ironically serves only to highlight how much more relevant Interspiro's experience is than MSA's. See AF Mot. at 37-38; MSA Mot. at 42 n.14. As the incumbent contractor, Interspiro has been producing a working Dual-Mode SCBA (the CW kit) for more than six years, while MSA has never produced or delivered a multiple-mode SCBA at all.

[38] Defendant and MSA suggest that Interspiro's past and present performance data [redacted] because two issues came up in a search of every contract Interspiro happened to have outstanding. MSA Mot. at 40; AF Mot. at 37. The truth is, however, that the Air Force found [redacted] AR 1522. Moreover, it is entirely conjectural how heavily the Air Force would have rated this information if it had properly assessed the relevance of Interspiro's experience.

## III.
## INTERSPIRO SHOULD BE GRANTED PERMANENT INJUNCTIVE RELIEF

Interspiro has established all of the elements necessary for permanent injunctive relief. Interspiro's demonstration of the flaws in the Air Force's award process has highlighted the fact that Interspiro's proposal provides the best, most readily available means of enhancing Air Force firefighter safety. This and other well established facts undermine Defendants' primary objections to Interspiro's request for the injunctive relief to which it is entitled.

### A. Interspiro Has Demonstrated Success on the Merits

The Air Force and MSA both make the conclusory argument that Interspiro "cannot prevail on the merits." MSA Mot. at 44; see also AF Mot. at 42.[39] This argument is belied by the clearly established facts: the Air Force conducted deeply flawed award evaluations that failed to comply with the legal requirements governing the conduct of this procurement. See 5 U.S.C. § 706(2)(A).

Furthermore, Interspiro has more than met the "substantial chance" standard that the Air Force admits governs this Court's determination of prejudice. See AF Mot. At 41 n.9; see also Bannum, Inc. v. United States, 404 F.3d at 1358 (stating that the "substantial chance" test is a more lenient requirement than a plaintiff showing that it would have actually won the award but for the agency's errors). This standard does not require that Interspiro show that it--rather than MSA--would have been in line for the award if the Air Force had evaluated the proposals in this RFP according to the relevant legal requirements (though, in fact, Interspiro has so

---

39 Notwithstanding the Government's assertion that "irreparable harm is the most important" factor in determining to grant injunctive relief (see AF Mot. at 42), this Court recently stated that "success on the merits is the most important factor" in granting injunctive relief. Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 514 (2006).

demonstrated).[40] Rather, it only requires that the errors committed by the Air Force were significant enough that Interspiro's chance of obtaining this contract under any re-solicitation is "not insubstantial." See Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312 at 1319 (Fed. Cir. 2003) (a qualified bidder whose "proposal would have been improved and its chances of securing the contract increased" if the errors in the evaluation had been fixed has demonstrated prejudice/standing); see also Impresa Contruzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (a bidder with an economic interest in a procurement that could compete again in any re-solicitation "has a 'substantial chance' of receiving the award . . . and has standing to challenge the award"); CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish prejudice, a protestor must demonstrate that "there was a substantial chance that [it] would receive an award- [i.e.,] that it was within the zone of active consideration.") (citation omitted). Interspiro clearly had a "substantial chance" of winning the award but for the Air Force's evaluation errors and was materially prejudiced by the Air Force's arbitrary, capricious, and unlawful actions.[41]

---

40 [redacted]

41 Defendant's criticisms of Interspiro's proposal as offering a less-capable solution (AF Mot. at 43-45) depend entirely on the Air Force's obviously flawed evaluations in this case, and are therefore inapt. Particularly egregious is the assertion that [redacted] See, e.g., Part I.B.1, supra.

