# In the United States Court of Federal Claims

No. 06-425C
(Filed: September 25, 2006)**

**OPINION ORIGINALLY FILED UNDER SEAL ON SEPTEMBER 11, 2006

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| INTERSPIRO, INC., | * | |
| | * | |
| and | * | |
| | * | |
| SCOTT TECHNOLOGIES, | * | |
| INC., d/b/a/ SCOTT HEALTH | * | |
| & SAFETY, | * | |
| | * | Bid Protest; Evaluation of Proposals; |
| Plaintiffs, | * | Warranties; Evaluation of Risk. |
| | * | |
| v. | * | |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant, | * | |
| and, | * | |
| | * | |
| MINE SAFETY APPLIANCES | * | |
| CO., | * | |
| | * | |
| Defendant-intervenor. | * | |
| * * * * * * * * * * * * * * * * * * * | | |

*David Hazelton,* Washington, DC, for plaintiff Interspiro, Inc. *Joshua Chandler*, *Kevin A. Russell*, *Kyle R. Jefcoat*, and *David P. Palmer*, Latham & Watkin LLP, of counsel.

*Rand L. Allen*, Washington, DC, for plaintiff Scott Technologies, Inc. *John A. McCullough*, *Daniel P. Graham*, and *William J. Grimaldi*, Wiley Rein & Fielding LLP, and *Bruce S. Ramo*, Tyco International, LTD, of counsel.

***Doris S. Finnerman*, U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director David M. Cohen,* for defendant. *James Caine* and *John G. Terra, Major*, United States Air Force, of counsel.**

***Thomas P. Humphrey*, Washington, DC, for defendant-intervenor Mine Safety Appliances Co. *Elizabeth W. Newsom*, *Amy E. Laderberg*, *Rebecca K. Lee*, and *Brian T. McLaughlin*, Crowell & Moring LLP, of counsel.**

## O P I N I O N

**FIRESTONE, *Judge*.**

This post-award bid protest comes before the court on the parties' cross-motions for judgment upon the Administrative Record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). At issue are the actions of the United States Air Force Material Command ("Air Force") in connection with the award of a five-year fixed-price requirements contract for Self-Contained Breathing Apparatus ("SCBA") units that include the features of Powered Air Purifying Respirators ("PAPR")/Air Purifying Respirators ("APR").[1] The Air Force awarded the contract to Mine Safety Appliances Company ("MSA"), the defendant-intervenor, at an evaluated price of $35,995,298.

[1] SCBAs and PAPRs/APRs are used by emergency workers in situations where the air is contaminated. An SCBA is a powered respirator that allows a user to breathe compressed air from an air cylinder. Wearers of a SCBA must carry their air supply, which generally does not exceed a 60-minute supply. A PAPR/APR, on the other hand, uses a filter/decontamination system to clean the air. However, there are certain situations where a PAPR/APR cannot be used, such as where there is either insufficient oxygen or excessive contamination. The RFP for the contract at issue in this case sought to procure a new SCBA system that combines these functions.

Plaintiff Interspiro, Inc. ("Interspiro") and Plaintiff Scott Technologies, Inc., doing business as Scott Health & Safety ("Scott"), protest the award and seek to permanently enjoin the performance of the contract. Interspiro contends that it should have been awarded the contract because its evaluated price *** and because it alone satisfied all of the solicitation's requirements. Scott contends that its evaluated price of $*** was lower than MSA's evaluated price and that the Air Force deviated from or changed the requirements, terms, conditions and evaluation factors set forth in the RFP in a manner that favored MSA to the detriment of Scott.

The government and MSA contend that the plaintiffs have failed to demonstrate that the government's actions in awarding the contract to MSA were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

For the reasons that follow, the defendant's and defendant-intervenor's motions for judgment upon the Administrative Record are **GRANTED**. The plaintiffs' cross-motions for judgment upon the Administrative Record are **DENIED**.[2]

---

[2] The court grants the government's motion to supplement the Administrative Record ("AR") with the declaration of Laurie Beebe. The court grants Interspiro's motion to supplement the Administrative Record with Tab 35 (GAO's March 21, 2006 decision), and denies Interspiro's motion as to the remainder of the documents. The court denies Scott's motion for supplementation of the Administrative Record regarding any communications between the Air Force and MSA on MSA's warranty. The court denies MSA's motion to supplement the Administrative Record with drafts of a National Institute for Occupational Safety and Health ("NIOSH") standard because the standard was incorporated by reference in the RFP, and thus it is unnecessary to designate the drafts as part of the Administrative Record.

## BACKGROUND

### I. Background Facts

#### A. Background to the Procurement

From 2002 through March 2005, the Air Force conducted extensive research into Air Force needs for SCBA equipment. AR 1443. The Air Force conducted its first industry event in December 2002, at which Air Force first responders[3] discussed their SCBA requirements and desires and the industry representatives discussed the current state of the art of their commercial units. AR 1443, 1710. A draft Purchase Description was issued on January 14, 2005, and a draft RFP was issued on February 11, 2005. The Air Force hosted a second industry meeting on March 1, 2005, at which approximately seven companies discussed the current capabilities of their products and future enhancements in their product line. AR 1710-1711.

Based on this market research, the Air Force determined that SCBAs constituted a commercial item within the definition of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 2.101. See Market Research Report, dated April 1, 2005, AR 1879-1882; Source Selection Plan, dated July 8, 2005, AR 1709; Draft Price Competition Memorandum, dated January 30, 2006, AR 1544 ("Commercially, SCBA and CW (commercial warfare) units exist as two separate face masks. . . . Research indicates that

---

[3] A first responder is an emergency service provider who is the first to arrive at the scene of an accident or other emergency situation.

the marketplace could not fulfill the Government's need for a one-face mask configuration with dual purpose capabilities . . . without some modification to their existing units; however, these modifications are considered minor, and the SCBA is determined to be commercial pursuant to FAR 2.101").

**B. The Request for Proposals**

On August 1, 2005, the Air Force issued Request for Proposals No. FA8532-05-R-76133 ("RFP"). AR 5. The RFP was issued on a standard form entitled, "Solicitation/Contract Order for Commercial Items." AR 5. In this procurement, the Air Force sought to fulfill its need for "next generation Self Contained Breathing Apparatus" units that, among other things, "provide respiratory protection in a chemical, biological, radiological, and nuclear . . . environment in: 1.) SCBA mode, 2.) SCBA and Air Purifying Respirator (APR) selectable mode, and 3.) SCBA and Powered Air Purifying Respirator (PAPR) selectable mode." AR 38.

The RFP implemented a two-tiered evaluation process. For the first phase, offerors were to submit their "existing commercial SCBAs units," called "base units," for field test evaluation:

> The two SCBA units shall be the same model and shall represent the base unit that the offeror intends to provide on the contract effort should it receive the contract award. The offeror shall ensure that the SCBA units comply with paragraphs 3.4.5 and 3.4.6 of the purchase description and are complete units in that all the accessories that are used with the unit are included, along with the units' standard commercial operations and maintenance manuals.

AR 28 (RFP Factor I, Subfactor Two). The offerors were required to ensure that these

base units had been certified in accordance with certain industry standards. AR 28.[4]

For the second phase, offerors were to submit a “detailed narrative of the design approach” explaining their approach for modifying the base units to meet all of the requirements in Section 3.0 of the RFP’s Purchase Description.[5] AR 28 (RFP Factor I, Subfactor Three).

The RFP stated that award would be made to the offeror that is judged to be “the best value” to the government, and that the best value determination could “result in an award to a higher rated, higher priced offeror.” AR 31. The RFP stated that the evaluation would be based on the following evaluation factors: (I) Mission Capability, (II) Proposal Risk, (III) Present and Past Performance, (IV) Cost/Price, and (V) Small Business Participation. AR 32. The RFP stated that the first three factors combined were “significantly more important” than the fourth and fifth factors.[6] AR 32.

---

[4] The RFP stated that the SCBA units would be required to meet and/or exceed all minimum requirements specified in the versions “at the time of award” of SCBA-related standards and certifications by the National Fire Protection Association (“NFPA”), Occupational Safety and Health Administration (“OSHA”), and NIOSH. AR 38.

[5] Section 3 of the Purchase Description contains detailed specifications for the unit’s design, operation, wearability and other characteristics. AR 43-55. Among other things, these specifications include those related to the PAPR (“The overall PAPR with NIOSH filters weight shall not exceed 10 lbs. . . . The PAPR shall have a minimum battery life of 6 hours (Threshold) with a 12 hours objective . . . The PAPR shall be designed in a way that the wearer shall not be exposed to inhalation, absorption, or ingestion contamination when transitioning from SCBA to APR or PAPR mode, or transitioning from PAPR to APR mode.” AR 48). They also relate to the tools (“The SCBA shall be field maintainable.” AR 55).

