**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

INTERSPIRO, INC.,

and

SCOTT TECHNOLOGIES, INC., d/b/a
SCOTT HEALTH & SAFETY

*Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

and

MINE SAFETY APPLIANCES CO.

*Intervenor.*

**Agreed-Upon Redacted Copy – May Be Made Public**

**FILED UNDER SEAL**

**No. 06-425**
**(Consolidated with No. 06-443)**
**Judge N. Firestone**

## SCOTT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Scott Technologies, Inc., doing business as Scott Health & Safety ("Scott"), respectfully moves for judgment in favor of Scott and against the United States on the Administrative Record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). Scott further requests that the Court issue declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65. As set forth in the accompanying Memorandum, the Government's contract award was premised on perceived technical and price differences between the offerors that exist only by virtue of the Government's departure from the solicitation's evaluation scheme and its arbitrary evaluation of the offerors' proposals. Moreover, the balance of harms and the

public interest decisively weigh in favor of the issuance of declaratory and injunctive relief to remedy these violations of procurement law.

Accordingly, Scott respectfully requests that the Court enter, based on the administrative record: (1) a declaratory judgment that (a) the Air Force's conduct of this procurement and its award of the SCBA contract to MSA were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and (b) if the Air Force amends or cancels the RFP, Scott is entitled to recover all proposal preparation costs incurred in connection with this procurement; (2) a permanent injunction consistent with and enforcing the Court's declaratory judgment; and (3) an order granting such other and further relief as the Court deems necessary, just and proper. A proposed order is attached.

Respectfully submitted,

s/Rand L. Allen
by Daniel P. Graham
Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com

*Counsel for Plaintiff*

July 7, 2006

Of counsel:
John A. McCullough
Daniel P. Graham
William J. Grimaldi
WILEY REIN & FIELDING LLP

Bruce S. Ramo
TYCO INTERNATIONAL, LTD.
9 Roszel Road
Princeton NJ 08540
(609) 720-4306 (O)
(609) 720-4335 (F)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| INTERSPIRO, INC., and SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY *Plaintiffs,* v. UNITED STATES, *Defendant,* and MINE SAFETY APPLIANCES CO. *Intervenor.* | **No. 06-425** **(Consolidated with No. 06-443)** **Judge N. Firestone** |

**ORDER**

Plaintiff Scott Technologies, Inc., doing business as Scott Health & Safety, has moved for judgment on the Administrative Record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and for declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65. Having considered this motion, as well as all other relevant materials and arguments, it is hereby

ORDERED that Scott's Motion for Judgment on the Administrative Record be and hereby is GRANTED;

FURTHER ORDERED that Air Force's conduct of this procurement and its award of the resulting contract to Intervenor Mine Safety Appliances Co. ("MSA") were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

FURTHER ORDERED that the Air Force's contract award to MSA hereby is DECLARED INVALID;

FURTHER ORDERED that if the Air Force amends or cancels the solicitation in this procurement, Scott is entitled to recover all proposal preparation costs incurred in connection with this procurement; and

FURTHER ORDERED that the Air Force is enjoined from taking any action inconsistent with the declarations made herein, including expending public funds or otherwise allowing performance of the contract awarded to MSA, and amending or cancelling the solicitation without paying Scott all proposal preparation costs incurred in connection with this procurement.

____________________________________
NANCY B. FIRESTONE
Judge

Dated: September __, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

INTERSPIRO, INC.,

and

SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY

*Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

and

MINE SAFETY APPLIANCES CO.

*Intervenor.*

**FILED UNDER SEAL**

**No. 06-425**
**(Consolidated with No. 06-443)**
**Judge N. Firestone**

# MEMORANDUM IN SUPPORT OF SCOTT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF


Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com

*Counsel for Plaintiff*

*Of counsel*:
John A. McCullough
Daniel P. Graham
William J. Grimaldi
WILEY REIN & FIELDING LLP

Bruce S. Ramo
TYCO INTERNATIONAL, LTD.
9 Roszel Road
Princeton NJ 08540
(609) 720-4306 (O)
(609) 720-4335 (F)


July 7, 2006

## TABLE OF CONTENTS

Page


I. STATEMENT OF THE ISSUES ..... 1

II. STATEMENT OF THE FACTS ..... 3

A. Overview of the Procurement and the RFP ..... 3

B. Evaluation of Proposals ..... 7

C. Contract Award, Debriefing, and Scott's Initial GAO Bid Protest ..... 9

D. Scott's Second GAO Bid Protest ..... 10

III. ARGUMENT ..... 10

A. Legal Standard for Judgment on the Administrative Record ..... 10

B. The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP by Accepting and Evaluating MSA's [redacted] and Supporting Materials ..... 11

1. The RFP's "Two-Step" Process for Evaluation of Proposed SCBA/APR/PAPR Systems. ..... 12

2. The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP when it Permitted MSA to Submit a [redacted] and Supporting Materials ..... 14

3. The Air Force Improperly Evaluated MSA Based on Its [redacted] and Supporting Materials ..... 16

C. The Air Force Failed to Apply Current Industry Standards by Waiving a Critical Technical Requirement for MSA While Evaluating Scott Under a More Stringent Requirement than Called for in the RFP ..... 17

1. The 2004 and 2005 Dual Use Concepts ..... 17

2. MSA Did Not [redacted], and the Air Force's Failure to Recognize this Critical Deficiency Is Wholly Irrational ..... 18

3. Despite Waiving the Dual Use Concept for MSA, the Air Force Evaluated Scott Under the More Stringent 2004 Concept ..... 21

D. The Air Force Waived the RFP's [redacted] Requirements for MSA ..... 25

E. The Air Force Failed to Evaluate Critical Risks of MSA's Proposal and Treated the Offerors Unequally in its Price Evaluation. ..... 27

**TABLE OF CONTENTS**
(continued)

**Page**

1. The Air Force Failed to Evaluate the Increased Costs Associated with MSA's [redacted], MSA's [redacted] and Life-Cycle Costs ........ 27
2. The Air Force Evaluated Price on an Uneven Basis that Does Not Reflect the True Price Difference Between Scott and MSA ........ 30
3. The Air Force Failed to Evaluate MSA's Reliance on [redacted] for the [redacted] Requirement ........ 32

F. The Air Force Departed from the Evaluation Process in the RFP and Treated the Offerors Unequally ........ 33

G. The Above Violations of Procurement Law Render the Air Force's Source Selection Decision Irrational ........ 37

H. Scott is Entitled to Declaratory and Injunctive Relief to Remedy the Air Force's Violations of Procurement Law ........ 39

IV. CONCLUSION ........ 40

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Al Ghanim Combined Group v. United States*, 56 Fed. Cl. 502 (2003)............................20

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999).......... passim

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87 (1983).........33

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005).......................................10

*Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131 (1999).......................21, 25, 26

*Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384 (2005).......................19, 20, 38

*CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100 (2006)..........................29, 39

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................11

*Computer Sci. Corp. v. United States*, 51 Fed. Cl. 297 (2001)........................................11

*Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361 (1998)...........................17, 19

*Dubinsky v. United States*, 43 Fed. Cl. 243 (1999)..............................................12, 23, 26

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993)...............................................39

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) .......................................... passim

*Hunt Bldg. Co., Ltd. v. United States*, 61 Fed. Cl. 243 (2004) ...............................2, 17, 22

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001)..........................................................................................11

*LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995)..........................................12

*Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 788 (1991) ............................................12

*Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10 (2000)............................ passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)....................................................................................29, 30, 33

*NKF Eng'g, Inc. v. United States*, 9 Cl. Ct. 585 (1986), *vacated on other grounds*, 805 F.2d 372 (Fed. Cir.1986)....29

*OTI Am., Inc. v. United States*, 68 Fed. Cl. 646 (2005)....15

*Omega World Travel v. United States*, 54 Fed. Cl. 570 (2002)....15

*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (2000)....29, 39, 40

*Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560 (2000)....33, 39

*Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)....11

*Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 766 (2006)....29

*TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212 (2001)....15, 34

*Tel-Instrument Elecs. Corp. v. United States*, 56 Fed. Cl. 174 (2003)....26

*Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48 (2005)....19, 20, 38

**AGENCY DECISIONS**

*Ashland Sales & Serv. Co.*, B-291206, Dec. 5, 2002, 2003 CPD ¶ 36....37

*Cortland Mem'l Hosp.*, B-286890, Mar. 5, 2001, 2001 CPD ¶ 48....36, 37

*Elec. Design Inc.*, B-279662.2, Aug. 31, 1998, 98-2 CPD ¶ 69....14

*Envirosolve LLC*, B- 294974.4, June 8, 2005, 2005 CPD ¶ 106....37

*Gemmo Impianti SpA*, B-290427, Aug. 9, 2002, 2002 CPD ¶ 146....31

*Genesis Gen. Contracting, Inc.*, B-225794, June 1, 1987, 87-1 CPD ¶ 550....26

*ITT Electron Tech. Div.*, B-242289, Apr. 18, 1991, 91-1 CPD ¶ 383....15, 16

*Keeton Corr., Inc.*, B- 293348, Mar. 4, 2004, 2005 CPD ¶ 44....37

*Liquidity Servs., Inc.*, B-294053, Aug. 18, 2004, 2005 CPD ¶ 130....31

*Lockheed, IMS*, B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180....29, 31

