**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

**Agreed Upon Redacted Copy – May Be Made Public Version**

INTERSPIRO, INC.,

and

SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

MINE SAFETY APPLIANCES CO.

*Intervenor*.

**FILED UNDER SEAL**

**No. 06-425**
**(Consolidated with No. 06-443)**
**Judge N. Firestone**

**CORRECTED**

# SCOTT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O)
(202) 719-7049 (F)
rallen@wrf.com

*Counsel for Plaintiff*

*Of counsel*:
John A. McCullough
Daniel P. Graham
William J. Grimaldi
WILEY REIN & FIELDING LLP

Bruce S. Ramo
TYCO INTERNATIONAL, LTD.
9 Roszel Road
Princeton NJ 08540
(609) 720-4306 (O)
(609) 720-4335 (F)

August 18, 2006

## TABLE OF CONTENTS


Page

I. SUMMARY .......... 1

II. ARGUMENT .......... 4

A. The Air Force Waived the RFP's Warranty and Maintenance Requirements for MSA .......... 4

B. The Air Force Failed to Evaluate Proposals According to the Most Current Industry Standard .......... 6

1. Evaluation of Initial Proposals Prior to Release of the November 2005 Concept—MSA's [redacted] .......... 9

2. The Air Force Conducted No Meaningful Evaluation of MSA's Proposal After the November 2005 Concept Was Issued .......... 11

3. The Air Force Violated the RFP and Procurement Law by Mixing and Matching Requirements from the June and November 2005 Concepts [redacted] .......... 13

4. If the Beebe Declaration Is a Reasonable Interpretation of the "Most Current Standard" Provision, It Exposes a Latent Ambiguity in the RFP .......... 15

C. The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP by Accepting and Evaluating MSA's [redacted] .......... 17

D. The Air Force Failed to Evaluate Critical Risks of MSA's Proposal and Treated the Offerors Unequally in its Price Evaluation .......... 20

E. The Air Force Departed From the Evaluation Process in the RFP and Treated the Offerors Unequally, and These Violations of Procurement Law Render the Air Force's Source Selection Decision Irrational .......... 24

III. CONCLUSION .......... 28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACRA, Inc. v. United States*, 44 Fed. Cl. 288 (1999) .......... 20

*Al Ghanim Combined Group v. United States*, 56 Fed. Cl. 502 (2003) .......... 12

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999) .......... 6, 8

*Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131 (1999) .......... 6

*Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384 (2005) .......... 9, 26

*CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100 (2006) .......... 24

*Dubinsky v. United States*, 43 Fed. Cl. 243 (1999) .......... 6, 21

*Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003) .......... 18, 21, 24

*LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995) .......... 20

*Logicon, Inc. v. United States*, 22 Cl. Ct. 776 (1991) .......... 20

*Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10 (2000) .......... 11, 23

*Metcalf Construction Co. v. United States*, 53 Fed. Cl. 617 (2002) .......... 16, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......... 24

*OTI America Inc. v. United States*, 68 Fed. Cl. 646 (2005) .......... 9, 15

*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (2000) .......... 24

*Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757 (2006) .......... 24

*Tel-Instrument Elecs. Corp. v. United States*, 56 Fed. Cl. 174 (2003) .......... 6

*Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48 (2005) .......... 10, 12, 26

## AGENCY DECISIONS

*Arora Group, Inc.*, B-288127, Sept. 14, 2001, 2001 CPD ¶ 154 .......... 16

*BAE Tech. Servs.*, B-296699, Oct. 5, 2005, 2006 CPD ¶ 91 .......... 9

*Cardkey Systems, Inc.*, B-239433, Aug. 27, 1990, 90-2 CPD ¶ 159 ........ 13

*Eastman Kodak Co.*, B-194584, Aug. 9, 1979, 79-2 CPD ¶ 105 ........ 22

*ITT Electron Tech. Div.*, B-242289, Apr. 18, 1991, 91-1 CPD ¶ 383 ........ 18

*Keeton Corr., Inc.*, B- 293348, Mar. 4, 2004, 2005 CPD ¶ 44 ........ 28

*Lockheed Martin Corp.*, B-293679, May 27, 2004, 2004 CPD ¶ 115 ........ 24

*Lockheed Martin Info. Sys.*, B-292836, Dec. 18, 2003, 2003 CPD ¶ 230 ........ 15

*Labat-Anderson Inc.*, B-246071, 71 Comp. Gen. 252, 258 (1992) ........ 13, 14

*Marquette Med. Sys., Inc.*, B-277827, Apr. 29, 1999, 99-1 CPD ¶ 90 ........ 22

*Mine Safety Appliances Co.*, B-238597.2, July 5, 1990, 90-2 CPD ¶ 11 ........ 14

*New Breed Leasing Corp.*, B-259328, Mar. 24, 1995, 96-2 CPD ¶ 84 ........ 28

*Preferred Sys. Solutions, Inc.*, B-292322, Aug. 25, 2003, 2003 CPD ¶ 166 ........ 21

*SOS Interpreting, Ltd.*, B-287477.2, May 16, 2001, 2001 CPD ¶ 84 ........ 21

**FEDERAL STATUTES**

5 U.S.C. § 706 ........ 3

10 U.S.C. § 2305 ........ passim

28 U.S.C. § 1491 ........ 3

**FEDERAL REGULATIONS**

FAR § 7.101 ........ 22

FAR § 15.206 ........ 9, 20

FAR § 15.304 ........ 17

FAR § 15.305 ........ 3, 8, 17

FAR § 15.308 ........ 26

MP § 5315.3 ........ 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| INTERSPIRO, INC., and SCOTT TECHNOLOGIES, INC., d/b/a SCOTT HEALTH & SAFETY *Plaintiffs,* v. UNITED STATES, *Defendant,* and MINE SAFETY APPLIANCES CO. *Intervenor.* | **FILED UNDER SEAL** **No. 06-425** **(Consolidated with No. 06-443)** **Judge N. Firestone** **CORRECTED** |

**SCOTT'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Scott Technologies, Inc., doing business as Scott Health & Safety ("Scott"), respectfully files this Reply in support of its July 7, 2006 Motion for Judgment on the Administrative Record and for Declaratory and Injunctive Relief, and Opposition to the August 7, 2006 Cross-Motions for Judgment on the Administrative Record filed by the United States and Intervenor Mine Safety Appliances Co. ("MSA").