**B. Interspiro Will Suffer Irreparable Injury Absent Injunctive Relief**

Neither MSA nor the Air Force refute the irreparable harm Interspiro will suffer absent injunctive relief. "This Court has acknowledged that a lost opportunity to compete may constitute an irreparable harm." PGBA, L.L.C. v. United States, 57 Fed. Cl. 655, 664 (2003). Interspiro's only remedy at law from such a lost opportunity precludes recovery of profits; this inadequate recovery for an award that Interspiro was in line to win demonstrates irreparable injury. See Blue & Gold Fleet, 70 Fed. Cl. at 514 ("Plaintiff has shown irreparable harm. 'An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed.'") (citation omitted); accord United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998). Moreover, Interspiro has lost the opportunity to fairly compete for a contract, and this independently constitutes irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 744 n.25 (2000) ("[A] lost opportunity to compete in a fair competitive bidding process for a contract[] has been found sufficient to prove irreparable harm."); see also Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders."); Ellsworth Assocs. Inc. v. United States, 45 Fed. Cl. 388, 398 (1999) (listing cases in support of the position that "the denial of the right to have [an offeror's] bid fairly and lawfully considered constitutes irreparable injury").

Indeed, neither MSA nor the Air Force disputes the injuries Interspiro will suffer. Instead, MSA refers to them as "garden variety arguments that generically apply in nearly every post-award bid protest." See MSA Mot. at 45. Interspiro's injuries, regardless of whether they are commonly suffered or not, have repeatedly justified injunctive relief in this Court.

The Air Force asserts – incorrectly – that Interspiro has suffered no harm or prejudice

because its proposal is technically inferior to MSA's, and thus stands no meaningful chance of winning in any re-solicitation. See AF Mot. at 43, 45-46. The Air Force's argument is misguided as a matter of law and fact. As a matter of law, Interspiro does not need to prove that but for the Air Force's errors, it would have won the award. See Bannum, 404 F.3d at 1358. As a matter of fact, Interspiro has documented at length that Interspiro should have been awarded the Contract consistent with the RFP's terms.

Furthermore, the Air Force's assertion that Interspiro has a technically inferior product is based entirely on the Air Force's flawed evaluations. In other words, if the Air Force had correctly evaluated the proposals as required by law, MSA's proposal would be far downgraded (or disqualified due to its failure to satisfy the RFP's minimum requirements), while Interspiro's would be significantly upgraded. Moreover, the Air Force's evaluation also failed to take into account numerous, substantial risks that make MSA's purported life-saving capabilities even more illusory. See, e.g., Parts I.A.3, I.B above; Int. Mem. at 33-36. Once the correct technical evaluations – taking into account the various risks all other offerors face (but which the Air Force did not consider) – [redacted], there exists a more than substantial chance that Interspiro would benefit from a re-solicitation, without which Interspiro will suffer lost profits it can never recover. See, e.g., Keco Indus. v. United States, 428 F.2d 1233, 1240 (Ct. Cl. 1970) (a protestor may not recover profits from a procurement contract that "never actually came into existence").

**C. The Balance of Harms Weighs in Favor of Granting Interspiro Injunctive Relief**

The best way to enhance Air Force firefighter safety is to award the contract to Interspiro based on its proven Three-Mode SCBA products or, at a minimum, re-evaluate proposals consistent with the actual facts and RFP requirements. While the Air Force and MSA argue

about the impact of delay on Air Force firefighters (AF Mot. at 43-45, 46), the objective reality is that an award to Interspiro is the best way to avoid delay.[42] As Interspiro has repeatedly documented, it is the only offeror that currently is even capable of providing a Three-Mode SCBA to the Air Force. See, e.g., Int. Mem. at 19. Indeed, Interspiro has been offering this technology to the Air Force since 2003, and it [redacted]. See e.g., Supp. AR, Tab 39, (Brookman Decl.). Other offerors--particularly MSA--face significant risks, technical and otherwise, that the Air Force did not even evaluate, thereby substantially increasing the chances that MSA will never be able to provide the equipment needed by the Air Force. See Int. Mem. at 19, 21-23, 24-26. Moreover, should MSA's equipment ever reach the firefighters, there will be additional delays as the firefighters are retrained on MSA's equipment; such a delay will not occur if Interspiro is awarded the contract. See Supp. AR, Tab 36 (Grimm Decl.).