[6] Specifically, RFP stated that Factors I, II, and III are equal in importance; are more important than Factors IV and V; and, when combined, are significantly more important than Factors IV and V. It also stated that, between Factors IV and V, Factor IV is significantly more

The subfactors under Factor I are as follows:

Subfactor One: Certifications and Test Data. This subfactor is met when the proposal provides the required certifications and test data specified for this subfactor and such clearly demonstrates that the information meets, or exceeds the requirements in a way beneficial to the Government.

Subfactor Two: Field Evaluation. The subfactor is met when the offeror provides all the material required for Subfactor Two in the "Proposal Requirements" provision and the two submitted SCBA units meet, or exceed in a way beneficial to the Government all the performance evaluation areas listed in the Field Assessment Questionnaire.

Subfactor Three: SCBA Design Approach. This subfactor is met when the proposal identifies an acceptable design approach for the modification of the offeror's commercial SCBA units in that it clearly demonstrates that the information meets, or exceeds in a way beneficial to the Government all the requirements of Section 3.0 of the purchase description including, but not limited to, the PAPR weight, operating time, battery information, filter information, re-hydration data, facepiece information, system weight and numbers, contamination protection, and cylinder size, and tool kits that support the SCBA system have minimal quantities of tools and such tools are common in form, fit, and function.

Subfactor Four: Program Production Plan. The standard for this subfactor is met when the proposal identifies a sound and feasible plan for the organization of personnel, facilities, equipment, plant layout, and material resources, and the proposal provides a viable plan for accelerating production and delivery of SCBA units to meet surge and contingency situations and all the information clearly demonstrates a level of knowledge and understanding of the requirement that is acceptable or exceptional in a way deemed beneficial to the Government.

AR 32.

The RFP stated that the subfactors under Factor I were of equal importance, AR

---

important, but that both Factors IV and V are important considerations in the best value award decision. AR 32.

32, and that they would be evaluated using the following color/adjectival ratings:

| Color | Ratings | Definitions |
|---|---|---|
| Blue | Exceptional | Exceeds specified minimum performance or capability [r]equirements in a way beneficial to the Government; Proposal must have one or more strengths and no deficiencies [t]o receive a blue. |
| Green | Acceptable | Meets specified minimum performance or capability [r]equirements delineated in the Request for Proposal; Proposal rated green must have no deficiencies but may have [o]ne or more strengths. |
| Yellow | Marginal | Does not clearly meet some specified minimum performance [o]r capability requirements delineated in the Request for Proposal, but any such uncertainty is correctable. |
| Red | Unacceptable | Fails to meet specified minimum performance or capability [r]equirements; proposal has one or more deficiencies. Proposals with an unacceptable rating are not awardable. |

AR 33.

As to Factor II (Proposal Risk), the RFP stated that proposal risk would be evaluated for each subfactor under Factor I based on the following criteria:

| Ratings | Definitions |
|---|---|
| High | Likely to cause significant disruption of schedule, [i]ncreased cost or degradation of performance. Risk may be unacceptable even with special contractor emphasis [a]nd close Government monitoring. |
| Moderate | Can potentially cause some disruption of schedule, [i]ncreased cost or degradation of performance. Special [c]ontractor emphasis and close Government monitoring [w]ill likely be able |

to overcome difficulties.

Low — Has little potential to cause disruption of schedule, [i]ncreased cost or degradation of performance. Normal [c]ontractor effort and normal Government monitoring [w]ill likely be able to overcome any difficulties.

AR 33.

In connection with the Air Force's evaluation of an offeror's proposal under Factor III (Present and Past Performance), the RFP required an offeror to submit information regarding "its three most relevant SCBA contracts/efforts and its three most relevant APR contracts/efforts." AR 29.[7] The RFP stated that the government would assess "the confidence in the offeror's ability to successfully accomplish the proposed effort based on the offeror's demonstrated present and past work record." AR 33. The RFP stated that the government would obtain information from the references listed in an offeror's proposal, as well as from other sources known to the government. AR 34. The RFP stated that the government would determine the relevance of the data as either "very relevant," "relevant," "semi-relevant," and "not relevant."[8] AR 34. Based upon the

[7] The RFP also required that an offeror provide a list of "all of the contracts that the offeror is performing or has performed in the past three (3) years." AR 29.

[8] The relevance of the contracts listed by an offeror were to be determined by the following criteria:

> Very Relevant: Present and/or past performance efforts that involved the magnitude of work and complexities that are essentially what this solicitation requires. . . .
>
> Relevant: Present and/or past performance efforts that involves less magnitude of work and complexities, including most of what this solicitation requires. . . .

government's assessment of the quality of the offeror's past performance as a whole, the RFP stated that the Air Force would assign overall past performance ratings of either "high," "significant," "unknown," "little," or "no" confidence." AR 35.[9]

As to Factor IV(Cost/Price), the RFP stated that the offeror's line item/Contract

---

Semi-relevant: Present and/or past performance efforts that involved much less magnitude of work and complexities, including some of what this solicitation requires. . . .

Not relevant: Past and/or present performance efforts that do not involve any significant aspects of the above definitions.

[9] The past performance ratings were to be based on the following criteria:

| Rating: | Definition: |
|---|---|
| High Confidence | Based on the offeror's performance record, [t]he Government has high confidence the Offeror will successfully perform the required effort. |
| Significant Confidence | Based on the offeror's performance record, [t]he Government has significant confidence the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's performance record, [t]he Government has confidence the offeror [w]ill successfully perform the required effort. Normal [c]ontractor emphasis would preclude any problems. |
| Unknown Confidence | No performance record identifiable |
| Little Confidence | Based on the offeror's performance record, substantial doubt exists that the offeror will successfully perform the required effort. |
| No confidence | Based on the offeror's performance record, substantial doubt exists that the offeror will successfully perform the required effort. |

Line Item Numbers ("CLINs") would be evaluted for (1) reasonableness, (2) balanced pricing, and (3) total evaluated price. AR 36.

As to Factor V (Small Business Participation), the RFP stated that an offeror's proposal would be evaluated as either acceptable or unacceptable relative to the proposal's adherence to Department of Defense small business goals. AR 37.

**C. The Evaluation of Proposals**

In response to the RFP, the government received offers from seven companies, one of which was eliminated from further consideration. The Air Force opened discussions with the six remaining offerors on November 22, 2005. Specifically, the Air Force issued Evaluation Notices which conveyed the initial evaluation results and identified proposal deficiencies. AR 1750.

The Air Force reviewed the offeror's responses to the Evaluation Notices and on January 4, 2006, completed the Final Technical Report that summarizes the Air Force's evaluation of the four subfactors of Mission Capability. AR 1478-1499.

On January 12, 2006, the Air Force closed discussions and issued Final Proposal Revision requests to the remaining six offerors. AR 1703. The offerors were notified of the final evaluation results of their proposals, and each offeror was given a final opportunity to revise its proposal by January 17, 2006. ***. AR 158. Scott advised that it was not revising its proposal. AR 1115. MSA revised its pricing. AR 415-433.

The Air Force's final ratings of Interspiro's, Scott's and MSA's proposals were as

follows:

| | **MSA** | **Interspiro** | **Scott** |
|---|---|---|---|
| **Factors 1 & 2: Mission Capability and Proposal Risk** | | | |
| Subfactor 1: Certifications/Test Data | green/low risk | *** | *** |
| Subfactor 2: Field Evaluation | blue/low risk | *** | *** |
| Subfactor 3: Design Approach | blue/low risk | *** | *** |
| Subfactor 4: Program Production Plan | green/low risk | *** | *** |
| **Factor 3: Present and Past Performance Confidence Rating** | high confidence | *** | *** |
| **Factor 4: Price** | $35,995,298 | *** | *** |
| **Factor 5: Small Business Participation** | acceptable | *** | *** |

AR 1485-1488, 1491-1496, 1886, 1702-1703.

The Air Force's evaluations were summarized further in the Rating Team Worksheets, dated January 20, 2006. The evaluations were also referenced in the Source Selection Decision Document, which was signed by the Source Selection Authority on January 25, 2006. AR 1703, 1742-1748. These documents were included in the

Simplified Source Selection Report, also dated January 25, 2006. AR 1700-1755.

### 1. Interspiro's Proposal

In the Rating Team Worksheet, the Air Force justified its *** risk rating for Interspiro's proposal under Subfactor Four as follows:

> ***

AR 1730.