*Mine Safety Appliances Co.*, B-238597.2, July 5, 1990, 90-2 CPD ¶ 11....24, 36

*New Breed Leasing Corp.*, B-259328, Mar. 24, 1995, 96-2 CPD ¶ 84 ................34, 37, 38

*Northrop Grumman*, B-295526, Mar. 16, 2005, 2005 CPD ¶ 45 ....................................31

*Preferred Sys. Solutions, Inc.*, B-292322, Aug. 25, 2003, 2003 CPD ¶ 166 ....................31

*Programmatics, Inc.*, B-228916.2, Jan. 14, 1988, 88-1 CPD ¶ 35 ..................................30

*RMI, Inc.*, B-203652, Apr. 20, 1983, 83-1 CPD ¶ 423 ............................................36, 37

*SDA, Inc.*, B-248528.2, Apr. 14, 1993, 93-1 CPD ¶ 320 ...............................................34

*SOS Interpreting, Ltd.*, B-287477.2, May 16, 2001, 2001 CPD ¶ 84 .........................30, 32

*Son's Quality Food Co.*, B-244528.2, Nov. 4, 1991, 91-2 CPD ¶ 424.......................36, 37

**FEDERAL STATUTES**

4 C.F.R. § 21.11 .........................................................................................................10

5 U.S.C. § 706 ........................................................................................................3, 10

10 U.S.C. § 2304..........................................................................................................16

10 U.S.C. § 2305.................................................................................................. passim

28 U.S.C. § 1491.......................................................................................1, 3, 10, 39

31 U.S.C. § 3556..........................................................................................................10

**FEDERAL REGULATIONS**

FAR § 7.105..................................................................................................................28

FAR § 9.601 .................................................................................................................33

FAR § 9.603..................................................................................................................33

FAR § 15.206...................................................................................................12, 14, 21

FAR § 15.303...............................................................................................2, 12, 17, 33

FAR § 15.304..................................................................................................... passim

FAR § 15.305 ........ passim

FAR § 52.212-1 ........ 13

48 C.F.R. § 5315.3 ........ 5

48 C.F.R. § 207.103 ........ 28

MP § 5315.305 ........ 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| INTERSPIRO, INC., and SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY, *Plaintiffs,* | **FILED UNDER SEAL** |
| v. | |
| UNITED STATES, *Defendant,* and MINE SAFETY APPLIANCES CO. *Intervenor.* | **No. 06-425** **(Consolidated with No. 06-443)** **Judge N. Firestone** |

**MEMORANDUM IN SUPPORT OF SCOTT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

Scott Technologies, Inc., doing business as Scott Health & Safety ("Scott"), respectfully files this memorandum in support of its contemporaneously filed motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and for declaratory and injunctive relief under 28 U.S.C. § 1491(b)(2) and RCFC 65.

## I. STATEMENT OF THE ISSUES

The Administrative Record confirms three systemic flaws identified by Scott in the Air Force's conduct of the competition under Request for Proposals No. FAA8532-05-R-76133 (the "Solicitation" or "RFP"). In three separate areas, the Air Force deviated from or changed the

requirements, terms, conditions, and evaluation factors set forth in the RFP in a manner that favored Mine Safety Appliances Co. ("MSA") to the detriment of Scott.

- First, contrary to the evaluation factors, terms, and conditions of the RFP, which provided that Subfactor Two (Field Evaluation) would be based on offerors' "existing commercial" products, while Subfactor Three SCBA Design Approach would be based on written narratives, the Air Force permitted MSA, but not Scott, to submit a [redacted] and [redacted] that reflected MSA's design approach. *Infra* § III.A.

- Second, although the RFP required offerors to comply with the most current version of several industry standards, the Air Force waived a critical standard for MSA, while evaluating Scott under an older, more stringent standard. *See infra* § III.C.

- Third, the Air Force waived the RFP's [redacted] requirements by allowing MSA to propose a [redacted] that prohibits the Air Force from [redacted]. Rather than comply with two mandatory requirements, MSA's proposal forces the Air Force to choose one requirement to the exclusion of the other. *See infra* § III.D.

The Air Force's conduct violated the requirements of 10 U.S.C. §§ 2305(a)(2)(A)(i) and 2305(b)(1), and FAR §§ 15.303(b)(4), 15.304(d), and 15.305(a), which require that solicitations clearly identify all evaluation factors and significant subfactors, and that agencies "evaluate . . . competitive proposals based solely on the factors specified in the solicitation."[1] The Air Force violated two basic tenets of Federal procurement law: (1) that agencies are strictly bound by the requirements stated in the solicitation, *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999); and (2) that agencies must apply the same requirements consistently to all offerors, *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004).

In addition to these clear violations, the Air Force also inconsistently applied the evaluation factors to Scott and MSA. Scott's proposal shared several identical evaluated technical strengths with MSA but failed to receive any credit for them. *See infra* § III.F.

---

[1] All emphasis is added throughout this Memorandum unless otherwise noted.

Moreover, the Air Force entirely failed to consider unavoidable additional costs associated with MSA's proposal, including [redacted] associated with MSA's noncompliant [redacted] that MSA must incur to comply with the waived industry standard, and life-cycle costs. *See infra* § III.E1. Not only were these costs a critical part of the RFP's Proposal Risk factor that the Air Force inexcusably ignored, they also undermine the Air Force's evaluation of price. Because MSA's price does not include these unevaluated costs, no "apples to apples" price evaluation could be made. *See infra* § III.E.2.

Each of these violations, standing alone, renders the Air Force's award "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). Simply put, the Air Force's award was premised on perceived technical and price differences between MSA's and Scott's proposal that exist only by virtue of the Air Force's departure from the RFP's evaluation scheme and its arbitrary evaluation of the offerors' proposals. The balance of harms and the public interest decisively weigh in favor of declaratory and injunctive relief to remedy these violations of procurement law. For all of these reasons, and those set forth below, the Court should grant Scott's Motion.

## II. STATEMENT OF THE FACTS

### A. Overview of the Procurement and the RFP.

The Air Force issued the RFP on August 1, 2005 for proposals to meet the Air Force's need for a next generation Self Contained Breathing Apparatus ("SCBA"). The new SCBA system would combine traditional SCBA functionality with air purifying respirator ("APR") and powered air purifying respirator ("PAPR") features, resulting in an integrated product that provides military and civilian fire fighters with day-to-day protection and first responders with respiratory protection in chemical, biological, radiological and nuclear ("CBRN") environments.

The RFP was structured to solicit proposed design approaches that exceeded the minimum requirements of the specification, "Purchase Description Self Contained Breathing Apparatus (SCBA)" ("Purchase Description").

While the Air Force sought to procure a modified commercial item under Part 12 of the Federal Acquisition Regulation ("FAR"), the Air Force used the Contracting by Negotiation procedures of FAR Part 15, Part 5315 of the Air Force FAR Supplement ("AFFARS"), and Air Force Mandatory Procedure ("MP") 5315.3, in order to give evaluation credit for anticipated features that exceed minimum requirements. AR1708. Under the RFP, each offeror was required to submit two commercially available SCBA units for testing, and to propose a written "design approach" describing how the offeror would modify its proposed commercial unit to meet the requirements set forth in the RFP's Purchase Description.

The RFP stated that award would be made to the offeror who represents the best value to the Government based on the following factors and subfactors:

> **Factor I: Mission Capability**
>
> **Subfactor One: Certifications and Test Data.** This subfactor is met when the proposal provides the required certifications and test data specified for this subfactor and such clearly demonstrates that the information meets, or exceeds the requirements in a way beneficial to the Government.
>
> **Subfactor Two: Field Evaluation.** This subfactor is met when the offeror provides all the material required for Subfactor Two in the "Proposal Requirements" provision and the two submitted SCBA units meet, or exceed in a way beneficial to the Government all the performance evaluation areas listed in the Field Assessment Questionnaire.
>
> **Subfactor Three: SCBA Design Approach.** This subfactor is met when the proposal identifies an acceptable design approach for the modification of the offeror's commercial SCBA units in that it clearly demonstrates that the information meets, or exceeds in a way beneficial to the Government all the requirements of Section 3.0 of the purchase

> description **including, but not limited to**, the PAPR weight, operating time, battery information, filter information, re-hydration data, facepiece information, system weight and numbers, contamination protection, and cylinder size, and tool kits that support the SCBA system have minimal quantities of tools and such tools are common in form, fit, and function.
>
> **Subfactor Four: Program Production Plan.** The standard for this subfactor is met when the proposal identifies a sound and feasible plan for the organization of personnel, facilities, equipment, plant layout, and material resources, and the proposal provides a viable plan for accelerating production and delivery of SCBA units to meet surge and contingency situations and all the information clearly demonstrates a level of knowledge and understanding of the requirement that is acceptable or exceptional in a way deemed beneficial to the Government.
>
> **Factor II. Proposal Risk**
>
> **Factor III. Present and Past Performance**
>
> **Factor IV. Cost/Price**
>
> **Factor V. Small Business Participation**

Administrative Record ("AR") 32 (emphasis in original). The RFP stated that Factors I, II, and III were equal in importance and more important than Factors IV and V, and that when Factors I, II, and III were combined, they were significantly more important than Factors IV and V. *Id.* The RFP further stated that award could be made to a higher priced, higher rated offeror if the technical superiority outweighs the cost difference. AR 31. The RFP stated that, while Factors IV and V were both important considerations in the best value decision, Factor IV was significantly more important than Factor V. AR 32.