## I. SUMMARY

The Oppositions filed by the Government and MSA only exacerbate the violations of procurement law that Scott identified in its Opening Brief. The Administrative Record shows,

and the Parties' briefs confirm, that the Air Force deviated from or changed the requirements, terms, conditions, and evaluation factors set forth in the RFP in a manner that unfairly favored MSA to the detriment of Scott in three major areas:

First, the Air Force waived the RFP's Warranty and Maintenance requirements by allowing MSA to propose a warranty that [redacted] Scott Br. § III.D.[1] Although the Government argues that MSA's proposal [redacted],"[2] Gov't Br. at 18, the pages immediately following MSA's warranty contain [redacted]. Administrative Record ("AR") 559-62; *infra* § III.A.

Second, the Declaration of Laurie Beebe attached to the Government's Opposition confirms that the Air Force failed to apply "the most current standard" to offerors' proposals, as required by the RFP. AR43; Scott Br. § III.C. Notwithstanding the RFP's requirement that the most current standard "shall always apply," Ms. Beebe states that the Air Force "generally evaluated initial proposals against the June 20, 2005, draft concept," and then selectively applied the November 2005 Concept [redacted] Gov't Br. Attach. ("Beebe Decl.") ¶ 8; Gov't Br. at 11, 14. This is the epitome of unfairness—rather than evaluate proposals "based solely on the factors specified in the solicitation," 10 U.S.C. § 2305(b)(1);

---

[1] Citations to "Br." refer to Scott's Memorandum in support of its Motion for Judgment on the Administrative Record and to the Government's and MSA's Memoranda opposing Scott's Motion and in support of their Cross-Motions for Judgment on the Administrative Record.

[2] All emphasis in this Memorandum is added unless otherwise indicated.

FAR § 15.305(a), the Air Force mixed and matched between two different standards on an offeror by offeror basis. *Infra* § III.B.

Third, the record establishes that the Air Force accepted and evaluated MSA's [redacted] submission, notwithstanding the Parties' agreement that those materials had no place in the RFP's evaluation scheme. Scott Br. § III.B; *infra* § III.C.

In addition to these clear violations of the RFP and bedrock principles of procurement law, the Government's and MSA's Oppositions cannot explain or justify the Air Force's consistent failure to apply the evaluation factors to Scott and MSA equally. Notwithstanding its obligation to evaluate each offerors' "potential for . . . increased cost," AR33, the Air Force simply ignored (1) the increased costs it must necessarily incur to comply with MSA's [redacted]; (2) the life-cycle costs that MSA explicitly described in MSA's proposal; or (3) the true cost of ownership for each offeror's proposed solution. Scott Br. § III.E; *infra* § III.D. Moreover, the Government simply does not respond to Scott's showing that the Air Force inconsistently applied the evaluation factors to Scott and MSA, ignoring evaluated strengths in Scott's proposal that are identical to the strengths of MSA on which contract award was based. Scott Br. § III.F; *infra* § III.E.

Each of these violations, standing alone, renders the Air Force's award "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). Simply put, the Air Force's award was premised on perceived technical and price differences between MSA's and Scott's proposal that exist only by virtue of the Air Force's departure from the RFP's evaluation scheme and its arbitrary evaluation of the offerors' proposals.

## II. ARGUMENT

### A. The Air Force Waived the RFP's Warranty and Maintenance Requirements for MSA.

The clearest instance of the Air Force's violation of the RFP is its failure to hold MSA to the RFP's mandatory Warranty and Maintenance requirements. Scott's Opening Brief established that the Air Force waived these requirements by allowing MSA to propose a [redacted]. Scott Br. § III.D. The Government and MSA respond by taking the position that MSA [redacted]. Gov't Br. at 18; MSA Br. at 24. The Government's position is that this [redacted] was implicit in MSA's proposal. Gov't Br. at 18.

Scott, the Government, and MSA all agree the RFP required offerors to provide a warranty that "conform[s] with all requirements of the contract." AR20; Gov't Br. at 18; MSA Br. at 23. The Parties further agree that one of the requirements with which warranties must comply is that "[t]he SCBA system shall be field maintainable," AR55, and that this requirement is not met if the Air Force is [redacted] Gov't Br. at 18; MSA Br. at 23-24.

MSA's proposed warranty, [redacted] AR558 [redacted] *Id.* The Government argues that Air Force personnel [redacted]

[redacted]

[redacted]

Gov't Br. at 18 (emphasis in the original).

The Government simply ignores MSA's proposal. Immediately following MSA's proposed warranty is a description of the [redacted] AR559-62 [redacted] Specifically, MSA included the [redacted] MSA [redacted]. AR562. In addition to the [redacted] fee, MSA's proposal states that the [redacted] includes an [redacted] AR561. MSA's proposal makes clear that [redacted] and will not be so [redacted] until (1) [redacted], AR521-28 [redacted] and (2) [redacted] AR560. But it does not end there—MSA [redacted] *Id.*

If the Air Force truly concluded that MSA's warranty [redacted] the Air Force did not read MSA's proposal. Gov't Br. at 18. MSA's warranty patently fails to "conform with all requirements of the contract," AR20, particularly the requirement that [redacted] AR55. The RFP did not allow offerors to choose whether to propose a warranty [redacted]; instead, both were mandatory requirements. Because MSA's proposal

makes its warranty [redacted] MSA's proposal is ineligible for award. *Alfa Laval, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999); *Beta Analytics Int'l Inc. v. United States*, 44 Fed. Cl. 131, 138 (1999).