The contrast between this case and the primary decision cited by MSA in support of its argument is instructive. See MSA Mot. at 45. In Gentex Corp v. United States, 58 Fed. Cl. 634, 636 (2003), the court denied a request for injunctive relief because the head of the Air Force contracting had "issued a determination that performance of this contract was urgent and compelling and in the best interest of the United States," thereby overriding a GAO stay of the procurement. See id. at 637. By contrast, no such determination has been made here. In fact, the Air Force has **voluntarily** agreed to stay performance of this contract pending the outcome of these protests—which would be a very odd move indeed, were it facing an urgent and

---

42 Defendants' arguments regarding delay seek to create a false sense of urgency: regardless of which offeror is awarded this procurement, no performance will begin on this contract for many months. See, e.g., "Provisioning Performance Schedule," AR 125.

compelling need of the kind it faced in Gentex.[43]

Moreover, as discussed in Part III.B above, the SSDD's assertion regarding [redacted] is based on the flawed results of the Air Force evaluations. In particular, the SSDD's statement [redacted] Interspiro is the only offeror currently manufacturing SCBAs with a three-mode capability. AF Mot. at 43.

Considering that continuing with an award to MSA will only add expense and prolong the time before Air Force firefighters receive Three-Mode SCBAs, the irreparable harm faced by Interspiro, and the interest of the public (as further explained in the following subsection), the balance of harms clearly favors granting injunctive relief requested by Interspiro.

### D. The Public Interest is Best Served By Granting Interspiro Injunctive Relief

In their Motions, both the Air Force and MSA fail to even address the "**overriding** public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004) (emphasis added). Indeed, "[t]here is no question that '[t]he public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations.'" Rotech Healthcare Inc. v. United States, No. 06-303C, 2006 WL 2055882 at *41 (Fed. Cl. July 24, 2006) (citation omitted); see also Cardinal Maint. Serv., 63 Fed. Cl. at 111 ("The public interest 'is served by enforcing a procurement

---

43 Furthermore, as explained in this Subpart, the reasoning in Gentex actually supports awarding the contract to Interspiro as a means to avoid any delay in providing Three-Mode SCBAs to Air Force firefighters.

process that conforms with. . . the solicitation's evaluation criteria.'"). Consequently, MSA's attempts to dismiss the "strong" and "overriding" public interest served by ensuring fair and lawful evaluations as "garden variety" ignores this Court's repeated affirmations that such interests are not lightly disregarded. See MSA Mot. at 45. Moreover, to the extent MSA argues that the public interest is best served by not delaying this procurement any further, such a position (as explained above in Part III.C) in fact strongly cuts against awarding this contract to MSA.

The Air Force conflates several other injunctive relief factors to argue that, when balanced against the Air Force's asserted harms from delaying the solicitation, Interspiro's lack of irreparable injury (as a result of its inability to win any re-solicitation through technological inferiority) does not justify injunctive relief, so the Court should instead defer to the Air Force's earlier judgment. See AF Mot. at 45-46. Because (a) Interspiro has clearly suffered irreparable injuries that are far more than speculative (see Section III.B. above), and (b) Interspiro's proposal, when correctly evaluated, provides a technologically advanced Three-Mode SCBA product that will best serve the Air Force's needs (see id.), no reason exists for this Court to defer to the Air Force's discretion. Indeed, the reality of Interspiro's superior proposal [redacted], combined with the overriding public interest in fair and lawful procurement evaluations and the irreparable harm to Interspiro should such an interest not be upheld, demonstrate just how necessary it is for this Court to set aside the Air Force's procurement decision.

## IV.
## CONCLUSION

Based on the established facts and law, Interspiro respectfully requests that the Court grant Interspiro's Motion for Judgment on the Administrative Record and deny the Air Force's

and MSA's Cross Motions.

Dated: August 18, 2006

Respectfully Submitted,

s/David R. Hazelton
David R. Hazelton, Esq. (Counsel of Record)
Joshua K. Chandler, Esq.
LATHAM & WATKINS LLP
555 11th St., N.W., Suite 1000
Washington, D.C. 20004-1304
Direct Dial: (202) 637-2254
Facsimile: (202) 637-2201
David.Hazelton@lw.com
Joshua.Chandler@lw.com

Attorneys for Plaintiff Interspiro, Inc.

Of Counsel:
Kevin A. Russell, Esq.
Kyle R. Jefcoat, Esq.
David P. Palmer, Esq.
LATHAM & WATKINS LLP