As for the Air Force's rating of Interspiro's past and present performance (Factor III), the Rating Team Worksheet stated that ***. AR 1730. The Air Force also examined data on Interspiro's performance in other contracts. In its Final Performance Confidence Assessment Group Report, dated January 4, 2006, the Air Force stated that, ***. AR 1519-1520. Based on its evaluation of the data, the Air Force rated Interspiro's confidence level ***. AR 1730, 1522.

### 2. Scott's Proposal

The Air Force's Rating Team Worksheet referred to the Technical Report for the narrative in support of its ratings for Scott under Factor I. AR 1736. For Subfactor Two, the Technical Reports stated: "Exceptional areas included ***." AR 1494. The report also stated that there were ***. The report stated that, in response to the Air Force's initial evaluation, Scott had provided ***. AR 1494. Based on the information provided by Scott, the Air Force stated that the overall technical rating for Subfactor Two ***. AR 1495.

For Subfactor Three of Factor I, the Technical Evaluation Report stated as follows: "***" AR 1495. The report stated that, in response to the Air Force's initial evaluation, Scott had addressed how the ***. Based on this information, the report stated that the rating for Subfactor Three ***. AR 1495.

**3. MSA's Proposal**

In the Rating Team Worksheet for MSA, the Air Force provided the following justification for its higher ratings of MSA for two of the subfactors under Mission Capability:

> The Blue ratings were determined based on several features in the physical configuration of the SCBA in Subfactor Two, including the overall comfort, donning, doffing, interface with . . . gear, clarity of vision, and clarity of hearing. Exceptional comfort was noted with the *** bottle being so *** . . . .
>
> In Subfactor Three, the blue ratings were attributed to several areas: the design approach exceeded the minimum performance and capability requirements while meeting weight objective of 30 lbs or less with the *** cylinder, *** thresholds of PAPR without and especially *** ; no unique tools required to maintain or repair proposed system; and the ability to *** .

AR 1734.

As for the evaluation of MSA's past and present performance, the Rating Team Worksheet stated that of the six efforts for which MSA had provided information, one was deemed very relevant and five were deemed relevant. Based on the evaluation of the data, the Air Force rated the overall confidence level as high. AR 1735.

Based on its higher technical ratings, the Source Selection Authority determined

that MSA's proposal provided the "best overall value to satisfy Air Force needs." AR 1748.

### D. The Contract Award, Scott Debriefing, and Protests Before the Government Accountability Office

The Air Force awarded the SCBA contract to MSA on January 31, 2006. AR 1756. Scott requested a debriefing from the Air Force, which it received on February 17, 2006. Scott's Amend. Compl. Ex. 1.

Interspiro and Scott filed bid protests with the Government Accountability Office ("GAO"). AR 2113. On March 20, 2006, the Air Force informed the GAO that the Air Force intended to take "corrective action" as follows: "The Source Selection Authority (SSA) will reconsider the proposals, and will then issue a new Source Selection Decision Document. The Air Force will notify all the parties after the SSA has made his new decision." AR 2117. On March 21, 2006, the GAO dismissed the bid protests as "academic" because the agency had decided to take corrective action. AR Tab 35.

On April 18, 2006, the Air Force notified Interspiro and Scott of the results of the corrective action. AR 2113; Scott's Amend. Compl. Ex. 4. The Air Force issued a new Source Selection Document on April 18, 2006. AR 1883-1889. In the new Source Selection Document, the Source Selection Authority compared MSA's proposal to Scott's proposal, which he stated was the next best technical proposal. He stated: "MSA's proposal provided a better SCBA than that proposed by Scott. It is ***, easier to see through, easier to communicate with, and provided greater safety features. These

additional benefits are well worth ***." AR 1888.

In the new Source Selection Document, the Source Selection Authority also compared MSA's proposal to Interspiro's proposal, which he stated ***

***

AR 1889.

On April 21, 2006, the Air Force denied Interspiro's and Scott's requests for a debriefing, stating that the corrective action taken by the Air Force had not included any new evaluation of the offerors' proposals. In a letter from the contracting officer, the Air Force stated: "Please be advised that as no new evaluations took place and a new award was not made, no debriefings are required pursuant to FAR 15.506. Therefore, a debriefing will not be provided . . ." AR 2115; Scott's Amend. Compl. Ex. 5.

Interspiro and Scott filed new protests at the GAO. These protests were dismissed by the GAO when Interspiro filed a bid protest in this court.

## II. The Present Litigation

On May 26, 2006, Interspiro filed a bid protest action in this court.[10] Scott filed a bid protest action in this court on June 6, 2006. These actions have been consolidated. The court granted MSA's unopposed motions to intervene in the consolidated cases.

Oral argument was held on September 5, 2006.

[10] The court grants Interspiro's Motion for Leave to Amend its Complaint, filed on September 1, 2006.

## DISCUSSION

### I. Standard of Review

This is an action to set aside the award of a government contract pursuant to 28 U.S.C. § 1491(b) (2000), which provides that this court has jurisdiction "to render judgment on an action by an interested party objecting to a . . . proposed award or award of a contract . . . [T]he courts shall review the agency's decision pursuant to the standards set forth in section 706 of Title 5." 28 U.S.C. § 1491(b)(1), (4). The Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2000), of which 5 U.S.C. § 706 is a part, in turn provides: "The reviewing court shall- . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under these standards of review, this court may set aside an award of a contract if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## II. The Parties' Cross Motions

### A. Interspiro's Contentions and the Defendant's and MSA's Responses

#### 1. The Air Force Did Not Err in Evaluating Interspiro's Proposal.

##### a. The RFP Did Not Require the Air Force to Field Test Interspiro's Prototype SCBA.

Interspiro argues that the Air Force's failure to evaluate the prototype "three-mode" SCBA[11] *** (Subfactor Two) violated the terms of the RFP. Interspiro bases this argument on its interpretation of the RFP as requiring offerors to propose an existing "three-mode" SCBA unit that meets the "commercial items" definition under FAR § 2.101, 48 C.F.R. § 2.101 (2006).[12] In support of this argument, Interspiro relies on the

---

[11] Interspiro defines a "three-mode" SCBA as one that operates in three different modes (SCBA only mode, SCBA and APR selectable mode, and SCBA and PAPR selectable mode). However, according to the government, the term "three-mode SCBA" is not used in the RFP. <u>See</u> Decl. of Laurie Beebe ¶ 9.

[12] FAR § 2.101 provides that "commercial items" include:

> (1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and –
> (i) Has been sold, leased, or licensed to the general public; or
> (ii) Has been offered for sale, lease, or license to the general public;
>
> (2) Any item that evolved from an item described in paragraph (1) . . . that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;
>
> (3) Any item that would satisfy a criterion expressed in paragraph (1) or (2) of this definition, but for –
> (i) Modifications of a type customarily available in the commercial marketplace; or

RFP's Purchase Description, which refers to SCBA units that operate in three different modes, AR 38; the Field Exercise set forth in Appendix A to the RFP, AR 72-76; and the accompanying Field Assessment Questionnaire, AR 130-133. Interspiro argues that the RFP's evaluation criteria for the field evaluation required the submitted SCBA units to "meet, or exceed in a way beneficial to the Government all the performance evaluation areas listed in the Field Assessment Questionnaire," AR 32, and that only a "three-mode" SCBA could meet all of these specified performance evaluation areas.

Interspiro argues that it had a commercially available "three-mode" SCBA and that the Air Force had information prior to the procurement process that Interspiro had developed, manufactured, and marketed "three-mode" SCBAs. Interspiro argues that its use of the *** was based on the terminology provided for in the Field Evaluation Exercise, AR 72 (referring to "the field test of manufacturer's prototypes"), and thus did not indicate that it was not commercially available. Interspiro also argues that the lack of NIOSH certification for its PAPR was not a bar to the Air Force's evaluation of its "three-mode" SCBA. Interspiro argues that the Air Force had only required that the PAPR meet draft NIOSH standards, rather than be NIOSH-certified, because no final NIOSH standards for certification existed. AR 2402 ("For PAPR, the Government

---

> (ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. . . .

requires that the unit meets NIOSH Standard (draft) requirements . . . .").

Furthermore, Interspiro argues that the RFP called for the Air Force to evaluate the SCBA "accessories" during the field evaluation. AR 28 ("The offeror shall ensure that the SCBA units . . . are complete units in that all the accessories that are used with the unit are included . . . ."); AR 72 (The Field Evaluation Exercise provides that "SCBA and accessories shall be worn to conduct field exercises . . . ."). Interspiro argues that, based on the "Frequently Asked Questions" issued by the Air Force on August 26, 2005, AR 2414, a PAPR is an "accessory," and therefore, the government erred when it did not evaluate Interspiro's "three-mode" SCBA with its accessory PAPR.