Within Factor I, the RFP stated that Subfactors One, Two, Three, and Four were of equal importance. AR 32. The RFP stated that each Subfactor under Factor I would be evaluated in accordance with the following color/adjectival ratings specified in regulations, AFFARS § 5315.3 and MP § 5315.305:

| **Color** | **Ratings** | **Definitions** |
|---|---|---|
| Blue | Exceptional | Exceeds specified minimum performance or capability [r]equirements in a way beneficial to the Government; Proposal must have one or more strengths and no deficiencies [t]o receive a blue. |
| Green | Acceptable | Meets specified minimum performance or capability [r]equirements delineated in the Request for Proposal; [p]roposal rated green must have no deficiencies but may have [o]ne or more strengths. |
| Yellow | Marginal | Does not clearly meet some specified minimum performance [o]r capability requirements delineated in the Request or Proposal, but any such uncertainty is correctable. |
| Red | Unacceptable | Fails to meet specified minimum performance or capability [r]equirements; proposal has one or more deficiencies. Proposals with an unacceptable rating are not awardable. |

AR 33.

The RFP also provided evaluation criteria for Factors II through V. As to Factor II, the RFP stated that Proposal Risk would be evaluated for each Mission Capability Subfactor and explained that Proposal Risk "focuse[d] on the weaknesses associated with an offeror's proposed approach and include[d] an assessment of the potential for disruption of schedule, increased cost, degradation of performance, the needed (sic) for increased Government oversight, and the likelihood of unsuccessful contract performance." *Id.* Each offeror would be assigned risk ratings as follows:

| **Ratings** | **Definition** |
|---|---|
| High | Likely to cause significant disruption of schedule, [i]ncreased cost or degradation of performance. Risk may be unacceptable even with special contractor emphasis [a]nd close Government monitoring. |

| | |
|---|---|
| Moderate | Can potentially cause some disruption of schedule, [i]ncreased cost or degradation of performance. Special [c]ontractor emphasis and close Government monitoring [w]ill likely be able to overcome difficulties. |
| Low | Has little potential to cause disruption of schedule, [i]ncreased cost or degradation of performance. Normal [c]ontractor effort and normal Government monitoring [w]ill likely be able to overcome any difficulties. |

*Id.*

**B. <u>Evaluation of Proposals</u>**

The Air Force's internal process for conducting the evaluations is described in the July 20, 2005 Source Selection Plan. AR1705-26. The SSP establishes three levels of source selection participants: (1) the Source Selection Evaluation Team ("SSET"), (2) the Source Selection Advisory Council ("SSAC"), and (3) the Source Selection Authority ("SSA"). AR1709-10. The SSET was to "conduct[] a detailed and comprehensive review and evaluation of each offeror's proposal against the solicitation requirements." AR1711. The SSET would then complete and document the final evaluation in a "Simplified Source Selection Report" and advise the SSAC and the SSA of the findings. AR1712.

Scott submitted its initial proposal to the Air Force on September 15, 2005. AR1187. Following the outline of the SSP, Subfactor Two Field Evaluations were initially documented in "Field Assessment Evaluation" checklists, "observer" forms, and a "master form" completed by participants and members of the SSET. AR Tabs 17, 18, and 19. Subfactor Three Design approach evaluations were initially documented in individual "Proposal Evaluation Guidelines" and summarized in a matrix prepared by members of the SSET. AR Tabs 17, 18, and 19.

On November 1, 2005 the initial evaluations for the four subfactors were "rolled up" and rated with color/adjectival ratings in the "Initial Technical Evaluation Report." AR Tab 20. These ratings were presented in a "Competitive Range Briefing" on November 21, 2005.

AR1438-77. The Air Force subsequently opened discussions with all offerors in the competitive range on November 22, 2005, issuing "Evaluation Notices" ("ENs") that identified proposal deficiencies to the offerors that remained in the competitive range. AR1750. [redacted]

The SSET reviewed the offerors' EN responses and on January 4, 2006 completed the Final Technical Report that summarizes the SSET's evaluation of the four subfactors of Mission Capability. AR1478-99. The evaluations were then summarized further in the Rating Team Worksheets, dated January 20, 2005, and these were included in the January 25 Simplified Source Selection Report. AR1700-55. No further evaluations were conducted. AR1097. The Air Force's final ratings of Scott and MSA are summarized as follows:

| Factor/Subfactor | Scott | MSA |
|---|---|---|
| Factor I: Mission Capability | | |
| Subfactor One: Certifications and Test Data | [redacted] | Green/Acceptable |
| Subfactor Two: Field Evaluation | [redacted] | Blue/Exceptional |
| Subfactor Three: Design Approach | [redacted] | Blue/Exceptional |
| Subfactor Four: Program Production Plan | [redacted] | Green/Acceptable |
| Factor II: Proposal Risk | [redacted] | Low |
| Factor III: Present & Past Performance | [redacted] | High Confidence |
| Factor IV: Cost and Price | [redacted] | $35,995,298.00 |
| Factor V: Small Business Participation | [redacted] | Acceptable |

AR1886. [redacted] AR1888. Accordingly, the Mission Capability and Proposal Risk evaluations, particularly for Subfactors Two and Three, were critical to the Air Force's selection of MSA. AR1887-88.

C. **Contract Award, Debriefing, and Scott's Initial GAO Bid Protest**

The Air Force initially awarded the SCBA contract to MSA on January 31, 2006. AR1756. Scott requested a debriefing from the Air Force, which it received on February 17, 2006. Amend. Compl. Ex. 1.[2] Based on information revealed by the Air Force at the debriefing, Scott filed a bid protest to the Government Accountability Office ("GAO") on February 22, 2006. Rather than respond to Scott's protest and produce the administrative record of this procurement, the Air Force notified GAO that it would take the following "corrective action":

> The Source Selection Authority (SSA) will reconsider the proposals, and will then issue a new Source Selection Decision Document. The Air Force will notify all the parties after the SSA has made his new decision.

Amend. Compl. Ex. 2. In light of the Air Force's proposed corrective action, GAO dismissed Scott's protest as academic. *Id.* Ex. 3.

The Air Force notified Scott of the results of the corrective action on April 18, 2006. *Id.* Ex. 4. On April 21, 2006 the Air Force denied a request by Scott for a debriefing. *Id.* Ex. 5. The Air Force attempted to justify its denial of a debriefing by stating that the corrective action taken by the Air Force had not included any new evaluation of the offerors' proposals:

> Please be advised that as no new evaluations took place and a new award was not made, no debriefings are required pursuant to FAR 15.506. Therefore, a debriefing will not be provided to Scott Health & Safety.

*Id.* Ex. 5. Although the Air Force did not conduct any new evaluation it had issued a new Source Selection Document on April 18, 2006. Among other things the SSA summarized in a "Comparative Analysis of Tradeoff Factors" the previously prepared color/adjectival ratings and

---

[2] The Exhibits to Scott's Verified Amended Complaint are part of the Administrative Record (Continued...)

descriptions for each offeror. AR1886-88. The SSA's award decision relied primarily on the fact that MSA [redacted] AR1888. In addition, [redacted] *Id.*

**D. Scott's Second GAO Bid Protest**

On April 28, 2006 Scott filed another protest at GAO based on the Air Force's failure to correct the evaluation errors during the corrective action. The Air Force, however, never responded to Scott's protest or produced the administrative record of this procurement. On May 26, 2006, prior to the deadline for the Air Force's response, Interspiro, Inc., another offeror for the SCBA procurement, filed a bid protest in this Court. In light of Interspiro's action before this Court, GAO dismissed Scott's protest on May 30, 2006, in accordance with 4 C.F.R. § 21.11(b). Amend. Compl. Ex. 6.

## III. ARGUMENT

**A. Legal Standard for Judgment on the Administrative Record.**

Judgment on the administrative record is proper where the record establishes, by a preponderance of the evidence, that the agency's procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C § 706(2)(A); 28 U.S.C. § 1491(b)(4); RCFC 52.1; *Bannum, Inc. v. United States*, 404 F.3d 1346,

(...Continued)
under 31 U.S.C. § 3556. *See generally* AR Tab 15.