*Tel-Instrument Electronics Corp. v. United States*, 56 Fed. Cl. 174 (2003) *aff'd mem. per curiam*, 87 Fed. Appx. 752 (Fed. Cir. 2004), is dispositve. The Court in that case ruled that an offeror was ineligible for award because it qualified its warranty by stating that "it would not 'warranty Test Set performance if the hardware, software, or firmware is modified by anyone but [Plaintiff] without its concurrence.'" 56 Fed. Cl. at 178. This qualification is [redacted] AR558. [redacted] As in *Tel-Instrument*, "[t]he terms of a warranty are a material part of a solicitation," and "[a] bidder's [redacted] 56 Fed. Cl. at 178 (citing *Genesis Gen. Contracting, Inc.*, B-225794, June 1, 1987, 87-1 CPD ¶ 550); *see also Dubinsky v. United States*, 43 Fed. Cl. 243, 268-69 (1999) (sustaining protest where awardee's proposed warranty failed to comply with requirements).

## B. The Air Force Failed to Evaluate Proposals According to the Most Current Industry Standard.

Although the warranty issue may be a clear instance of the Air Force's deviation from the RFP, the most prejudicial deviation was the Air Force's admitted failure to apply the most current industry standard in its evaluation of the offerors' proposals. As with the warranty issue, the Parties share significant common ground. Thus, the Parties agree that the RFP mandated

compliance with several industry standards listed in the Purchase Description, including the "Concept for Chemical, Biological, Radiological, and Nuclear (CBRN) Tight Fitting, Powered Air Purifying Respirator (PAPR) Standard" (the "Concept" or "CBRN PAPR standard"). AR 43; Gov't Br. at 2; MSA Br. at 7. The Parties further agree that, under the RFP, "[s]hould these existing standards be replaced by a newer numbered or titled standard, the most current standard shall always apply." AR43; Gov't Br. at 9; MSA Br. at 16.

The Parties also agree that, at the time that the RFP was issued, the "most current standard" was the June 2005 version of the Concept,[3] Gov't Br. at 9-10; MSA Br. at 8, but that it was anticipated that a new version of the Concept would be issued during the course of the procurement. Gov't Br. at 10; MSA Br. at 8, 16. A new version was in fact issued in November 2005 that "relaxed the flow rate requirements set forth in the earlier draft Concepts and eliminated all references to 'high' and 'moderate' breathing rates." Beebe Decl. ¶ 6; MSA Br. at 8; Scott Br. at 24.[4]

The Declaration of Laurie Beebe admits that the various standards were applied inconsistently to MSA and Scott. Notwithstanding the RFP's requirement that the most current standard "shall always apply," Ms. Beebe states that the Air Force "generally evaluated initial

[3] Scott's Opening Brief referred to the 2004 Concept, which was the standard expressly referenced in the Purchase Description. AR44; Scott Br. at 17-18. The Government and MSA are correct that the Concept was revised in June 2005; however, the "Breathing Performance" requirements did not materially change from the 2004 Concept to the June 2005 Concept. *Compare* App. 5-6 (2004 Concept) *with* App. 21-22 ¶ 4.3 (June 2005 Concept). Both Concepts required PAPRs to be tested under dynamic breathing conditions using a breathing machine at both a moderate and high breathing rate. *Compare* App. 6 ¶¶ 4.4.2-4.4.3 with App. 21-22 ¶¶ 4.3.2-4.3.3.

[4] The November 2005 Concept does not even have a section on "Breathing Performance," and does not require PAPRs to be tested against a breathing machine under dynamic breathing conditions. App. 36-45. Nor does the November 2005 Concept require PAPRs to maintain positive pressure in the mask, as the 2004 and June 2005 Concepts required. *Compare* App. 6 ¶

proposals against the June 20, 2005, draft concept," and then selectively applied the November 2005 Concept [redacted] Beebe Decl. ¶ 8; Gov't Br. at 11, 14. This is the epitome of unfairness—the Competition in Contracting Act ("CICA") mandates that proposals be evaluated "based solely on the factors specified in the solicitation," not generally. 10 U.S.C. § 2305(b)(1); FAR § 15.305(a).

Scott is not "trying to have it both ways," as the Government and MSA argue. MSA Br. at 20; Gov't Br. at 10. Under either Concept, the award to MSA cannot stand. Under the Concept that the Air Force "generally" applied in its initial evaluation—*i.e.*, the June 2005 Concept—MSA's proposal was [redacted] requirements. AR1042; *infra* § III.B.1; *Alfa Laval*, 175 F.3d at 1367-68. Under the Concept that the Air Force should have applied in its final evaluation—*i.e.*, the "most current" November 2005 Concept—Scott's proposal exceeded the Air Force's requirements in the critical area [redacted]. Scott Br. at 23-25; *infra* § III.B.2. The Air Force, however, never recognized these strengths, because the Air Force selectively applied the November 2005 Concept only [redacted] requirements but "stated it could comply with requirements set forth in the November 2005 draft concept." Beebe Decl. ¶ 8; Gov't Br. at 10-11. At no time was any one standard applied consistently to both MSA and Scott.

The revisions made to the Concept did indeed render it a "moving target." MSA Br. at 15; Beebe Decl. ¶¶ 5-6. It was for this very reason that the RFP stated, "[s]hould these existing standards be replaced by a newer numbered or titled standard, the most current standard shall

---

4.4.4 *with* App. 22 ¶ 4.3.4. For the Court's convenience, Scott has appended all three Concepts to this Reply.

always apply." AR43. When the target "moved," the Air Force had no choice but to apply the new Concept or to amend the RFP to state what other Concept would apply. 10 U.S.C. § 2305(b)(1); FAR § 15.206(a). The Air Force was not permitted to mix and match between the June 2005 and November 2005 standards on an offeror by offeror basis. 10 U.S.C. § 2305(b)(1); *OTI America Inc. v. United States*, 68 Fed. Cl. 646, 656-57 (2005) (sustaining protest where record shows inconsistent application of applicable evaluation rules); *BAE Tech. Servs.*, B-296699, Oct. 5, 2005, 2006 CPD ¶ 91 at *9 (sustaining protest where agency applied a more exacting standard in evaluating the adequacy of protester's proposal than it did the awardee's proposal).