In response, the government[13] argues that the RFP did not require offerors to propose an existing commercially available "three-mode" SCBA. Instead, the government argues the RFP only required offerors to submit a commercially available SCBA – i.e., base units – for field testing, and that the offerors were required to provide an explanation of how they would then modify the commercially available SCBA to meet the Air Force requirements.

The government argues that the purpose of the field evaluation was to test each of the offerors' NIOSH-certified base units, and not to test an SCBA unit with APR and PAPR modes. The government argues that this is confirmed by the Air Force's response

[13] While the court cites primarily to the government's brief in its discussion of both Interspiro's and Scott's contentions, MSA's brief raised many of the same points. To the extent that MSA has raised additional points, the court also cites MSA's brief.

contained in the "Frequently Asked Questions" issued by the Air Force, which states:

> [Question] The two SCBA that are to be supplied with our proposal are to be our existing commercial units. But this paragraph requires that we ensure that these units comply with paragraph 3.4.5 and 3.4.6 of the purchase description. 3.4.6 requires that the unit be NIOSH certified. Para 3.4.6 implies that these units include the NBC APR mode. Does the government require that these units include the APR and PAPR modes? Or is the government's intent that the 2 SCBA must be NIOSH CBRN certified? Response: 2 SCBA NIOSH CBRN certified; <u>APR and PAPR modes are not required</u>.

AR 2409 (emphasis added).[14] Therefore, the government contends, it was appropriate for the Air Force to not test Interspiro's prototype SCBA unit with PAPR accessory.

With regard to Interspiro's references to the Field Evaluation Exercise and Field Assessment Questionnaire, the government argues that these documents were to be used not only to test the offerors' existing commercial items during the procurement process, AR 28, but also to test the awardee's first production SCBA units, AR 19, 56. Therefore, these documents contained space for evaluation of aspects of the units that would not be present on the base units, but would be present on the production units.

The government argues that the Air Force was not permitted to consider Interspiro's prototype "three-mode" SCBA because the RFP permitted it to only perform field testing on an offeror's "existing commercial SCBA units." AR 28. The government contends that Interspiro referred to its "three-mode" SCBA unit *** AR 363, and that Interspiro never represented that it was commercially available. In response to

---

[14] Interspiro contends that this statement can be interpreted to mean that it was not required to submit a PAPR, not that the Air Force would not test a PAPR that was submitted for field evaluation.

Interspiro's argument that the term "prototype" is used in the Field Evaluation Exercise, the government argues that the RFP's proposal requirements clearly specified that offerors were to provide two of their "existing commercial SCBA units" for field evaluation, and did not use the term prototype. AR 28. In addition, the government disputes Interspiro's assertion that the Air Force did not require NIOSH certification for the SCBA unit to be tested. The government argues that the base units were required to have NIOSH certification, while the PAPRs proposed in the offerors' design approach were required to meet the "NIOSH Standard (draft) requirements." AR 2402. According to the government, the RFP did not provide that the Air Force would field evaluate a PAPR that was not NIOSH-certified.

Furthermore, the government argues that the government would not have been interested in testing Interspiro's prototype in any event because ***. Thus, the government contends, Interspiro ***. AR 28.

The court agrees with the government that the Air Force was not required to test Interspiro's prototype "three-mode" SCBA unit. First, the RFP did not require offerors to propose a "three-mode" SCBA that is presently commercially available. The RFP clearly provides for a two-tiered evaluation process. For the first phase, offerors were to submit their "existing commercial SCBA units"– i.e., base units – for field test evaluation. AR 28. For the second phase, offerors were to submit a "detailed narrative" explaining how they would "modify the proposed commercial unit" to meet the requirements of the

Purchase Description. AR 28. Therefore, under the evaluation scheme provided for in the RFP, the offerors were not required to propose an existing SCBA that was commercially available and that already met all of the requirements of the Purchase Description.

Second, as the Air Force made clear in its "Frequently Asked Questions," AR 2409, the purpose of the field evaluation was to test the offerors' NIOSH-certified base units, and not to test an SCBA unit with APR and PAPR modes. Indeed, the court finds that the Air Force would have violated the RFP if it had tested prototypes because there are no NIOSH-certified SCBA units that also have NIOSH-certified APR and PAPR modes.

Third, Interspiro has not demonstrated that its prototype "three-mode" SCBA was commercially available in any event. While Interspiro alleges in its briefing that it had developed, manufactured, and marketed its "three-mode" SCBA, ***. In addition, Interspiro stated in its proposal ***. AR 363. For all of these reasons, the Air Force was not arbitrary or capricious and did not violate the RFP when it did not field test Interspiro's prototype "three-mode" SCBA.

**b. The Air Force Was Not Required to Consider Interspiro's Pending Patents.**

Interspiro argues that the Air Force should have considered the statements in its proposal about its pending patent applications on multiple-mode SCBA technology and products. Interspiro contends that MSA's proposal raises serious infringement issues that

could lead to remedies such as monetary damages or an injunction.

Interspiro acknowledges that a contractor may under some circumstances be permitted to infringe another party's patent while performing a government contract as provided by 28 U.S.C. § 1498 (2000). However, Interspiro, argues, for a contractor to avail itself of government protection under this statutory provision, the contractor must be working "with the authorization or consent of the Government." 28 U.S.C. § 1498(a). Interspiro argues that the government did not give explicit consent in the RFP. In addition, Interspiro argues that the RFP does not contain an indemnification clause, which would provide for the government to be indemnified against the infringement of U.S. patents, as provided for under 48 C.F.R. § 27.104(d) (2006).[15] Interspiro argues that in the context of a commercial acquisition where there is neither explicit consent nor an indemnification clause, the cost to the government of potential royalty payments cannot be ignored.

In response, the government argues that Interspiro's claim of patent infringement is speculative and irrelevant. The government argues that a "potential" patent infringement does not provide a basis for objection to the award of a contract. For this

---

[15] 48 C.F.R. § 27.104(d) provides:

> Generally, the Government should be indemnified against infringement of U.S. patents resulting from performing contracts when the supplies or services acquired under the contracts normally are or have been sold or offered for sale by any supplier to the public in the commercial open market or are the same as such supplies or services with relatively minor modifications.

proposition, the government relies on Motorola, Inc. v. United States, 727 F.2d 765, 771 (Fed. Cir. 1984) ("[I]t is the policy of the United States that it must award the bid to the lowest qualified bidder irrespective of the possibility or inevitability of infringing the patents of other bidders or non-bidders."); Lab Products, Inc., B-252,452, 93-1 CPD ¶ 250 (1993); and Aircraft Porous Media, Inc., B-242665.2, 91-1 CPD ¶ 356 (1991) ("A potential for patent infringement does not provide a basis for objection to award. As we have recognized, 28 U.S.C. § 1498 (1988) gives patent holders an adequate and effective remedy for patent infringement, while saving the government from having its procurements delayed pending litigation of patent disputes.").

The court agrees with the government that the Air Force was not required to consider possible infringement of Interspiro's pending patents in its evaluation of the proposals. First, absent evidence that MSA's proposal would infringe upon an existing Interspiro patent, the claim is irrelevant. Importantly, there is no dispute that MSA's proposal does not infringe upon an existing Interspiro patent.[16] Second, based on the Federal Circuit's decision in Motorola, Inc. v. United States, 727 F.2d at 771, as well as GAO's decisions cited by the government, the court finds that the possibility that an offeror's proposal will infringe upon a patent that may be issued in the future does not provide a basis for enjoining a procurement.

[16] Because Interspiro does not have an existing patent, the court does not address Interspiro's argument that the legal remedy provided for under 28 U.S.C. § 1498 applies only when the government consents to a patent infringement.

### 2. The Air Force Did Not Err in Evaluating MSA's Proposal.

#### a. The Air Force Did Not Err in its Determination that MSA's Proposal Complied with the Definition of a Commercial Item.

Based on Interspiro's same mistaken theory that the RFP required offerors to propose an existing commercially available "three-mode" SCBA, Interspiro argues that MSA's proposal did not satisfy the terms of the RFP. Interspiro contends that, because MSA's "three-mode" SCBA had not ***, the Air Force should not have considered MSA's proposal. In this context, Interspiro also argues that MSA was required to provide a "three-mode" SCBA for field evaluation. Interspiro states that, because the Air Force could not conduct tests on the operation of MSA's products in either the APR selectable mode or the PAPR selectable mode, AR 2204-2221 (evaluator worksheets reporting "N/A" under items regarding MSA's field test), MSA's proposal should have been either significantly downgraded or have been completely eliminated from the competition.