1356 (Fed. Cir. 2005) (procedure is designed to "provide for an expedited trial on the record"). Under this standard, an award will be set aside "if *either*: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). To determine whether the Air Force's decision is rational, the Court will conduct "a 'thorough, probing, in-depth review' to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 306 (2001) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).[3]

**B. The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP by Accepting and Evaluating MSA's [redacted] and Supporting Materials.**

As discussed above, the purpose of this procurement is to acquire a next generation SCBA with filtered air provided through an APR or PAPR. *See supra* § II.A. Recognizing that the "Dual Use"[4] aspect of the Air Force's requirement constitutes an advance in the state of the art, the RFP established a "two-step" evaluation scheme in which Subfactor Two (Field Evaluation) would be based on offerors' "existing commercial" products, while Subfactor Three (Design Approach) would be based on written narratives. AR28. Notwithstanding this clear evaluation scheme, the Air Force permitted MSA, but not Scott, to submit a [redacted] that reflected MSA's design approach for the procurement.

---

[3] Scott must also show "'that there was a *substantial chance it would have received the contract award but for [the alleged] error[s]*.'" *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

[4] In other words, the system must provide CBRN protection through an APR or PAPR function when the air in the environment need only be filtered to be breathable, or a SCBA function that provides contained air when the air in the environment cannot be filtered.

In doing so, the Air Force violated 10 U.S.C. §§ 2305(a)(2)(A)(i) and 2305(b)(1), as implemented in Part 15 of the FAR, which require that solicitations clearly identify all evaluation factors and significant subfactors, and that agencies "evaluate . . . competitive proposals based solely on the factors specified in the solicitation." *Accord* FAR §§ 15.303(b)(4), 15.304(d), & 15.305(a)). The FAR further requires that, if "the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." FAR § 15.206(a). This statutory and regulatory scheme reflects "'the bastion of federal procurement policy that all offerors must possess equal knowledge of the same information in order to have a valid procurement,'" *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (quoting *Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 788 (1991)), and that "'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition.'" *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003) (quoting *Dubinsky v. United States*, 43 Fed. Cl. 243, 259 (1999)).

### 1. The RFP's "Two-Step" Process for Evaluation of Proposed SCBA/APR/PAPR Systems.

Recognizing that the integration of an APR/PAPR with a SCBA represents an advance in the state of the art, the RFP provided that offerors' proposals would be evaluated in two steps. In the first step, Mission Capability Subfactors One (Certifications and Test Data) and Two (Field Evaluation) were to be evaluated based on the offerors' "existing commercial SCBA units," which were "the base unit that the offeror intends to provide on the contract effort should it receive the contract award." AR28; *see also* AR32 (criteria for Subfactors One and Two). The RFP therefore provided that the base unit that would be Field Evaluated was "a company's commercially available SCBA already being marketed and used by emergency response

personnel," without current or modified APR or PAPR, or otherwise modified to comply with the Air Force's Product Description. AR1482.

In the second step, under Mission Capability Subfactor Three, the Air Force would evaluate offeror's written proposal on how it would modify the base unit SCBA to meet the innovative requirements of the Purchase Description, including the integration of an APR and PAPR:

> The proposal shall provide a detailed narrative of the design approach it will use to modify the proposed commercial unit referenced in Subfactor One and Subfactor Two to meet all the requirements identified in Section 3.0 of the purchase description .
> . . .

AR28. The RFP explains further that an offeror's narrative should include, among other things, estimates of PAPR weight and total system weight and other "minutely specific information" on specified portions of the Purchase Description. AR28-29.

Emphasizing that Design Approach would be based on a written narrative, the RFP set strict page limits on offerors' submissions: "**Page Limitations do not Apply to Subfactor Two. The page limitation for Subfactors 3 and 4 is 50 pages.**" AR26 (emphasis in original). Offerors were "cautioned that any pages that exceed the limitations shall not be read and shall be removed and sent back to the offeror." *Id.* The RFP further advised that "any noncompliance with the terms and conditions of the RFP may cause [a] proposal to be determined unacceptable and therefore not considered eligible for award." AR27; *accord* FAR § 52.212-1(b)(11) (incorporated by reference into the RFP at AR26-27).[5]

---

[5] Consistent with this two-step approach, the Product Description called for product "Conformance Confirmation" in two phases. AR55. First, after "Pre-Award Evaluation" of two sample "base units" consisting of each offeror's existing commercial SCBA. The Air Force
(Continued...)

**2. The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP when it Permitted MSA to Submit a [redacted] and Supporting Materials.**

Contrary to the evaluation factors and the terms and conditions of the RFP, which provided that Subfactor Two (Field Evaluation) would be based on offerors "existing commercial SCBA units," the Air Force permitted MSA to submit a [redacted]. MSA described the [redacted] as a [redacted] AR 1095. The [redacted] included items, such as a [redacted], which [redacted] and were outside the scope of the Field Evaluation. AR1090; AR2205. In addition, the Air Force permitted MSA to submit an [redacted] AR Tab 23. Among other things, the [redacted] all of which were subject to mandatory page limitations of the RFP.

By permitting MSA to circumvent both the limitations on the number and type of items acceptable for Subfactor Two, Field Evaluation, AR28 ("provide two (2) of its existing commercial SCBA units"), and Subfactor Three, Design Approach, *id.* ("provide a detailed narrative"), the Air Force changed the terms and conditions of the RFP without formally amending the solicitation, FAR § 15.206(a). It is well settled, however, that agencies may not ignore limitations on the volume and nature of proposal submissions, including the submission of [redacted], without providing a like opportunity to the other offerors. *Elec. Design Inc.*,

(...Continued)
would conduct "Post-Award Testing" of modified commercial SCBA with APR and PAPR. AR55-56.

B-279662.2, Aug. 31, 1998, 98-2 CPD ¶ 69 at *7-8[6] (submission of additional pages and CD with video); *see also Omega World Travel v. United States*, 54 Fed. Cl. 570, 574-75 (2002) (contracting officer did not abuse his discretion by taking corrective action to re-open negotiations to permit all bidders to correct deficiencies following submissions of proposals in excess of the solicitation's page limitation); *ITT Electron Tech. Div.*, B-242289, Apr. 18, 1991, 91-1 CPD ¶ 383 at *6-7 (agency's review of a proposal appendix which exceeded solicitation page limitation was improper because it provided one offeror an evaluation opportunity not provided to others). Contrary to the terms and conditions of the RFP, the Air Force did not reject and return MSA's [redacted]. AR1090.

The Air Force's relaxation of the RFP's terms and conditions in the RFP for MSA but not for Scott deprived Scott of its right to compete on a level playing field. *E.g., OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 656 (2005) ("A 'fundamental principle of government procurement is that [agencies] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." (quoting *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001))). Surely, if a picture is worth a thousand words, than the additional [redacted] and [redacted] provided MSA with an advantage of [redacted], that was not provided to Scott. Had it known that the Air Force would accept such materials, Scott would have submitted its own [redacted] and [redacted] to effectively compete with MSA. Scott did not submit these materials because the mandatory requirements of the RFP clearly prohibited offerors from doing so. The appropriate remedy for such unequal treatment is the re-opening of

[6] Pinpoint citations to GAO bid protest decisions refer to the pagination as reported by Westlaw.

negotiations giving all offerors an opportunity to amend their proposals and be evaluated on a common basis. *Gentex*, 58 Fed. Cl. at 654; *ITT Electron Tech. Div.*, 91-1 CPD ¶ 383 at * 6-7.

**3. The Air Force Improperly Evaluated MSA Based on Its [redacted] and Supporting Materials.**

Contrary to the RFP's two-step evaluation scheme, the Air Force improperly used MSA's [redacted] and [redacted] in its Mission Capability evaluation and credited MSA for information derived from those submissions. This fact was confirmed at the debriefing of Scott on February 17, 2006, during which the Air Force stated its technical evaluation of the PAPR was based on the offerors' "progress of development." Amend. Compl. ¶ 67. By doing so, the Air Force failed to evaluate offerors "based <u>solely</u> on the factors specified in the solicitation," 10 U.S.C. § 2304(b)(1); FAR §§ 15.304(a), 15.305(a).

The impact of MSA's [redacted] and [redacted] is reflected in the Air Force's evaluation. In the Subfactor Three evaluation two evaluators referred to the MSA [redacted] and credited MSA in the areas of [redacted] AR2244, and the [redacted], AR2259. Moreover, one of the capabilities demonstrated in MSA's [redacted]—"[redacted]"—was the [redacted] AR1888. The very same capability [redacted] was noted during the evaluation of Scott's Design Approach. AR2317-18; AR2329. Scott, however, which complied with the requirements of the RFP to submit only two sample base units and to limit the pages of its proposal, was not evaluated as "Exceed" for the capability in the initial summary of the Subfactor

Three, AR2298, or in subsequent "rollups" of the evaluation, *e.g.*, AR1495-96; AR1684; AR1887-88. As a result Scott artificially remained [redacted] AR1888.