**1. Evaluation of Initial Proposals Prior to Release of the November 2005 Concept—MSA's [redacted]**

The Air Force maintains that it dutifully applied the June 2005 Concept in its initial technical evaluation, which was completed by November 1, 2005, prior to the release of the November 2005 Concept. Beebe Decl. ¶¶ 7-8; AR2351 (report prepared by L. Beebe on Nov. 1, 2005); Gov't Br. at 10. As Scott explained in its Opening Brief, however, [redacted] does not [redacted] Scott Br. at 18-20.

Despite MSA's [redacted], the Air Force's initial technical evaluation inexplicably found that MSA submitted a compliant proposal and assigned MSA a "Blue" rating for Design Approach, meaning that MSA's proposal had strengths but "no deficiencies." AR33; AR2343; AR2351. At the time, then, the Air Force's

evaluation was patently unreasonable. *E.g., Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 402-03 (2005) (unreasonable for agency to award offeror maximum points where offeror clearly did not meet requirements); *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 55 (2005) (sustaining protest where award was based on misinterpretation of statements in proposal regarding compliance with requirements). Given MSA's [redacted], there was no reasonable basis for the Air Force to find that MSA's design approach met, let alone exceeded, the requirements applicable to the PAPR. AR33 (requiring "no deficiencies" as a condition precedent to a "blue" rating, and stating that proposals that do "not clearly meet some . . . requirements" will be assigned a "yellow" rating).[5]

The Government argues the Air Force reasonably accepted MSA's statement that [redacted] AR1042; Gov't Br. at 11. Rather than explain how this statement represents compliance with the [redacted], the Government argues that Scott was similarly curt [redacted] Gov't Br. at 13. The statements of Scott and MSA are not comparable: Scott provided a detailed [redacted] AR1160-61,[6] and then followed up with a

---

[5] Given the critical nature of the [redacted] to the procurement, MSA's failure to meet the [redacted] requirements was a material deficiency rendering its proposal "not awardable." AR33 (definition of "Unacceptable" rating); Air Force Mandatory Procedure ("MP") 5315.3 ¶ 5.5.1 ("If an offeror's proposal demonstrates a material failure to meet a government requirement, this is a deficiency in the offeror's proposal resulting in a Red/Unacceptable rating and the proposal is not awardable."), *available at* https://www.safaq.hq.af.mil/contracting/affars/5315/mandatory/MP5315.3.doc; AR 31 (incorporating MP5315.3 into the RFP). The Air Force therefore violated its own regulations and the RFP by failing to exclude MSA from the competition at the completion of the October 2005 evaluation.

[6] The Government ignores this response in its Opposition.

clear statement that [redacted] AR1124. MSA, by contrast, stated nothing more that it could [redacted] AR1042.[7]

If there were any doubt, MSA made clear that it had no intention of [redacted] November 2005 Concept: [redacted] AR1028. Inexplicably, the Government interprets this as a statement that "the existing [redacted] . . . currently meets the NIOSH draft standard." Gov't Br. at 12. Scott cannot fathom how [redacted] AR1028, translates into "currently meets," Gov't Br. at 12. Regardles, MSA provided [redacted] to the Air Force either before or after the November 2005 Concept was released [redacted] would, in fact, comply with that concept. *Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 17-18 (2000) (sustaining protest where awardee failed to submit information necessary to establish compliance with mandatory requirement).

### 2. The Air Force Conducted No Meaningful Evaluation of MSA's Proposal After the November 2005 Concept Was Issued.

As discussed above, the Parties agree that a new version of the Concept was issued shortly after the completion of the initial technical evaluation. Gov't Br. at 10. The Air Force acknowledges that the November 2005 version "relaxed certain requirements" including those concerned with [redacted] Beebe Decl. ¶¶ 6, 8; MSA Br. at 8. The Air Force,

---

[7] The Government offers no explanation how this satisfies the Air Force's obligation to conduct "a detailed and complete analysis of each offeror's proposal," AR32, or MSA's obligation to submit a "convincing rationale to address how the offeror intends to meet these requirements," AR27.

however, made no attempt to conduct "[a] detailed and complete analysis of each offeror's proposal" after the November 2005 Concept was released. AR 32. Nor does the record contain any evidence that the Air Force ever verified MSA's self-serving [redacted] once the terms of the 2005 Concept were finalized. To the contrary, the record shows that the Air Force performed no additional evaluation of MSA's proposal after the initial technical evaluation. AR1734 (Final Evaluation Worksheet dated 1/20/06: "The ratings above are based on the Government's evaluation of the offeror's initial technical proposal."). The Air Force's failure to confirm that MSA met the November 2005 Concept requires that the award to MSA be overturned. *Transatlantic*, 68 Fed. Cl. at 50, 53-55 (sustaining protest where agency failed to make a reasonable inquiry to ensure conformance with requirements).

Ms. Beebe attempts to salvage her evaluation by stating that, "during the final evaluation, where the November 4, 2005, draft Concept requirements varied from earlier drafts, if an offeror stated it could comply with requirements set forth in the November 2005 draft Concept, we considered the approach to be acceptable." Beebe Decl. ¶ 8; Gov't Br. at 11-12. Again, however, there is no record that the Air Force performed any "final evaluation" of MSA's proposal, or any other evaluation after the initial technical evaluation, and "[t]he Court cannot assume that an analysis was performed where the record indicates otherwise." *Al Ghanim Combined Group v. United States*, 56 Fed. Cl. 502, 514 (2003); *see* AR1734.[8] [redacted] regarding its design approach, AR1734, and MSA [redacted], AR416-24.

[8] Rather, the final evaluation was simply cut and pasted from the initial evaluation. *Compare* AR2343 *with* AR1492-93.

### 3. The Air Force Violated the RFP and Procurement Law by Mixing and Matching Requirements from the June and November 2005 Concepts [redacted].