In response, the government argues that MSA's product met the definition of a "commercial item" under 48 C.F.R. § 2.101. The government contends that the FAR does not define a commercial item as one that has been ***. Instead, the government argues that a commercial item is one that "will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation," or a commercial item that has been modified to meet the government's requirements. Id. The government argues that the RFP did not require that offerors submit designs for

products that had *** , and that Interspiro does not allege that MSA will be unable to satisfy the delivery requirements of the contract.

The government also argues that MSA was not required to submit a "three-mode" SCBA for field evaluation. The government argues that the RFP did not require offerors to provide a product for field evaluation that met the Air Force's ultimate needs. Instead, the government argues, the RFP made clear that field evaluations were to be conducted on the offerors' "existing SCBA units." AR 28. The government points out that in a set of "Frequently Asked Questions" the Air Force stated that, for the two SCBAs to be supplied for field evaluation, "APR and PAPR modes are not required." AR 2409. Furthermore, the government argues that, because the Field Evaluation Exercise was to be used both to test the offerors' existing commercial items and to test the awardee's first production SCBA units, the fact that the field evaluators marked "N/A" by a number of items regarding MSA's SCBA does not mean that MSA's SCBA did not meet the RFP requirements for the initial test of the offerors' existing commercial items.

The court agrees with the government that the Air Force did not err in determining that MSA's proposal complied with the terms of the RFP. As the court concluded in the previous section, the RFP did not require offerors to propose a "three-mode" SCBA that was *** . Nor did the RFP require that the SCBA that was submitted for field testing be a "three-mode" SCBA. The Air Force did not err in field testing MSA's commercially available SCBA and in determining that MSA's proposed design approach would satisfy

the Air Force's requirements.

**b. The Air Force Was Not Arbitrary or Capricious in Assessing a Risk Rating to MSA's Design Approach.**

Interspiro criticizes the "Low" risk rating for MSA's design approach (Subfactor Three). Interspiro states that the RFP required each offeror to assess the risks posed by various aspects of its design approach "in accordance with MP5315.305, paragraph 5.5.2," AR 27, which Interspiro states is the same risk assessment system that the Air Force stated it would use to assess proposals. AR 33. Interspiro argues that, in five of the twelve areas MSA addressed, MSA assessed its own proposal risk as *** , in many cases requiring ***. AR 660. Interspiro argues that these risk ratings demonstrate significant reservations on the part of MSA as to whether it could satisfy the RFP's requirements on time, without increased cost and without degradation of performance. Interspiro argues that the Air Force ignored any risks related to MSA's proposed "three-mode" SCBA design. For example, Interspiro points out that MSA identified a *** risk for its proposed *** feature. AR 660. Interspiro argues that the Air Force credited MSA for this feature in rating MSA's design approach, but the Air Force then failed to consider the risks of this feature.

In response, the government states that MSA provided a risk matrix, AR 660, as required by the RFP. The RFP required each offeror to submit a "risk matrix" in which proposal risk was identified and rated (including quantitative estimates of impact on cost,

schedule, and performance) and to propose "work-arounds" or risk mitigators. AR 27.[17] The government disputes Interspiro's contention that the Air Force was bound by MSA's assessment of its proposal risks, regardless of the materiality of the design issue, the magnitude of the design issues identified, or the work-around proposed. The government states that Mandatory Procedure 5315.3, paragraph 5.5.2, which governs this analysis, AR 33, provides that "[f]or any weakness identified, the evaluation shall address the offeror's proposed mitigation and why that approach is or is not manageable." In terms of the risks identified by MSA regarding its *** feature, the government argues that MSA had identified the risk because it had *** of this feature, but that MSA's proposed solution was determined to be acceptable by the evaluators. AR 2236 ("Need testing to co[n]firm").

In addition, the government argues that Interspiro ***:

***.

***.

MSA also argues that the purpose of the requirement for offerors to self-identify proposal risks is usually for an agency to ensure that an offeror is well-acquainted with the challenges inherent in a project. Thus, MSA contends, the identification of risks in its proposal reflected MSA's thorough understanding of the project rather than reservations about its ability to perform.

---

[17] The government also states that, ***.

The court agrees with the government that the Air Force was not arbitrary in its rating of MSA's risk for its design approach. The Air Force determined that MSA had proposed acceptable solutions to the risks it had identified. AR 2236.[18] *** AR 367-368, the Air Force's rating of MSA as "Low" was justified where the Air Force had determined that MSA had proposed acceptable solutions.

### 3. The Air Force's Scoring of Proposals was Not Unreasonable or Inconsistent with the RFP's Terms.

#### a. The Air Force Did Not Unreasonably Rate MSA's Design Approach as "Blue/Exceptional."

Interspiro criticizes the Air Force's rating of MSA's design approach as "blue/exceptional." Interspiro argues that the Air Force erred in assessing the four factors set forth in the Final Technical Evaluation Report, AR 1492, in support of this rating. With regard to the first factor – *** – Interspiro argues that MSA does not claim that its *** feature allows a user to *** , and argues that MSA's risk matrix regarding this feature also raises concerns. AR 660. In addition, Interspiro argues that MSA's proposal does not state that a user can ***.

With regard to the second factor – no unique tools required – Interspiro argues that ***.

---

[18] The court also notes that the fact that the Air Force did not discuss each of the risks identified by MSA does not mean that the Air Force failed to consider them. See Reboksy v. United States, 60 Fed. Cl. 305, 312 (2004) (quoting Lorion v. U.S. Nuclear Regulatory Commission, 785 F.2d 1038, 1042 (D.C. Cir. 1986)) ("It does not necessarily follow . . . that the failure to mention certain evidence means that it was not considered.").

With regard to the third factor – the *** of the proposed system – Interspiro contends that MSA's proposed *** ( *** and ***, AR 649) is conjectural because MSA has not built the proposed system and because many portions of its proposal still require redesign. AR 660.

With regard to the fourth factor – the assessment of the PAPR – Interspiro argues that the Air Force improperly credited MSA for the *** of a PAPR which did not meet the requirements of the Purchase Description in that it had only ***.[19] Interspiro argues that solving these problems would ***. In addition, Interspiro argues that MSA failed to meet the government's 12-hour objective for battery life. AR 48.

The government argues that it properly evaluated MSA and Interspiro's design approach.[20]

With regard to the ***, the government acknowledges that Interspiro's proposal stated that its system protects the user from exposure when transitioning between the SCBA mode and the APR mode. AR 345. However, with regard to the ability to ***, the government asserts that ***. The government argues that MSA's design approach

---

[19] Interspiro also argues that the existing commercial PAPR that MSA proposed – which was a *** – violated the RFP's Purchase Description's requirement that the PAPR operate ***. AR 48. In response, the government argues that MSA's proposal did not violate the terms of the RFP, which required that the PAPR "be designed" to operate in ***, AR 48 (emphasis added), because MSA proposed to *** the PAPR to operate in ***. AR 660.

[20] The government further argues that Interspiro has failed to challenge the Air Force's rating of "field evaluation" (Factor I, Subfactor Three), in which MSA was given a "blue/exceptional" rating and a "low" risk. The government contends that, by ignoring this factor, *** based on MSA's rating for "field evaluation."

differed from all the other offerors in that it incorporated a *** that *** would allow the ***. AR 565, 640, 2248. The government states that, at the time the proposals were submitted for evaluation, MSA had ***, so MSA highlighted the risk and stated that it was willing to *** this feature if needed. AR 629, 631, 641, 660. The government contends that, based on the professional knowledge and judgment of the Air Force evaluation team, this was determined to be an acceptable solution. AR 2236.

With regard to unique tools, the government states ***. With regard to the *** of the proposed system, the government argues that during field evaluation the Air Force *** all offerors' existing commercial SCBA units submitted for field testing, and that MSA's unit with a ***. Decl. of Laurie Beebe ¶ 2; AR 2422 ("SCBA system w/out PAPR ≈ ***").[21]

With regard to the PAPR assessment, the government argues that, ***

The court agrees with the government that the Air Force was not unreasonable in rating MSA's design approach as "blue/exceptional." The Air Force identified a number of superior features in MSA's design approach. AR 2236-2237. Despite its contentions, Interspiro has not demonstrated that the government erred in identifying these features as being superior. Based on the superior features in MSA's design approach identified by the Air Force, the Air Force's rating of "blue/exceptional" satisfied the criteria set forth in

[21] Interspiro argues that regardless of this difference in the *** of the PAPR ***, MSA will need to ***, which will require *** even when canisters are not attached. In response, MSA argues that ***.

the RFP. AR 33. (Blue/Exceptional defined as: "Exceeds specified minimum performance or capability [r]equirements in a way beneficial to the Government; Proposal must have one or more strengths and no deficiencies [t]o receive a blue.").