## C. The Air Force Failed to Apply Current Industry Standards by Waiving a Critical Technical Requirement for MSA While Evaluating Scott Under a More Stringent Requirement than Called for in the RFP.

The RFP required that offerors' proposed designs "shall meet and/or exceed all minimum requirements" set forth in a variety of industry standards listed in the Purchase Description (Appendix A to the RFP). AR 43; *see also* AR1708 (discussing industry standards). The RFP further instructed that, "[s]hould these existing standards be replaced by a newer numbered or titled standard, the most current standard shall always apply." AR43.

Contrary to the RFP's requirements, the Air Force did not apply "the most current standard." The Air Force not only evaluated Scott under an older, more stringent standard, but at the same time waived the standard altogether for MSA. In doing so, the Air Force violated two basic tenets of Federal procurement law codified at 10 U.S.C. §§ 2305(a)(2)(A)(i) and 2305(b)(1), and implemented by FAR §§ 15.303(b)(4), 15.304(d), & 15.305(a): First, that agencies are strictly bound by the requirements stated in the solicitation, *e.g.*, *Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361, 369 (1998) ("It is patently unreasonable for a government agency to state a requirement on the one hand, and then treat it as malleable in awarding the contract to a bidder that did not comply with that requirement,"); and second, that agencies must apply the same requirements consistently to all offerors, *e.g.*, *Hunt Bldg., Co.*, 61 Fed. Cl. at 273 ("The agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis.").

**1. The 2004 and 2005 Dual Use Concepts.**

Through this procurement, the Air Force sought a "Dual Use" system in that the proposed, modified SCBA must have the capability to provide CBRN protection in both SCBA and APR/PAPR modes. AR43; 1709. The Dual Use aspect of the RFP's requirements is governed by a particular draft industry standard, or "concept"—the National Institute for Occupational Safety and Health ("NIOSH") "Concept for Chemical, Biological, Radiological, and Nuclear (CBRN) Tight Fitting, Powered Air Purifying Respirator (PAPR) Standard 2004" (the "Concept"). AR44. The 2004 Concept sets forth the necessary features and performance standards that must be met in order for a device to be suitable for both SCBA and PAPR functions.

On November 4, 2005, after submission and initial evaluation of proposals, but before the source selection decision, NIOSH issued an updated, 2005 version of the Concept, which significantly reduced key technical requirements of the 2004 Concept. AR2351 (initial evaluations completed by November 1).[7] As this version replaced the 2004 Dual Use Concept, the Air Force, under the RFP, was required to evaluate whether the offerors' proposed designs "me[t] and/or exceed[ed] all minimum requirements" of the 2005 Concept because it was the "most current standard."[8]

**2. MSA Did Not [redacted], and the Air Force's Failure to Recognize this Critical Deficiency Is Wholly Irrational.**

---

[7] Copies of the 2004 and 2005 Concepts, which are part of the Administrative Record because they are incorporated by reference into the RFP, are attached as Appendices A and B.

[8] The Air Force knew that the Dual Use Concept was likely to change during the procurement. The July 2005 SSP recognized that "[a] new NIOSH standard, effective date October 2005, is applicable for SCBAs with a dual-use system." AR 1709.

MSA's proposal explicitly states that its proposed PAPR—the "[redacted]"—would not [redacted], even though that was the governing standard [redacted].[9] Specifically, in [redacted] its proposal, MSA directly advised the Air Force that the [redacted]. AR1042 ("[redacted]"). MSA also informed the Air Force that a [redacted] that would require a [redacted] *Id.*

Despite MSA's admission that its proposal did not conform [redacted], the Air Force's initial technical evaluation—which was completed by November 1, 2004, prior to the release of the 2005 Concept—inexplicably found that MSA submitted a compliant proposal and assigned MSA a "Blue" rating for Design Approach, meaning that MSA's proposal had "no deficiencies." AR2343; AR2351. Three evaluators reviewing MSA's proposal separately stated that MSA met an undefined Dual Use Concept:

- [redacted] AR2239;
- [redacted] AR2247; and
- [redacted] AR2257.

These conclusions are refuted by MSA's own proposal, which clearly states: [redacted] AR1042. It is patently unreasonable for an agency to give an offeror a perfect evaluation rating

[9] Because MSA's design did not meet the requirements of the RFP when it was submitted to the Air Force, it was technically nonresponsive and should have been rejected at that time. *E.g.*, *Concept Automation*, 41 Fed. Cl. at 369.

when the offeror explicitly takes exception to a mandatory requirement. *E.g., Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 402-03 (2005) (unreasonable for agency to award offeror maximum points where offeror clearly did not meet requirements); *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 55 (2005) (sustaining protest where award was based on misinterpretation of statements in proposal regarding compliance with requirements).

In fact, MSA did not even propose that the [redacted] would comply with [redacted]. Instead, MSA merely [redacted]—*i.e.*, when the applicable RFP requirement was still the 2004 Concept—[redacted] AR1028. MSA, however, provided no information to the Air Force [redacted] demonstrating that the [redacted] would, in fact, comply with [redacted]. *Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 17-18 (2000) (sustaining protest where awardee failed to submit information necessary to establish compliance with mandatory requirement). Nor does the record contain any evidence that the Air Force ever verified MSA's [redacted] To the contrary, the record shows that the Air Force performed no additional evaluation of MSA's proposal after the initial technical evaluation. AR1734 ("The ratings above are based on the Government's evaluation of the offeror's initial technical proposal.").[10] The Air Force's failure to confirm that

---

[10] "[T]he Court cannot assume that an analysis was performed where the record indicates otherwise." *Al Ghanim Combined Group v. United States*, 56 Fed. Cl. 502, 514 (2003). On this issue, the Air Force's January 4, 2006 Final Technical Evaluation Report concludes: [redacted] AR1492. This sentence, however, simply repeats an
(Continued...)

MSA met the [redacted] requires that the award to MSA be overturned. *Transatlantic*, 68 Fed. Cl. at 50, 53-55 (sustaining protest where agency failed to make a reasonable inquiry to ensure conformance with requirements).[11]

The Air Force therefore waived one of the most critical technical requirements of this procurement. Agencies, however, are "strictly bound" to the terms and requirements set forth in a solicitation; any proposal that fails to meet those provisions may not be considered for award. *Alfa Laval*, 175 F.3d at 1367-68; *accord Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 138 (1999). The FAR requires that, if "the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." FAR § 15.206(a). Here, the Air Force did not amend the solicitation or otherwise announce that it would not enforce the most current version of the Concept. In fact, the Air Force turned around and applied an even more stringent requirement to Scott.

### 3. Despite Waiving the Dual Use Concept for MSA, the Air Force Evaluated Scott Under the More Stringent 2004 Concept.

Because the 2004 version of the Dual Use Concept was current at the time of proposal submission, Scott followed the stringent requirements of the 2004 Concept in proposing its combined SCBA system. AR1317 ([redacted]

---

(...Continued)
identical sentence in the Initial Evaluation Report, which was prepared on November 1, prior to the release of the 2005 Concept. AR2343. Because MSA told the Air Force that it [redacted] the [redacted], the Air Force could not rationally rely on the conclusions in either report. *Beta Analytics*, 67 Fed. Cl. at 402-03.

[11] Nor is there any evidence that the Air Force determined whether the same or additional [redacted] would be needed to comply with the [redacted]. Instead, based on the erroneous assumption that MSA's proposal complied with the "[redacted], the Air Force irrationally concluded that [redacted] AR1493.

[redacted] Once the 2005 Concept was issued, however, the RFP required the Air Force to evaluate the offerors' proposals under that standard. AR43.

The Air Force, however, admitted to Scott at the February 17 debriefing that it evaluated Scott's proposal against the more stringent requirements found in the 2004 Concept. Amend. Compl. ¶ 110. This fact is further reflected in the Administrative Record by the fact that the Air Force did not alter its Design Approach evaluations for either MSA or Scott when NIOSH released the 2005 Concept during the procurement. *Compare* AR2343 & AR2345-46 (Initial Evaluation Report) *with* AR1492-93 & AR1495 (Final Evaluation Report).

Thus, while the Air Force evaluated Scott against the exacting 2004 Concept, the Administrative Record demonstrates that the Air Force held MSA to another, undefined Dual Use standard, thereby treating the offerors unequally to Scott's detriment. *E.g.*, *Hunt Bldg., Co.*, 61 Fed. Cl. at 273 ("The agency's failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements than those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis."); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 650-53 (2003) (agency unfairly evaluated offerors by waiving a technical requirement for the awardee and assigning it an advantage for a resulting low cost, while failing to inform the only other offeror of the possibility of a waiver).