Even assuming that Ms. Beebe is correct, and that the Air Force did apply the November 2005 Concept to rectify the deficiencies in MSA's [redacted], this was a blatant violation of the RFP that only benefited MSA. MSA's proposal [redacted], but Scott did not receive any consideration for the areas in which it exceeded the November 2005 Concept. 10 U.S.C. § 2305(b)(1); *Labat-Anderson Inc.*, B-246071, 71 Comp. Gen. 252, 258 (1992) (sustaining protest where agency failed to evaluate offerors under a particular subfactor in the RFP); *Cardkey Systems, Inc.*, B-239433, Aug. 27, 1990, 90-2 CPD ¶ 159 at *3 (protest sustained where agency failed to consider features in protester's proposal that RFP had informed offerors were desirable). Indeed, nothing in Ms. Beebe's Declaration or the Administrative Record remotely suggests that Scott's proposal was evaluated against the November 2005 Concept on any issue.

The Government suggests, without support, that Scott received the benefit of the November 2005 Concept with respect to [redacted]. Gov't Br. at 14 [redacted] But even assuming that this is correct—which it is not—it does not change the fact that the Air Force failed to apply one standard consistently to both offerors. Scott was entitled to have its entire proposal evaluated under the "most current standard," not just one aspect of that proposal. AR43. Because the Air Force concedes that this was not done, Beebe Decl. ¶ 8, the award to MSA should be overturned. *Labat-Anderson*, 71 Comp. Gen. at 258; *Cardkey Systems*, 90-2 CPD ¶ 159 at *3.

The record shows that Scott received no benefit from the November 2005 Concept. Scott's [redacted] addressed Scott's efforts to [redacted] while still complying with the [redacted] requirements under the June 2005 Concept. AR1161; AR 1124. [redacted] Scott went on to discuss potential [redacted] that would be possible under the November 2005 Concept. AR1124. Scott never indicated that its present compliance was based on the November 2005 Concept, nor did Scott ever receive evaluation credit for the ability to achieve [redacted] under that Concept. Instead, the Final Technical Report only acknowledged that Scott meets the [redacted] requirements. AR1495.

Otherwise, the discussion of Scott's design approach in the January 4, 2006 Final Technical Evaluation Report repeats the evaluation documented in the Initial Technical Evaluation, prepared on November 1, 2005. *Compare* AR1495-96 *with* AR2345-46. Clearly, no evaluation of Scott's proposal was performed against the November 2005 Concept. But as Ms. Beebe explains, the November 2005 Concept "relaxed the [redacted] requirements set forth in the earlier draft Concepts and eliminated all references to [redacted] Beebe Decl. ¶ 6. By applying the June 2005 Concept rather than the November 2005 Concept, the Air Force failed to consider Scott's [redacted] *See* Scott Br. 24.

The RFP required, and Scott was entitled to, an evaluation of these strengths. AR31-33; *Labat-Anderson*, 71 Comp. Gen. at 258. The Air Force's failure to apply the current, 2005 Concept during the evaluation of Scott's proposal therefore caused the Air Force to ignore significant areas of Scott's proposal that far exceeded the requirements of the RFP to Scott's prejudice. *Mine Safety Appliances Co.*, B-238597.2, July 5, 1990, 90-2 CPD ¶ 11 at *5

(sustaining protest where, after reviewing the individual evaluators' scores and worksheets, the GAO determined that the agency had evaluated inconsistent with the solicitation evaluation scheme).[9]

At no time was any one standard applied consistently to both MSA and Scott. Instead, the Air Force "generally evaluated initial proposals against the June 20, 2005, draft concept," and then selectively applied the November 2005 Concept [redacted]. Beebe Decl. ¶ 8. By doing so, the Air Force violated the RFP and fundamental principles of procurement law. 10 U.S.C. § 2305(b)(1); *OTI America*, 68 Fed. Cl. at 656-57; *Lockheed Martin Info. Sys.*, B-292836, et al., Dec. 18, 2003, 2003 CPD ¶ 230 at *8 (protest sustained where the agency applied a more exacting review of the protester's proposal than the wardee's proposal.).

**4. If the Beebe Declaration Is a Reasonable Interpretation of the "Most Current Standard" Provision, It Exposes a Latent Ambiguity in the RFP.**

For the reasons discussed above, Scott submits that Ms. Beebe's interpretation of the RFP's requirement that "the most current standard shall always apply" is unreasonable. AR43. By its terms, the RFP contemplated the application of one standard to both offerors, and did not leave the Air Force with discretion to pick and choose which aspect of which standard would

---

[9] MSA asserts that Scott made a "business decision in hope of receiving extra credit from the Air Force" when Scott submitted a design approach capable of satisfying the June 2005 Concept, and did not revise its design after the November 2005 Concept was issued. MSA Br. at 20. But that is the point—the RFP encouraged Scott to propose a solution that "[e]xceeds specified minimum performance or capability," and informed Scott that it would be evaluated favorably if it did so. AR33. Indeed, the Air Force stated that reason it used formal competitive procedures was "[b]ecause the Government wants the opportunity to give credit to a proposal for a SCBA that offers more than the mandatory requirements." AR1708. As such, Scott had a legally justified expectation that the Air Force would at least attempt to evaluate areas in which its proposal exceeded the "most current" Concept. AR 43; 10 USC § 2305; FAR §§ 15.304(d) & 15.305(a).

apply to a particular offeror. At the very least, however, Scott's interpretation that one standard be applied to both offerors was reasonable. Accordingly, to the extent that the Court finds Ms. Beebe's interpretation of the RFP also to be reasonable, the RFP necessarily is ambiguous. *Metcalf Construction Co. v. United States*, 53 Fed. Cl. 617, 628-28 (2002) ("Ambiguity arises when some portion of the contract is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." (internal quotation omitted)).