**b. The Air Force's Risk Rating for Interspiro's Program Production Plan Was Not Arbitrary or Capricious.**

Under the evaluation of the offerors' program production plans (Subfactor Four), the offerors were required to explain how they would "accomplish accelerated production and delivery of SCBA units to meet surge and contingency situations." AR 29. Interspiro argues that the Air Force's assessment of *** risk for Interspiro's program production plan was based on an erroneous mathematical calculation of Interspiro's ability to meet the government's surge requirements. According to Interspiro, surge capability was measured under the contract as the total number of units an offeror could produce and deliver over a 60-day period. Interspiro points to a statement in the Final Technical Report that 10 units per day, or 300 units per month, was considered a minimum threshold. AR 1488.[22] Interspiro promised***. Therefore, Interspiro contends that it met the Air Force's threshold and that the risk rating was erroneous.

The government contends that the Air Force's calculations[23] were reasonable in light of Interspiro's failure to provide more precise information. The government argues

---

[22] Interspiro states that the Air Force's assessment of risk based on this factor was unreasonable because the threshold did not appear in the RFP or other relevant materials.

[23] ***.

that Interspiro was advised on January 12, 2006, that the evaluation of this subfactor was ***, and that Interspiro did not provide any revision or further clarification of its surge capacity. The government also argues ***.

The court agrees with the government that the Air Force's calculations of Interspiro's surge capability were reasonable given the information provided by Interspiro. In addition, the Air Force ***. AR 33.[24]

**c. The Air Force Properly Evaluated Interspiro's Past and Present Performance.**

Interspiro argues that the Air Force failed to evaluate Interspiro's past and present performance in accordance with the RFP (Factor III)[25] because the Air Force allegedly (1) ***.

The government argues that the Air Force properly evaluated Interspiro's past and present performance. First, with regard to aggregation, the government argues that the three contracts which Interspiro had requested that the Air Force consider in the aggregate were individually ***. The government argues that, even in the aggregate, Interspiro's contracts *** , the government argues that Interspiro's rating ***. The government states that, in response to an Evaluation Notice concerning ***.

Second, with regard to Interspiro's "incumbent" status, the government contends

[24] ***.

[25] The Air Force's rating for Interspiro in this area ***. AR 168. MSA received a "high" confidence level. AR 1735.

that it is arguable whether Interspiro is even an "incumbent" because the requirements for the SCBA under the current procurement are dramatically different from the SCBA that Interspiro provided under the previous Air Force procurement.[26] The government also argues that, even if Interspiro were an incumbent, it would be improper to afford an incumbent an evaluation preference absent a provision in the RFP allowing for such consideration. For this proposition, the government relies on General Dynamics-Ordinace & Tactical Services, B-295987.2, 2005 CPD ¶ 114 (2005), and Weber Cafeteria Services, Inc., B-290085.2, 2002 CPD ¶ 99 (2002).

Third, with regard to Interspiro's subcontractors, MSA argues that ***.

The court agrees with the government that the Air Force properly evaluated Interspiro's past performance. As the government and MSA have pointed out, *** , the evaluation of Interspiro's past performance ***. AR 1521. Based on this record, the court finds that the Air Force's evaluation of Interspiro's past performance as *** was not unreasonable.

**4. The Air Force Provided a Reasonable Basis for Awarding the Contract to MSA.**

Interspiro contends that, in light of the problems identified by the GAO protests, the Air Force agreed to take "corrective action" in which it would "reconsider the proposals" and "issue a new Source Selection Decision Document." AR 2117. Interspiro

[26] Although Interspiro represented that it has been producing a "three-mode" SCBA, it did not identify any contracts for such units.

contends that, despite acknowledging the need for "corrective action," the Air Force did not conduct a new evaluation of proposals, AR 2038, but simply issued a revised Source Selection Decision Document, AR 1883-1889. The new Source Selection Decision Document acknowledged that ***. Thus, Interspiro contends that the Air Force failed to take the corrective action that it promised.

In response, the government argues that the Air Force took the action that it promised. The government argues that the Source Selection Authority considered the ratings given to the proposals, the relative weight of the evaluation factors, and the possible trade-offs. The government contends that the new decision document reflected consideration of the price difference among the proposals, and the value of the non-price factors relative to the cost difference. The government argues that the Source Selection Authority determined that MSA's proposal provided the best value to the Air Force because of its superior technical proposal, its overall business approach, and its past and present performance justified the additional price. AR 1883-1889.

The court agrees with the government that the Air Force took the corrective action that it had promised. As the Air Force promised in its letter to the GAO, AR 2117, the Source Selection Authority considered the ratings and explicitly addressed why it was awarding the contract to MSA ***. AR 1888-1889. The revised Source Selection Decision Document is sufficiently detailed to support the Air Force's decision.

**B. Scott's Contentions and the Defendant's and MSA's Responses**

### 1. The Air Force Did Not Waive the RFP's Warranty and Maintenance Requirements for MSA.

Scott contends that, contrary to the RFP's requirement that the offerors propose their standard commercial warranty and that the warranty conform with all of the requirements of the contract, AR 20, MSA's warranty does not conform with the RFP requirement that the "SCBA system shall be field maintainable." AR 55. Specifically, Scott argues that MSA's proposed warranty prohibits the Air Force from performing any repairs that would be part of field maintenance on MSA's SCBA units. AR 558 ("MSA shall be released from all obligations under this warranty in the event repairs or modifications are made by persons other than its own or authorized service personnel . . . ."). Scott argues that the only way that Air Force users could perform repairs as part of field maintenance would be to first go through a certification process that is costly and burdensome. AR 559-562.

Scott contends that repairs are a necessary part of field maintenance based on the NFPA Standard 1852 (Standard on Selection, Care, and Maintenance of Open-Circuit Self-Contained Breathing Apparatus) (2002 edition) ("NFPA 1852"),[27] which is

---

[27] Chapter 7 (Maintenance) of NFPA 1852 provides, in pertinent part, as follows:

7.1 User Maintenance

***

7.1.3 Repair
7.1.3.1 Where user repair can be accomplished promptly and replacement items or remedial action are immediately available, the SCBA shall be permitted to be restored to proper condition and returned to in-service status.
7.1.3.2 Where user repair cannot be accomplished promptly and replacement

incorporated by the RFP, AR 43-44. NFPA 1852 includes "Repair" under the category of "User Maintenance." Scott contends that such repairs – if not done by authorized service personnel – would void MSA's proposed warranty.

Scott argues that this court has recognized that the "terms of a warranty are a material part of a solicitation" and that a "bidder's qualification of a warranty clause in the solicitation renders its bid non-responsive." Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174, 178 (2003) (citations omitted). Scott contends that, similar to Tel-Instrument, where the court ruled that an offeror was ineligible for award because it qualified its warranty, here MSA has qualified its warranty because MSA retains a veto

---

items or remedial action are not immediately available, the SCBA shall be tagged out-of-service and removed from the response vehicle or standby location until the user repair can be completed.
7.1.3.3 The organization's personnel shall follow the organization's SOPs and the manufacturer's written instructions for allowable user repairs and shall be trained on the specific repair procedures before performing them.
7.1.3.4 Users shall not perform work beyond the limits of the organization's SOPs and their training, and shall not exceed what is allowed by the manufacturer's written instructions.
7.1.3.5 All repairs shall be done with the proper tools, parts, equipment as specified by the manufacturer.
7.1.3.6 After repairs are made, the user shall conduct the appropriate inspection as specified in 7.1.2 to verify proper function of the SCBA.

7.1.4 Removal from Service
7.1.4.1 Where a condition exists that is beyond user repair in accordance with 7.1.3 or there is reason to suspect the SCBA is not in a safe condition, the SCBA shall be removed from service, tagged, and referred to personnel responsible for technical maintenance.

***

7.2 Technician Maintenance

***

7.2.3 Repair and Rebuild

over who may repair its SCBAs. In such circumstances, Scott argues that MSA's warranty is qualified and therefore MSA is ineligible for award.

In response, the government argues that MSA's proposal satisfied the RFP warranty and field maintenance requirements. The government argues that, as required by the RFP, MSA proposed its standard commercial warranty. AR 518, 558. The government argues that, as required in the RFP, MSA stated in its proposal that its SCBA is field maintainable. AR 635, 650. In addition, the government argues that MSA's proposal comports with the industry standard set forth in NFPA 1852 Chapter 7, regarding maintenance. The government argues that MSA has proposed a certification process through which Air Force personnel may become "authorized" to conduct repairs, AR 559-562, as required by MSA's warranty.