The Air Force's misapplication of the Concept undermines the most significant discriminator that the SSA identified between Scott's and MSA's design approaches—[redacted]. Because the Air Force did not apply [redacted] to MSA (even though the [redacted] was applied to Scott), MSA was able to

propose a [redacted].[12] This [redacted] was critical in the eyes of the SSA, who concluded that [redacted] AR1888; *see id.* [redacted] AR1887 [redacted] In essence, MSA received "extra credit" for proposing a PAPR that admittedly failed to meet applicable requirements. This was plainly unreasonable. *Dubinsky v. United States*, 43 Fed. Cl. 243, 268 (1999) (agency's assignment of rating indicating exceeding the requirements of the RFP was arbitrary and capricious where the awardee's proposal failed to state that it met minimum requirements).

Scott, on the other hand, [redacted]. AR 1172. At no time, however, did the Air Force notify Scott that the [redacted] performance standards of the Dual Use Concept would be waived for MSA. This additional failure to treat Scott equally only compounded the Air Force's unlawful evaluation of MSA. *Gentex*, 58 Fed. Cl. at 652-53 (sustaining protest where Air Force "questioned Gentex regarding whether its proposal would be fully compliant" with a particular requirement, even though it had allowed another offeror to avoid that requirement in order to propose other desirable features).

The Air Force's failure to apply "the most current standard," as required by the RFP, AR43, further deprived Scott of the evaluation benefit derived from additional instances in which

---

[12] [redacted]

its proposed design approach "exceeds specified minimum performance or capability requirements in a way beneficial to the Government" and the corresponding "Blue/Exceptional" evaluation for Subfactor Three. For example, by applying the 2004 rather than the 2005 Concept, the Air Force failed to consider the following:

[redacted]

[redacted]

[redacted]

Scott, by proposing to meet the 2004 Concept, significantly exceeded the ultimate requirements of the RFP, which were set by the more lax requirements of the 2005 Concept. The Air Force's failure to apply the current, 2005 Concept during the evaluation of Scott's proposal therefore caused the Air Force to ignore significant areas of Scott's proposal that far exceeded the

requirements of the RFP to Scott's prejudice. *Mine Safety Appliances Co.*, B-238597.2, July 5, 1990, 90-2 CPD ¶ 11 at *5 (sustaining protest where, after reviewing the individual evaluators' scores and worksheets, the GAO determined that the agency had evaluated inconsistent with the solicitation evaluation scheme).

**D. The Air Force Waived the RFP's [redacted] and [redacted] Requirements for MSA.**

Again, agencies are "strictly bound" to the terms and requirements set forth in a solicitation; any proposal that fails to meet those provisions may not be considered for award. *Alfa Laval*, 175 F.3d at 1367-68. "Thus, if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail. . . ." *Beta Analytics*, 44 Fed. Cl. at 138; *accord Mangi*, 47 Fed. Cl. at 18.

The RFP required offerors to provide [redacted] but further required the [redacted] AR20. Among the requirements with which [redacted] must comply is that [redacted] AR55. [redacted] AR101. The RFP also contained a [redacted]

[redacted] AR126.

Contrary to the RFP's requirements, MSA's proposed [redacted] AR558. MSA's [redacted] patently fails to [redacted] AR20, particularly the requirement that the [redacted] AR55. The RFP, however, did not allow offerors to choose whether to propose a [redacted] or [redacted] instead, both were mandatory requirements. Because MSA's proposal makes its [redacted] contingent on the Air Force not [redacted] MSA's proposal is ineligible for award. *Alfa Laval*, 175 F.3d at 1367-68; *Beta Analytics*, 44 Fed. Cl. at 138.

This Court has recognized that [redacted]

[redacted]

E. **The Air Force Failed to Evaluate Critical Risks of MSA's Proposal and Treated the Offerors Unequally in its Price Evaluation.**

1. **The Air Force Failed to Evaluate the Increased Costs Associated with MSA's [redacted], MSA's [redacted] and Life-Cycle Costs.**

Even assuming that MSA submitted a proposal that complied with the RFP's [redacted] and technical requirements, the Air Force's failure to recognize the increased costs associated with these aspects of MSA's proposal undermines both its Proposal Risk and Price evaluations. The RFP provided that the Air Force would evaluate Proposal Risk (which was tied with Mission Capability and Present and Past Performance as the most important evaluation factor). AR32. The RFP explained that its Proposal Risk evaluation would "include[] an assessment of the potential for . . . increased cost." AR33.

The Air Force assigned MSA Proposal Risk ratings of "Low," meaning that the Air Force concluded that MSA's proposal "[h]as little potential to cause . . . [i]ncreased cost." AR33; 1886. MSA's [redacted], however, makes clear that the Air Force must [redacted] AR 558. As a result, the Air Force necessarily must incur additional costs to pay [redacted] and the RFP left the Air Force with no choice but to assign MSA a "High" or "Moderate" Proposal Risk rating, depending on whether the increased cost will be "significant." AR33.

Similarly, the Air Force assigned MSA a "low" Proposal Risk rating for the Design Approach subfactor notwithstanding the fact that MSA explicitly warned the Air Force that its proposed PAPR [redacted] and that a [redacted] was necessary that would entail [redacted] AR1042. Again, there is no dispute that Proposal Risk exists, the question is whether the increased cost will be "significant." AR33. The Air Force, however, has no idea how "significant" these costs will be because the Air Force entirely failed to recognize or evaluate them. Indeed, MSA provided no information regarding these costs in its proposal, notwithstanding the RFP's requirement that offerors "identify[] those aspects of the proposal considered to involve cost . . . risk," and "includ[e] quantitative estimates of the impact on cost." AR27. MSA's proposal was therefore doubly non-compliant—first for taking exception to mandatory requirements, and second for failing to provide required information. *Mangi*, 47 Fed. Cl. at 17-18 (sustaining protest where awardee failed to submit information required by the instructions in the proposal).

More broadly, the record provides no evidence that the Air Force conducted anything more than a superficial evaluation of the maintenance, operational, and other costs to the Air Force that were an essential part of the Proposal Risk Factor. To the contrary, the Air Force stated at the February 17 debriefing that these costs need not be evaluated because "the competitive bidding took care of it." Amend. Compl. ¶ 101. The Air Force's reasoning is patently irrational—price competition may indicate that an offeror's SCBA prices are reasonable, but price competition, standing alone, provides no assurance regarding the long-term cost to the Government of an offerors' products and designs. By the Air Force's logic, a Ford Pinto

requires no maintenance costs so long as there is competition among dealerships for the purchase price of the vehicle.[13]

Incredibly, the Air Force compounded these errors by actually crediting MSA for aspects of its proposal that the Air Force erroneously believed would lower long term costs. For example, the Air Force improperly assigned MSA a "Blue" rating under Factor I, Subfactor Three, SCBA Design Approach, because MSA's [redacted] AR1751. This aspect of MSA's proposal is meaningless, however, because the Air Force may not [redacted]

An agency's decision can be "found to be arbitrary and capricious" where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), *quoted in Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 766 (2006); *see also NKF Eng'g, Inc. v. United States*, 9 Cl. Ct. 585, 594 (1986), *vacated on other grounds*, 805 F.2d 372, 378 (Fed. Cir.1986) ("A decision that fails to consider all relevant evidence is the essence of arbitrariness."). Here, there is no evidence in the record that the Air Force recognized—let alone considered (1) the increased costs that the

---

[13] The Air Force's failure to consider life-cycle costs was apparently a failure of acquisition planning as much as the Air Force's evaluation. FAR § 7.105(a)(3)(iii) and the Department of Defense FAR Supplement, 48 C.F.R. § 207.103(i)(ii), required the Air Force to "Consider life-cycle-cost in all acquisitions of systems and equipment." Notwithstanding this clear directive, the Source Selection Plan for this procurement contains no discussion of life-cycle costs, or how
(Continued...)

Air Force must necessarily incur to comply with MSA's requirement that [redacted] (2) the [redacted] costs MSA explicitly described in MSA's proposal; or (3) the true cost of ownership for each offeror's proposed solution. The Air Force's failure to consider these critical Proposal Risk issues undermines this procurement. *E.g.*, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 732-743 (2000); *Lockheed, IMS*, B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180; *cf. CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 101 (2006) (sustaining override protest where agency "failed to consider several relevant factors," particularly the risk of increased costs associated with the agency's decision).

The Air Force's failure to adequately consider Proposal Risk undermines the SSA's award decision, which turned, in part, on the fact that "MSA had low Proposal Risk ratings for all four subfactors (Factor II), which was superior to all other offerors except Scott." AR1887. Because MSA's proposal told the Air Force that [redacted], the Air Force could not rationally select MSA based on a determination that MSA's proposal "[h]as little potential to cause . . . [i]ncreased cost." AR33; AR1886. Nor could the Air Force give MSA credit because [redacted] The Air Force's evaluation of MSA's proposal is therefore flatly contradicted by the statements in MSA's proposal. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency action is arbitrary and capricious where agency "offered an explanation for its decision that runs counter to the evidence before the agency");

---

(...Continued)
such costs would be considered. AR1705-26.