The Court must therefore determine whether the ambiguity was latent or patent. If latent, the Court must cancel the award to MSA because "the rule of *contra proferentem* puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party"—in this case, the Air Force. *Id.* at 629. An ambiguity is considered latent where "it is subtle, or otherwise undetectable, until such time as the parties reasonably ascribe two different meanings." *Id.* Conversely, an ambiguity is deemed patent when it is "obvious, gross, glaring, or substantial." *Id.* Applying these standards to the facts of this case, the Air Force's understanding that different aspects of the two Concepts would apply to different aspects of each offerors' proposal could not possibly have been apparent to Scott from the face of the RFP. Certainly, that understanding was not "obvious, gross, [or] glaring." *Id.* Because Scott reasonably concluded that one standard—"the most current standard," AR43—would govern this procurement, any ambiguity is latent and Scott's reasonable interpretation should prevail. *Id.*

As in *The Arora Group, Inc.*, Comp. Gen. B-288127, Sept. 14, 2001, 2001 CPD ¶ 154 at * 10, the RFP led "offerors to make different, yet reasonable, assumptions with respect to the Army's requirements . . . and, thus, did not permit competition on an equal basis." The remedy for this defect is to reopen the competition to allow the offerors to compete with full knowledge of the standards against which their proposals will be held. *Metcalf*, 53 Fed. Cl. at 646; 10

U.S.C. § 2305(a)(2)(a) (requiring agencies to clearly identify all specifications and evaluation factors).

**C. <u>The Air Force Changed the Terms, Conditions, and Evaluation Factors of the RFP by Accepting and Evaluating MSA's</u> [redacted]**

Neither the Government nor MSA have rebutted Scott's showing that the Air Force accepted and evaluated [redacted] and other [redacted] that were not permitted by the by the RFP. Scott Br. § III.B. Scott, the Government, and MSA all agree that the [redacted] and [redacted] submitted by MSA had no place in the RFPs evaluation. Scott Br. at 12-13; Gov't Br. at 8-9. MSA explains it best:

[redacted]

MSA Br. at 5 (first emphasis in original).

Notwithstanding this simple evaluation scheme, there is no dispute that MSA submitted a [redacted] AR 1095. Accordingly, there is no dispute that the RFP was violated when these materials were submitted by MSA and accepted by the Air Force. Nor do the Government and MSA dispute that the Air Force failed to reject the improper submissions or modify the terms of the solicitation to provide all bidders the opportunity to compete on a level playing field. *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003) (agency improperly failed to inform all offerors of a the ability to waive a technical requirement which it had waived for the awardee); *ITT Electron Tech. Div.*, B-242289, Apr. 18, 1991, 91-1 CPD ¶ 383 at * 6-7.

The only area of dispute concerns what the Air Force did with these materials after it accepted them. The Government reaches outside the written record created by the Air Force and presents the Declaration of Air Force Engineer Laurie Beebe that "the Air Force did not evaluate these [redacted] or [redacted] submitted by MSA." Beebe Decl. ¶ 4. In other words, the Government argues "no harm no foul," notwithstanding the undisputed deviation from the RFP.

The contemporaneous record prepared by the Air Force belies the *post hoc* litigation testimony of Ms. Beebe. That record reveals that both MSA and Interspiro submitted [redacted], and that MSA specifically submitted its [redacted] and [redacted]. AR1095; AR28. Ms. Beebe, along with an Air Force Contracting Specialist, accepted these items, including a [redacted] from MSA, and other [redacted] of the MSA and Interspiro proposals. AR 2417-18; 2421-22. The record reveals that two Air Force evaluators considered aspects of MSA's [redacted] in their written evaluation of MSA's [redacted] AR2244; AR2259.[10] MSA's [redacted] was referred to by one evaluator under the [redacted]. AR2246.

The Government argues that the evaluators' comments regarding the MSA [redacted] were derived from MSA's proposals, and were therefore "not an evaluation of its [redacted] or

10 [redacted]

review of its [redacted]." Gov't Br. at 8-9. This unsupported assumption misses the point. The evaluators noted [redacted] AR2244. By their own words, the evaluators considered aspects of the [redacted] in conducting their evaluation, contrary to the terms of the solicitation. It defies common sense for the Government and MSA, having conceded that the RFP precludes consideration of MSA's [redacted], to then argue that consideration of that very [redacted] was permissible because MSA also wrote about it in its proposal.

The RFP provided that the evaluation of offerors' design approaches was to be based on each offeror's written narrative, not on [redacted]. AR 28-29; AR32; MSA Br. at 5. MSA sought to gain an advantage by providing a [redacted] and [redacted] under the guise of its [redacted] submissions, and referring to the [redacted] in its [redacted] narrative. AR 1014; AR1031. This was done in order to demonstrate a [redacted], where offerors complying with the RFP, like Scott, were only permitted to demonstrate [redacted]. MSA succeeded—the record establishes that the Government had knowledge of the [redacted] and [redacted] and that the primary technical evaluator, Ms. Beebe, had physical interaction with them, and the Air Force's consideration of MSA's [redacted] is documented. Beebe Decl.¶ 4; AR2244; AR2259.

Whatever sense of the word "evaluate" Ms. Beebe may have intended, the dictionary definition of "evaluate" is "to consider or examine something in order to judge its value, quality, importance, extent, or condition." ENCARTA WORLD ENGLISH DICTIONARY, http://encarta.msn .com/dictionary_/_.html. The evaluators comments on the record show that they "considered or examined" the [redacted], including whether the [redacted]

[redacted] AR2244; *cf. ACRA, Inc. v. United States*, 44 Fed. Cl. 288, 284 n.9 (1999) (applying dictionary definition of the word "function").

When the Air Force decided to retain the noncompliant submissions, the law required it to modify the terms of the solicitation to provide the same opportunity to the other offerors to submit their [redacted]. 10 U.S.C. § 2305(b)(1) (requiring agencies to "evaluate . . . competitive proposals . . . based solely on the factors specified in the solicitation"); FAR § 15.206(a) ("When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation."). By not doing so, the Air Force violated bedrock principles of procurement law "that all offerors must possess equal knowledge of the same information in order to have a valid procurement,'" *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (quoting *Logicon, Inc. v. United States*, 22 Cl. Ct. 776, 788 (1991)), and that "'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition.'" *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 652 (2003) (quoting *Dubinsky v. United States*, 43 Fed. Cl. 243, 259 (1999)).