MSA argues that Scott's reliance on Tel-Instrument, 56 Fed. Cl. at 178, is misplaced because that case dealt with an offeror that had placed limits on its standard commercial warranty, contrary to the requirements of the solicitation.[28] In Tel-Instrument, the RFP specifically required that the offeror's warranty "not be voided by organic repair accomplished [in accordance with] prescribed maintenance manuals or standard military procedures on any item or component thereof." Id. In violation of this

[28] MSA also argues that Scott failed to provide a copy of its warranty. AR 1305 ("The unit is covered by a warranty providing protection against defects in materials or workmanship. The warranty covers a period of eight years on the SCBA, except for the pressure reducer, which is covered for 15 years."). Thus, MSA argues that Scott may have imposed similar restrictions on its warranty.

requirement, the offeror had stated that it would not "warranty Test Set performance if the hardware, software, or firmware is modified by anyone but [Plaintiff] without its concurrence." Id. Thus, the court held that the offeror had qualified the warranty clause in the solicitation, and its bid was non responsive. Id. Here, by contrast, there was no requirement in the RFP that the SCBAs be field maintainable by Air Force personnel without any specialized training.

The court agrees with the government and MSA that the Air Force did not violate the terms of the RFP nor was it arbitrary or capricious in accepting MSA's proposed standard commercial warranty. First, the court agrees with MSA that Scott's reliance on Tel-Instrument, 56 Fed. Cl. at 178, is misplaced. As noted above, Tel-Instrument dealt with an offeror that proposed a warranty in violation of a specific requirement in the contract. Id. Thus, the court held that the offeror had qualified the warranty clause in the solicitation, and its bid was non responsive. Id. Here, by contrast, MSA's proposed warranty does not violate the requirements set forth in the RFP. The RFP required that MSA propose its standard commercial warranty, AR 20, and that is what MSA proposed. There was no requirement in the RFP that Air Force personnel be permitted under the warranty to repair SCBA units without having been trained or authorized to make these repairs.[29] Therefore, the Air Force did not err in not concluding that MSA's proposal was

[29] Indeed, because Scott did not submit its proposed warranty in its proposal, it is unclear whether, unlike MSA, Scott would have extended it warranty to situations where repairs were made by untrained or unauthorized persons.

non-responsive based in its proposed warranty.

Second, while Scott contends that MSA's SCBA units cannot be field maintainable if each Air Force SCBA user must go through MSA's certification process, the court finds that there is no conflict with the RFP requirement that the SCBA unit be field maintainable and MSA's warranty requirement that repairs must be performed by "authorized" persons. An examination of the industry standard, as set forth in Chapter 7 of NFPA 1852, recognizes that user repairs may well require specialized training. Id. 7.1.3.3 ("The organization's personnel shall follow the organizations's SOPs and the manufacturer's written instructions for allowable user repairs and shall be trained on the specific repair procedures before performing them."). Therefore, there is no conflict between the RFP's requirement that the SCBA be "field maintainable" and the proposed warranty simply because certain field maintenance tasks will require specialized training and manufacturer certification. The industry standard recognizes the need for specialized training for certain field or "user" maintenance tasks. MSA's proposal has provided for such training. AR 559-562. For all of these reasons, the court concludes that the Air Force did not violate the terms of the RFP nor was it arbitrary and capricious in accepting MSA's proposed warranty.

**2. The Air Force Evaluated the Proposals Under the Same Industry Standard.**

Scott argues that the Air Force evaluated Scott under an older, more stringent industry standard, while evaluating MSA under a newer, more relaxed industry standard.

Therefore, Scott contends, the Air Force failed to consistently apply "the most current standard" to all offerors, AR 43, as required by the RFP.

The industry standard at issue is the NIOSH "Concept for Chemical, Biological, Radiological, and Nuclear (CBRN) Tight Fitting, Powered Air Purifying Respirator (PAPR) Standard" ("Concept" or "standard"). The NIOSH Concept, which has not yet been issued in final form, sets forth various performance standards. The June 2005 Concept was the version in effect at the time the RFP was issued. NIOSH issued an updated version in November 2005, which was after the submission and initial evaluation of proposals. With regard to the evaluation of the proposals against the draft Concept, according to Laurie Beebe, the Air Force's Project Lead Engineer for this procurement:

> The evaluators generally evaluated initial proposals against the June 20, 2005, draft Concept, but we knew that the NIOSH standards would be changing. NIOSH introduced the revised draft Concept on November 4, 2005, which relaxed certain requirements. Accordingly, during the final evaluation, where the draft Concept requirements varied from earlier drafts, if an offeror stated it could comply with requirements set forth in the November draft Concept, we considered this approach to be acceptable.

Decl. of Laurie Beebe ¶ 8.

Scott contends that the Air Force should have applied the November 2005 draft Concept in its final evaluation. Scott contends that the Air Force evaluated Scott's proposal against the more stringent requirements of the June 2005 Concept because the Air Force did not alter its design approach evaluations after the November 2005 Concept was released. AR 2345-2346 (initial Evaluation Report), 1492-1493, 1495 (final

Evaluation Report). Scott argues that, in proposing to meet the June 2005 Concept, it significantly exceeded the November 2005 Concept in the area of breathing performance by providing a higher flow rate. Scott's counsel contends that the higher flow rate would help users to be less fatigued in high-breathing demand situations. Therefore, Scott argues, the Air Force should have credited Scott for this feature.

By contrast, Scott contends that MSA's proposal admitted that it did not conform to the June 2005 Concept because it did not meet the requirements for ***. AR 1042. As a result, Scott contends that MSA was able to propose a significantly ***. Furthermore, Scott argues that the Air Force failed to confirm that MSA met the November 2005 Concept.

In response, the government argues that it did not apply different standards to the offerors' proposals. The government contends that all offerors had to meet the November 2005 Concept and the offerors had the opportunity to revise their proposals on January 12, 2006, after the issuance of the November 2005 Concept. Thus, the government argues that Scott could have revised its proposal to meet the November 2005 Concept if it so desired.[30] Indeed, Scott notified the Air Force that it might be able to *** based on the November 2005 Concept. AR 1124.

As for the evaluation of MSA's proposal, the government argues that Scott has

[30] The government also disputes Scott's assertions that its compliance with the requirements of the June 2005 NIOSH Concept caused Scott's proposed PAPR to *** than MSA's proposed PAPR. Rather, the government contends that the *** was due to Scott's filter design and other factors.

failed to explain how MSA's proposal failed to meet the November 2005 draft Concept. The government contends that it was not required to verify MSA's representations that it would comply with the November 2005 NIOSH standards because that is the purpose of post-award testing and field evaluation. As with MSA, the government argues that the Air Force also accepted Scott's representations (in response to an Evaluation Notice about ***) that it could make design changes based on the November 2005 NIOSH Concept to ***. AR 1495. As such, the government argues that it treated the offerors' representations equally.

In addition, MSA argues that exceeding the November 2005 NIOSH Concept alone was not sufficient for Scott to be deemed as "blue/exceptional" in any event. Instead, MSA argues that the performance or capability at issue must also be "beneficial to the Government." AR 33. Furthermore, MSA argues that because Scott made representations in its response to an Evaluation Notice that Scott might make design changes based on the revised November 2005 NIOSH Concept, it was not clear whether Scott would retain the higher flow rate. AR 1124 ("[R]ecent developments to the NIOSH CBRN PAPR requirements . . . could potentially allow further *** of the PAPR and filters.").

The court agrees with the government that the Air Force's evaluation of the offerors' proposals under the NIOSH Concept did not violate any law and was not arbitrary and capricious. The NIOSH Concept in effect at the time of the contract award

was the November 2005 Concept. There is no evidence in the record that either Scott or MSA failed to satisfy this standard. In addition, Scott had the opportunity to revise its proposal to meet the more relaxed standards of the November 2005 NIOSH Concept, but Scott failed to do so.

As for Scott's contention that the Air Force should have credited Scott for its proposed higher flow rate, it was not enough for Scott to exceed the November 2005 NIOSH Concept; it also had to be deemed beneficial to the government. While Scott had the opportunity in its proposal to point out the value to the government of its higher flow rate, it did not. Therefore, there is no basis upon which to assume that the government saw a higher air flow rate (coupled with ***) as beneficial. Finally, based on Scott's statements in response to the Evaluation Notice about potentially making design changes based on the November 2005 NIOSH Standard, it was unclear whether Scott would continue to offer the higher flow rate. In such circumstances, the government was not unreasonable in failing to give Scott extra credit for the higher flow rate.