*Programmatics, Inc.*, B-228916.2, Jan. 14, 1988, 88-1 CPD ¶ 35 (sustaining protest where technical evaluators findings were inconsistent with an offeror's proposal).

**2. The Air Force Evaluated Price on an Uneven Basis that Does Not Reflect the True Price Difference Between Scott and MSA.**

Agencies are required to include cost or price as a significant factor in the evaluation of proposals. 10 U.S.C. § 2305(a)(3)(A)(ii); FAR § 15.304(c)(1). While agencies have considerable discretion in determining the particular method used in evaluating cost or price, that method should, to the extent possible, accurately measure the price to be incurred under competing proposals. *E.g.*, *SOS Interpreting, Ltd.*, B-287477.2, May 16, 2001, 2001 CPD ¶ 84 at *9 ("An agency, at a minimum, is required to evaluate offerors on an equal basis and in a manner such that the total cost to the government for the required services can be meaningfully assessed."); *Lockheed, IMS*, B-248686, Sept. 15, 1992, 92-2 CPD ¶ 180 at *4. Where a source selection decision is based on figures that do not reasonably represent the difference in costs to be incurred under competing proposals, the source selection is not reasonably based. *E.g.*, *Preferred Sys. Solutions, Inc.*, B-292322, Aug. 25, 2003, 2003 CPD ¶ 166 at **7-8; *Gemmo Impianti SpA*, B-290427, Aug. 9, 2002, 2002 CPD ¶ 146 at **4-5.

The SSA, in making his award decision, emphasized that there was only a [redacted] price difference between MSA's and Scott's proposals. AR1888; *accord* AR1747 [redacted] The SSA, however, arrived at this differential using figures that do not reasonably reflect the true price difference between the offerors' proposals because they do not reflect the price that MSA will charge the Government for [redacted] on MSA's SCBAs, for [redacted] or for other life cycle costs. *Supra* at III.E.1. The Air Force's failure to consider these costs in its price

evaluation is inconsistent with the statutory mandate that agencies fully consider cost or price in every procurement. *Northrop Grumman*, B-295526, Mar. 16, 2005, 2005 CPD ¶ 45 at *9 ("Where a source selection decision is based on figures that do not reasonably represent the differences in costs to be incurred under competing proposals, the source selection is not reasonably based."); *Liquidity Services, Inc.*, B-294053, Aug. 18, 2004, 2005 CPD ¶ 130 at *4.

Moreover, the Air Force's price evaluation failed to treat MSA and Scott equally. The Air Force allowed MSA an additional, unevaluated revenue stream [redacted] that allowed MSA to artificially lower its proposed price schedule, knowing that any cost or profit not recovered in those prices would be recovered in subsequent [redacted] Scott's proposed prices, on the other hand, are fully and accurately reflected in the price schedule submitted with its proposal. The Air Force's failure to evaluate MSA's and Scott's prices on a level playing field was unreasonable and a violation of procurement law. *E.g.*, *SOS Interpreting*, 2001 CPD ¶ 84 at **8-9 (proposal prices not compared on an equal basis where awardee elected not to include escalation rates for two contract line items while protester did).

**3. The Air Force Failed to Evaluate MSA's Reliance on [redacted] for the PAPR Requirement.**

MSA proposed to satisfy the RFP's PAPR critical requirements using a PAPR that will [redacted] AR646. MSA, however, did not provide the Air Force with *any* substantive information regarding [redacted] this critical aspect of the procurement. Although MSA's proposal states that MSA [redacted] regarding the PAPR, AR646, MSA's proposal does not fully

disclose [redacted] and contains no commitment [redacted]

Confronted with nothing to evaluate with respect to the [redacted] of this critical, yet-to-be designed component, the Air Force evaluated nothing. The RFP, however, does not permit the Air Force to take this course. Three of the five evaluation factors in the RFP are directly implicated by MSA's reliance on [redacted]:

- The Program Production Plan Subfactor required the Air Force to evaluate the offeror's plan for the organization of personnel, facilities, equipment, plant layout, and material resources. AR32. There is no evidence of any evaluation of [redacted] personnel, facilities, equipment, plant layout, and material resources. AR1493.
- Although the RFP provided that the Air Force would evaluate Proposal Risk, AR32-33, the Air Force failed to conduct any evaluation of the risks associated with MSA's reliance on [redacted] to satisfy the RFP's PAPR requirements, including the lack of any [redacted] AR1492-93.
- Although the RFP provided that the Air Force would evaluate Present and Past Performance information for [redacted] AR1522-29.

The Air Force was not free to simply ignore these evaluation factors, particularly as they applied to the most critical technical requirements of this procurement. 10 U.S.C. §§ 2305(a)(2)(A)(i) & 2305(b)(1); FAR §§ 15.303(b)(4), 15.304(d), & 15.305(a)); *see also Seattle Sec. Services, Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000) (agency acted unreasonably in failing to evaluate relevant past performance information). Certainly, the Air Force was not relieved of its obligation to apply the RFP's evaluation factors by MSA's failure to submit information necessary to conduct an evaluation. The RFP expressly incorporated FAR 52.212-1(b)(4), which places the burden on offerors to provide "sufficient detail to evaluate compliance with the requirements in the solicitation." AR26-27. [redacted]

[redacted]. Given the closeness of the technical and risk ratings and the proposed prices, the Air Force's failure to consider this evidence was patently arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency action is arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem"); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) (failure to consider relevant evidence is arbitrary and capricious).

**F. <u>The Air Force Departed from the Evaluation Process in the RFP and Treated the Offerors Unequally.</u>**

A "fundamental principle of government procurement . . . [is] that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." *Gentex*, 58 Fed. Cl. at 653 (quoting *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001)) (Air Force violated law in aircrew mask procurement where source selection was inconsistent with requirements of the solicitation). A source selection decision based on inconsistent or inaccurate information concerning the technical evaluation or the relative merits of the offerors' technical proposals is not reasonable. *New Breed Leasing Corp.*, B-259328, Mar. 24, 1995, 96-2 CPD ¶ 84, *citing SDA, Inc.*, B-248528.2, Apr. 14, 1993, 93-1 CPD ¶ 320 (source selection was flawed because the SSA was provided information that contained errors concerning protester's ratings, failed to accurately represent accurate data, and provided conclusions about technical differences that were inconsistent with the evaluation record and the offerors' proposals).

Under the RFP the Air Force was required to assign an offeror's proposal a rating of "Yellow/Marginal" if the proposal did not clearly meet one or more minimum performance or capability requirements, regardless of whether that proposal also exceeded other requirements in

a way beneficial to the government. AR33. [redacted]. Having determined that all minimum performance and capability requirements were met, the RFP then required the Air Force to determine whether Scott's proposal exceeded minimum requirements in a way beneficial to the Government and assign a "Green/Acceptable" or "Blue/Exceptional" rating accordingly. AR33. Contrary to the RFP's evaluation scheme, the Air Force made no such determination, [redacted]

Most noteworthy, Scott shared several identical evaluated strengths with MSA but failed to receive credit for them:

- Both MSA and Scott were observed to have "exceptional" [redacted] in the Air Force's Mission Capability Subfactor Two Field Evaluations. *Compare* AR1491-92 (MSA) *with* AR1494 (Scott) [redacted] In fact, the Final Technical Report uses nearly identical language to describe both offerors' evaluations in these areas. *Id.*

- Similarly, the Air Force determined that neither offeror required [redacted] in the Air Force's Subfactor Three Design Approach evaluations. *Compare* AR1492 (MSA) *with* AR1495 (Scott).

- One of MSA's most oft-cited strengths was [redacted] AR1492; AR1734; AR1888. The very same capability [redacted] was noted extensively by an evaluator of Scott's design approach.

AR2317-18. Scott, however, was not evaluated as "Exceed" for the capability in subsequent "rollups" of the technical evaluation. AR2298; AR1495-96; AR1684; AR1887-88.

- Finally, Scott was evaluated initially as "exceeds" in various areas including [redacted] AR2236-64; AR 2297-2329. However, no "exceptional" items in Scott's proposal for design approach were considered after Scott [redacted], nor is there any explanation in the record why these exceptional items, or other areas of significance, were dismissed. AR1495.

Scott's exceptional features—satisfying the RFP's condition for a blue rating ("one or more strengths and no deficiencies" beneficial to the Government)—were simply not considered [redacted]. AR1736-37; 1887-88. Moreover, all traces of Scott's "exceeds" were inexplicably eliminated in the "Rating Team Worksheet" that accompanied the Simplified Source Selection Report. AR1736. Thus, the information provided to the SSA incorrectly communicated that [redacted]

The Air Force's departures from the evaluation criteria and failure to adequately support its evaluation render the award to MSA arbitrary, capricious, and an abuse of discretion. *Mine Safety Appliances Co.*, B-238597.2, July 5, 1990, 90-2 CPD ¶ 11 at *5 (sustaining protest where, after reviewing the individual evaluators' scores and worksheets, the GAO determined that the agency had evaluated inconsistent with the solicitation evaluation scheme). Particularly troubling is the Air Force's failure to credit Scott for identical features that were relied on to justify award to MSA. *See, e.g., Cortland Mem'l Hosp.*, B-286890, Mar. 5, 2001, 2001 CPD ¶ 48 at *5 (protest sustained where individual technical evaluator's worksheets show that the protester met a requirement but do not show the evaluation credited in the scoring, and equal scoring was credited to the awardee who did not meet the requirement); *Son's Quality Food Co.*,

B-244528.2, Nov. 4, 1991, 91-2 CPD ¶ 424 at *3 (protest sustained where the evaluation unreasonably downgraded the protester's proposal under the most important evaluation factors in areas which the evaluation worksheets demonstrated strengths); *RMI, Inc.*, B-203652, Apr. 20, 1983, 83-1 CPD ¶ 423 at *5 (protest sustained where the evaluation failed to analyze technical proposals utilizing a common model and made repeated factual errors resulting in the absence of a reasonable basis for the evaluation).

In the instant procurement the Air Force made numerous serious departures from the evaluation criteria and other errors that mirror these cases:

- The Air Force improperly credited MSA for satisfying a critical technical requirement—the Dual Use Concept—[redacted] *See supra* § III.C.2. The Air Force compounded its error by crediting MSA in the area of [redacted], and downgrading Scott, despite the fact that [redacted] is a direct function of complying with the standard. *See supra* § III.C.3; *Gentex*, 58 Fed. Cl. at 650-53; *RMI , Inc.*, 83-1 CPD ¶ 423; *Cortland Mem.*, 2001 CPD ¶ 48.

- The Air Force permitted MSA to submit a [redacted] and [redacted], changing the proposal requirements, and then credited MSA for design features apparently made more evident by the improper submissions. *See supra* § III.B. Again, the Air Force compounded the error by failing to credit Scott for the same functionality described in Scott's proposal. *See supra* § III.B.3; *Gentex*, 58 Fed. Cl. at 650-53; *Cortland Mem.*, 2001 CPD ¶ 48.

- The Air Force also changed the evaluation process, altering the color/adjectival definitions, without notice to the offerors, and ignoring evaluated strengths in Scott's proposal—many of them identical to those recognized with MSA's proposal. *See Gentex*, 58 Fed. Cl. at 650-53; *Son's Quality*, 91-2 CPD ¶ 424; *Cortland Mem.*, 2001 CPD ¶ 48; *New Breed*, 96-2 CPD ¶ 84.

For each of these reasons, the Air Force's award to MSA cannot stand.

## G. <u>The Above Violations of Procurement Law Render the Air Force's Source Selection Decision Irrational.</u>

As Scott has demonstrated, the Air Force's underlying evaluation was erroneous, and thus the source selection decision made in reliance on this evaluation is itself flawed and irrational.

The evaluation of offerors' proposals, and the determination as to which proposal represents the best value to the Government, must be based on accurate evaluations and differences in the offerors' proposals. Because that has not occurred in this case, the best value decision is itself flawed and unreasonable. *See Keeton Corr., Inc.*, B- 293348, Mar. 4, 2004, 2005 CPD ¶ 44 at *5 ("A source selection decision based on inconsistent or inaccurate information concerning the technical or the relative merits of the offerors' technical proposals or past performance is not reasonable." (citing *Ashland Sales and Serv. Co.*, B-291206, Dec. 5, 2002, 2003 CPD ¶ 36)). Moreover, failure to implement corrective action that led to dismissal of an earlier protest is unexcusable. *Envirosolve LLC*, B- 294974.4, June 8, 2005, 2005 CPD ¶ 106.

Nowhere is the impact of the above procurement violations more evident than in the SSA's mechanical reliance on MSA's "Blue" ratings in Mission Capability. The SSA emphasized that [redacted] AR1888; *accord* AR1887 [redacted] The SSA's reliance on MSA's "Blue" ratings, however, is improper and irrational for at least three reasons:

- First, MSA's proposal failed to comply with mandatory technical requirements in the RFP, thereby precluding a "Blue" rating. *See supra* §§ III.C & III.D; *Transatlantic*, 68 Fed. Cl. at 55; *Beta Analytics*, 67 Fed. Cl. at 402-03.

- Second, Scott's proposal shared several identical evaluated strengths with MSA but failed to receive any credit for them. *See supra* § III.F. Moreover, Scott's proposal was unfairly held to more stringent technical requirements than was MSA's. *See supra* § III.C.3. [redacted] *Gentex*, 58 Fed. Cl. at 652-53; *New Breed*, 96-2 CPD ¶ 84.

- Third, the Air Force permitted MSA to submit a [redacted] and supporting materials, changing the terms and conditions of the RFP, and then credited MSA for design features apparently made more evident by the improper submissions. *See supra* § III.A; *Gentex*, 58 Fed. Cl. at 654.

Similarly, the SSA could not reasonably rely on the fact that "MSA had low Proposal Risk ratings for all four subfactors (Factor II), [redacted] AR1887. As discussed above, MSA's proposal [redacted] to the Air Force, thereby precluding a "Low" risk rating. *See supra* §§ III.E.1 & III.E.3. Nor could the SSA rationally rely on the conclusion that there was only a [redacted] price difference between MSA's and Scott's proposals, since this figure does not reflect the price that MSA will charge the Government for [redacted] on MSA's SCBAs, for [redacted] that MSA must employ to meet the Concept, or for other life cycle costs. *See supra* § III.D.1. For all of these reasons, the award to MSA cannot stand.

**H. Scott is Entitled to Declaratory and Injunctive Relief to Remedy the Air Force's Violations of Procurement Law.**

To prevail on its claim for declaratory relief, Scott need only succeed on the merits, *i.e.*, demonstrate by a preponderance of the evidence that the Air Force's conduct of this procurement was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 28 U.S.C. § 1491(b)(4); *CIGNA Gov't Servs.*, 70 Fed. Cl. at 114. To prevail on its claim for a permanent injunction, Scott must further demonstrate by a preponderance of the evidence that: (1) it will suffer irreparable injury without an injunction; (2) the harm to the plaintiff without an injunction outweighs the injury to Defendant from issuance of the injunction; and (3) the injunction serves the public interest. *E.g.*, *Mangi Envtl.*, 47 Fed. Cl. at 14; *Overstreet*, 47 Fed. Cl. at 744. Also, "[n]o one factor, taken individually, is necessarily dispositive;" instead, "the

weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

The balance of these factors clearly favor granting Scott's request for an injunction:

- First, Scott has demonstrated irreparable harm because it was deprived of the opportunity to compete in a fair and lawful competition. *E.g.*, *Overstreet*, 47 Fed. Cl. at 744 & n.25 (recognizing that "denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm"); *accord Seattle Sec.*, 45 Fed. Cl. at 571. Also, this Court has previously held that a disappointed offeror suffers irreparable harm merely from the loss of profits from the contract. *E.g.*, *Mangi*, 47 Fed. Cl. at 20.

- Second, injunctive relief would serve the public interest by preserving the integrity of the procurement process. *E.g.*, *id.* Indeed, in circumstances such as these, where an agency's evaluation and award decision were unreasonable, the integrity of the public procurement process can only be maintained by granting injunctive relief. *Overstreet*, 47 Fed. Cl. at 744 (2000).

- Third, the harm to Scott and the public's interest in preserving the integrity of the public procurement system outweighs any inconvenience, additional time and/or agency resources to be spent in reevaluating the proposals. *E.g.*, *Mangi*, 47 Fed. Cl. at 20; *Overstreet*, 47 Fed. Cl. at 744.

## IV. CONCLUSION

Accordingly, Scott respectfully requests that the Court enter, based on the administrative record: (1) a declaratory judgment that (a) the Air Force's conduct of this procurement and its award of the SCBA contract to MSA were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and (b) if the Air Force amends or cancels the RFP, Scott is entitled to recover all proposal preparation costs incurred in connection with this procurement; (2) a permanent injunction consistent with and enforcing the Court's declaratory judgment; and (3) an order granting such other and further relief as the Court deems necessary, just and proper.

Respectfully submitted,

s/Rand L. Allen
by Daniel P. Graham
Rand L. Allen

WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O); (202) 719-7049 (F)
rallen@wrf.com

July 7, 2006

*Counsel for Plaintiff*

Of counsel:
John A. McCullough
Daniel P. Graham
William J. Grimaldi
WILEY REIN & FIELDING LLP

Bruce S. Ramo
TYCO INTERNATIONAL, LTD.
9 Roszel Road
Princeton NJ 08540
(609) 720-4306 (O); (609) 720-4335 (F)