**D. The Air Force Failed to Evaluate Critical Risks of MSA's Proposal and Treated the Offerors Unequally in its Price Evaluation.**

Scott argued in its Opening Brief that that the Air Force failed to evaluate the increased costs and other risks associated with (1) MSA's warranty, (2) life-cycle costs associated with MSA's proposal, and (3) MSA's reliance on a [redacted] Scott Br. § III.E. Scott agrees with the Government and MSA that the evaluation of risk with respect to MSA's warranty turns largely on the Court's resolution of the issues discussed in Sections II.A of this Brief. Gov't Br. at 19; MSA Br. at 25. The parties agree that,

if the Air Force must incur increased costs [redacted], those costs were not evaluated. Scott will therefore stand on the arguments made in its Opening Brief and in Section II.A of this Reply regarding the effect of MSA's warranty.

The same holds true for Scott's argument that the Air Force performed an unequal price evaluation. Scott Br. § III.E.2. If MSA's warranty [redacted] by the RFP, then the Air Force necessarily failed "to evaluate offerors on an equal basis and in a manner such that the total cost to the government for the required services can be meaningfully assessed." *SOS Interpreting, Ltd.*, B-293026, Jan. 20, 2004, 2004 CPD ¶ 26 at *9. Where a source selection decision is based on figures that do not reasonably represent the difference in costs to be incurred under competing proposals, the source selection is not reasonably based. *E.g.*, *Preferred Sys. Solutions, Inc.*, B-292322, Aug. 25, 2003, 2003 CPD ¶ 166 at *7-8. Again, the Government and MSA stand by their argument that MSA's warranty [redacted] and Scott will stand on its argument to the contrary.

With respect to "life-cycle costs," the Government concedes that these costs were not evaluated, arguing instead that "[t]he assessment of proposal risk was not related to any consideration of life cycle cost, and to do so would have violated the rules of the RFP." Gov't Br. at 19. The Government's and MSA's position is that, because the term "life-cycle costs" was not mentioned in the RFP, the Air Force was precluded from evaluating these costs. *Id.*; MSA Br. at 27 n.6. These arguments, however, ignore the plain, broad language of the RFP, which stated that the Proposal Risk evaluation would "include[] an assessment of the potential for . . . increased cost." AR33. "Life-cycle costs" simply refers to "the total cost to the Government of

acquiring, operating, supporting, and (if applicable) disposing of the items being acquired." FAR § 7.101. These costs fit squarely within the phrase "increased costs" as used in the RFP.

MSA cites two GAO decisions for the proposition that an agency must advise offerors that life-cycle costs will be considered. MSA Br. at 27 n.6. But the RFP in this case did just that, stating that the Air Force would evaluate the "potential for… increased costs." AR33. The solicitations in *Marquette Medical Systems, Inc.*, B-277827, Apr. 29, 1999, 99-1 CPD ¶ 90, and *Eastman Kodak Co.*, B-194584, Aug. 9, 1979, 79-2 CPD ¶ 105, contained no such statement and are therefore entirely distinguishable. Indeed, because this is a fixed-price contract, "increased costs" necessarily refers to life-cycle costs. MSA is bound by the price in its proposal, so the only potential for increased cost to the Government concerns the costs of "operating, supporting, and (if applicable) disposing of the items being acquired." FAR § 7.101.

There is no dispute that MSA's proposal carries [redacted]. MSA explicitly warned the Air Force that its proposed [redacted] and that a [redacted] was necessary that would entail [redacted] AR1042. This warning has nothing to do with the price the Air Force will pay to MSA, it is entirely concerned with [redacted] independent of the SCBA Contract. The Air Force, however, has no idea how "significant" these costs will be because the Air Force entirely failed to recognize or evaluate them.[11] Unlike MSA, [redacted]

---

[11] MSA provided [redacted], notwithstanding the RFP's requirement that offerors "identify[] those aspects of the proposal considered to involve cost . . . risk," and "includ[e] quantitative estimates of the impact on cost." AR27; *Mangi*, 47 Fed. Cl. at 17-18 (sustaining protest where awardee failed to submit information required by the instructions in the proposal).

Scott were awarded a contract.[12] In fact, Scott specifically addressed how its proposal "minimizes total Life Cycle Costs." AR1363. Again, however, Scott received no credit relative to MSA for these aspects of its proposal because the Air Force never evaluated them.

Finally, the Government and MSA cite to no evidence of any evaluation of MSA's reliance [redacted] to develop and produce the [redacted] for MSA's proposal. [redacted]

---

[12] MSA's discussion of Scott's risk matrix misses the point. Scott referred to increased costs that Scott would have to absorb under the fixed-price contract, not increased life-cycle costs that [redacted] independently from that contract.

[13] [redacted]

As Scott explained in its Opening Brief, "[a]n agency's decision can be found to be arbitrary and capricious where the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Scott Br. at 29 (citing *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 766 (2006) quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Here, there is no evidence in the record that the Air Force recognized—let alone considered (1) the increased costs that the Air Force must necessarily incur to comply with MSA's requirement that [redacted]; (2) the life-cycle costs that MSA [redacted]; or (3) the true cost of ownership for each offeror's proposed solution. The Air Force's failure to consider these critical Proposal Risk issues undermines this procurement. *E.g.*, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 732-743 (2000); *cf. CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 101 (2006) (sustaining override protest where agency "failed to consider several relevant factors," particularly the risk of increased costs associated with the agency's decision).

**E. <u>The Air Force Departed From the Evaluation Process in the RFP and Treated the Offerors Unequally, and These Violations of Procurement Law Render the Air Force's Source Selection Decision Irrational.</u>**

A "fundamental principle of government procurement . . . [is] that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." *Gentex*, 58 Fed. Cl. at 653 (citation omitted). Scott's Opening Brief demonstrated that the Air Force did not equally apply the evaluation factors regarding the definitions for the adjectival color ratings established for the SCBA procurement. Scott Br. § III.F. Scott cited specific

examples where the Air Force failed to give credit for evaluated strengths in Scott's proposal that were identical to strengths associated with MSA's proposal. *Id.* at 35, 37.

Notably, the Government did not respond at all to this argument. The Government did not address the Air Force's failure to consider whether areas of Scott's proposal should have been rated [redacted]. Scott Br. at 34-35. It did not question any of the specific examples of inconsistent treatment of Scott and MSA. *Id.* at 35, 37. Nor did it take issue with any of the cases cited by Scott that hold that a source selection decision based on inconsistent and unequal treatment cannot stand. *Id.* at 36. The Air Force's silence on these matters can only be taken as concurrence with the positions advanced by Scott.

MSA does attempt a response, arguing that Scott's evaluated strengths do not compare to the strengths of MSA's proposal, but cannot cite any record evidence that the SSA considered Scott's strengths. MSA Br. at 32-37. As one example of the strained distinctions MSA attempts to draw, MSA argues: [redacted] MSA Br. at 35. But MSA ignores the evaluators' notes that Scott's [redacted] and its [redacted] AR2272, that [redacted] AR2276, and that [redacted] AR2284.

MSA attempts to perform the analysis that the SSA should have done, and, not surprisingly, does so in a manner that twists the record to favor its own proposal. With respect to [redacted] AR1888, a strength that the SSA found significant in his selection decision but which Scott's proposal

shared, AR2317-18, MSA goes so far as to criticize Scott for citing to an evaluator's documented conclusions rather than Scott's proposal. MSA Br. at 34. Scott, however, is not asking the Court to evaluate proposals—Scott only requests that the Court order the Air Force to conduct the comparison and tradeoff it should have performed in the first place. The RFP and procurement law entitle Scott to have this analysis performed by the SSA, not MSA. FAR § 15.308.[14]

The record shows that the SSA never considered Scott's strengths but rather mechanically relied on MSA's "Blue" ratings in Mission Capability. The SSA emphasized that [redacted] AR1888; *accord* AR1887 [redacted] The SSA's reliance on MSA's "Blue" ratings, however, is improper and irrational for several reasons, not the least of which is that MSA's proposal failed to comply with mandatory technical requirements in the RFP, thereby precluding a "Blue" rating altogether. *See supra* §§ II.A & II.C; *Transatlantic*, 68 Fed. Cl. at 55; *Beta Analytics*, 67 Fed. Cl. at 402-03.

Moreover, MSA was the only offeror to receive "Blue" ratings because the Air Force never fully [redacted] Scott Br. at 34-35. The Initial Technical Evaluation Report identified a number of areas where Scott's proposal exceeded the minimum requirements, but [redacted]. AR2344-46. [redacted] AR1494-1495, but the Air

14 [redacted]

Force never took the next step required by the RFP—determine whether Scott's evaluated strengths "[e]xceed[]… minimum performance or capability Requirements in a way beneficial to the Government." AR33. [redacted].

Finally, the SSA's mechanical reliance on MSA's "Blue" ratings is unreasonable because Scott shared several identical evaluated strengths with MSA but failed to receive credit for them:

[redacted]

[redacted]

[redacted]

*See Magnum Medical Personnel, A Joint Venture*, B-297687.2, June 20, 2006, 2006 CPD ¶ 99 at *7 (sustaining protest where record did not explain why similarities in offerors' proposals were treated differently).

Similarly, the SSA could not reasonably rely on the fact that [redacted] AR1887. As discussed above, MSA's proposal identified multiple areas where increased costs were certain to accrue to the Air Force, thereby precluding a "Low" risk rating. *Supra* § II.D. Nor could the SSA rationally rely on the

conclusion that there was only a [redacted] (AR1888) price difference between MSA's and Scott's proposals, since this figure does not reflect the price that MSA will charge the Government for [redacted] on MSA's SCBAs or to [redacted] *supra* § II.A, or the life cycle costs MSA told the Air Force [redacted], *supra* § II.D. For all of these reasons, the award to MSA cannot stand.

As Scott has demonstrated, the Air Force's underlying evaluation was erroneous, and thus the source selection decision made in reliance on this evaluation is itself flawed and irrational. The evaluation of offerors' proposals, and the determination as to which proposal represents the best value to the Government, must be based on complete and consistent evaluations of the offerors' proposals. Because that has not occurred in this case, the best value decision is itself flawed and unreasonable. *See Keeton Corrections, Inc.*, B- 293348, Mar. 4, 2004, 2005 CPD ¶ 44 at *5 ("A source selection decision based on inconsistent or inaccurate information concerning the technical… or the relative merits of the offerors' technical proposals or past performance is not reasonable."); *New Breed Leasing Corp.*, B-259328, Mar. 24, 1995, 96-2 CPD ¶ 84 at *3-5 (source selection was flawed because the SSA was provided information that contained errors concerning protester's ratings, failed to accurately represent accurate data, and provided conclusions about technical differences that were inconsistent with the evaluation record and the offerors' proposals).

## III. CONCLUSION

The Air Force's deviation from the requirements, terms, conditions, and evaluation factors set forth in the RFP deprived Scott of the opportunity to compete on a level playing field with MSA. Each of the violations of the RFP and procurement law discussed above renders the Air Force's award "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). The Air Force's award was premised on perceived technical and price differences between MSA's and Scott's proposal that exist only by virtue of the Air Force's departure from the RFP's evaluation scheme and its arbitrary evaluation of the offerors' proposals. Accordingly, Scott respectfully requests that the Court grant Scott's Motion for Judgment on the Administrative Record.

Respectfully submitted,

s/Rand L. Allen
by Daniel P. Graham
Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-3193 (O); (202) 719-7049 (F)
rallen@wrf.com

*Counsel for Plaintiff*

July 7, 2006

Of counsel:
John A. McCullough
Daniel P. Graham
William J. Grimaldi
WILEY REIN & FIELDING LLP

Bruce S. Ramo
TYCO INTERNATIONAL, LTD.
9 Roszel Road
Princeton NJ 08540
(609) 720-4306 (O); (609) 720-4335 (F)

## APPENDIX – TABLE OF CONTENTS

1. October 2004 NIOSH Concept .......... 1
2. June 2005 NIOSH Concept .......... 19
3. November 2005 NIOSH Concept .......... 36