**3. The Air Force Did Not Evaluate MSA Based on Its *** and ***.**

Scott contends that, contrary to the terms of the RFP, the Air Force failed to reject a ***, AR 1095, and a *** entitled "SCBA-PAPR Combo Overview," AR Tab 23, that had been submitted by MSA. Scott contends that the Air Force improperly used the *** in its evaluation of MSA's proposal because there was no provision for offerors to submit such materials in the RFP. Scott contends that the impact of MSA's *** is reflected in

the Air Force's evaluation. Scott states that two evaluators referred to the MSA *** and credited MSA in the areas of test equipment, AR 2244, and the face piece, AR 2259. Scott also states that one of the capabilities demonstrated in MSA's *** – *** – was cited by the Source Selection Authority in his conclusion in the Source Selection Document. AR 1888. Scott argues that the same capability to *** was noted during the evaluation of Scott's design approach, AR 2317-2318, 2329, but that it was not evaluated as "exceed" for the capability under this subfactor, AR 2298, or under subsequent summaries of the evaluation, AR 1495-1496, 1684, 1887-1888. Based on the comments in evaluations, Scott contends that the Air Force's evaluators must have had physical interaction with MSA's ***, AR 2244, 2259.

In response, the government argues that the Air Force did not evaluate MSA's ***. The government states that the declaration of Ms. Beebe makes it clear that the Air Force did not evaluate MSA's *** nor did it review MSA's ***. Decl. of Laurie Beebe, ¶ 4 ("Although MSA and Interspiro both submitted *** in addition to their two existing commercial SCBA units, the Air Force did not evaluate these ***. Only the two existing commercial SCBA units were evaluated for each offeror. The evaluators also did not *** submitted by MSA along with its existing commercial SCBA units and ***."). With respect to Scott's citations to comments by the evaluators and the Source Selection Authority, the government argues that the cited comments were taken directly from MSA's written proposal, and reflected MSA's examination of its ***. The government

argues that the Air Force evaluators simply picked up on MSA's statements.

The court agrees with the government that there is no evidence on the record that the government used MSA's *** in its evaluation of MSA's proposal. The government has submitted the declaration from Ms. Beebe stating that the government did not evaluate the *** or view the ***. The government has also demonstrated that the references in the Air Force evaluations to MSA's *** were taken from MSA's written proposal describing its ***. Given that the RFP required offerors to describe a "design approach for the modification of the offeror's commercial SCBA units," AR 32, it was appropriate for any of the offerors to describe their *** in their written proposals and for the government to consider these written descriptions. Scott has failed to establish that the Air Force improperly considered MSA's ***.

### 4. The Air Force Did Not Violate Any Law and Was Not Arbitrary or Capricious in its Evaluation of the Risks of MSA's Proposal.

Scott argues that the Air Force failed to evaluate the critical risks of MSA's proposal related to both increased costs and the use of its subcontractor. With regard to increased costs, Scott argues that the Air Force failed to evaluate the increased costs associated with MSA's warranty, as the Air Force will be required to train and certify certain Air Force members or pay MSA to conduct field maintenance on MSA's SCBAs. Scott also contends that the Air Force failed to evaluate design costs and "life cycle costs" raised by MSA in its proposal. AR 1042. Scott contends that the Air Force's failure to evaluate these costs violated the language of the RFP, which stated that the proposal risk

evaluation would "include[] an assessment of the potential for . . . increased cost." AR 33.

Scott further contends that the Air Force failed to evaluate MSA's reliance on a *** for the PAPR requirement. Scott contends that MSA did not provide any substantive information regarding *** or *** production approach to a critical aspect of the procurement. Scott argues that the "Memorandum of Understanding" between MSA and *** regarding the PAPR, AR 646, does not provide a firm commitment *** to satisfy the requirements of the RFP. Scott contends that five of the evaluation factors in the RFP are directly implicated by MSA's reliance *** and, therefore, MSA was required to submit the information necessary to conduct an evaluation.

In response, the government argues that the Air Force properly evaluated MSA's proposal risk. First, in regard to increased costs, the government argues that MSA's warranty does not require that only MSA personnel be allowed to repair the SCBAs, and therefore there is no basis for concluding that user maintenance will be higher for MSA's SCBAs than any others. The government argues that there was no requirement in the RFP that the Air Force evaluate life-cycle costs, nor was there any requirement that offerors submit information about life-cycle costs. The government contends that Scott did not provide any information for the Air Force to evaluate concerning its life cycle costs.[31] The government also argues that, because this is a firm, fixed-price contract, any

[31] MSA also argues that life cycle costs are not included within proposal risk under the Air Force evaluation criteria, MP-5315.305, paragraph 5.5.2, which defines a "weakness" in a

additional design costs incurred to meet the requirements of the RFP would be absorbed by the contractor, not the Air Force.

Second, in regard to MSA's ***, the government argues that Scott fails to identify any requirement in the RFP for the Air Force to conduct a separate evaluation of ***. The government argues that, based on the information about ***, there was little reason for the Air Force to have concerns about ***. AR 647, 363. The government argues that the evaluation factors cited by Scott did not require the government to conduct an independent evaluation of ***.[32] The government also disputes Scott's contention that a "firm commitment" was required by the RFP.

The court agrees with the government that the Air Force was not arbitary or capricious in its evaluation of MSA's proposal risk or in its price evaluation. None of Scott's allegations demonstrate that the Air Force failed to consider information required by the RFP. First, as discussed above, there is no evidence that user maintenance will be higher for MSA's SCBAs than any others. Second, there was no requirement in the RFP that the Air Force consider life cycle costs. Third, there was no requirement that the Air Force conduct a separate evaluation of MSA's ***. As such, Scott has failed to establish

---

proposal as something that "increases the risk of unsuccessful contract performance." See also 48 C.F.R. § 15.001. Thus, MSA argues, life cycle costs would not be evaluated under proposal risk.

[32] In addition, MSA argues that Scott has not alleged any prejudice to Scott. In other words, Scott has not alleged that the Air Force scrutinized Scott's suppliers or that, had the Air Force scrutinized *** more closely, the ratings would have been different.

that the Air Force violated any law or was arbitrary or capricious in its evaluation of risks.

**5. The Air Force Treated All Offerors Equally.**

Scott alleges that the Air Force treated the offerors unequally in rating the proposals because it shared several identical strengths with MSA, but failed to receive credit for them under Subfactors Two and Three. Scott states that these strengths include: exceptional ***, AR 1494; ***, AR 1495; the ability to ***, AR 2317-2318; and other areas including ***, AR 2236-2264, 2297-2329. Scott contends that, once it had ***, the Air Force should have rated its proposal as "blue/exceptional" due to these strengths, rather than the *** rating that it received. In addition, Scott complains that its "exceeds" were eliminated from the "Rating Team Worksheet" that accompanied the Source Selection Report. AR 1736 ("See the comprehensive Technical Report . . . for detailed, thorough information.").

In response, the government argues that MSA's "blue/exceptional" ratings were based on multiple superior features, and that, even if Scott's proposal shared some of MSA's proposed features, this does not justify an identical rating. In addition, the government disputes many of the superior features that Scott claims its proposal offers. For example, the government contends that Scott's proposal did not state that it has the capability to ***.[33] MSA also contends that, while Scott's clarity of vision and

[33] Scott contends that the description in its proposal, AR 1315 (***), means that it could ***. However, the government distinguishes Scott's stated ability to *** with the ability to ***. The court agrees that Scott's representations about *** do not necessarily imply ***.

communication were noted as "exceptional," AR 1494, the Air Force concluded that MSA's SCBA was "easier to see through" and "easier to communicate with" compared to Scott's SCBA. AR 1888. Thus, the government argues, the Air Force treated all of the offerors equally.

The court agrees with the government that the Air Force was not arbitrary and capricious in its rating of proposals. The Air Force evaluators identified numerous superior features in MSA's proposal in support of its "blue/exceptional" ratings. Under Subfactor Two, MSA's rating was based on its ***, clarity of vision, ease of communication, and ease of donning/doffing. AR 1887. Under Subfactor Three, MSA's rating was based on the *** of the system and the ability to***. AR 1887. While the Air Force may have identified some of the same superior features in Scott's proposal, it is clear that the Air Force identified a greater number of superior features in MSA's proposal. Given the record before it, the court will not second guess the Air Force's decision to give MSA a higher rating under Subfactors Two and Three. See, e.g., Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 447, 467 (1997) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)) ("Technical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess.").

## CONCLUSION

For the reasons stated above, Plaintiff-Interspiro's and Plainitff-Scott's motions for

judgment upon the Administrative Record are **DENIED.** The government's and Defendant-intervenor MSA's motions for judgment upon the Administrative Record are **GRANTED.** Each party is to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge